PATRICK J. CAIN (SBN 105331)
**SMITH, GAMBRELL & RUSSELL, LLP**
444 South Flower Street Suite 1700
Los Angeles, California 90071
Telephone: 213-358-7200
Facsimile: 213-358-7300

DANA M. RICHENS (PRO HAC VICE)
**SMITH, GAMBRELL & RUSSELL, LLP**
1105 W. Peachtree St. NE, Suite 1000
Atlanta, Georgia 30309
Telephone: 404-815-3659
Facsimile: 404-685-6959

Email: pcain@sgrlaw.com
drichens@sgrlaw.com

Attorneys for Plaintiff
BJB ELECTRIC LP

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO**

| | |
|---|---|
| BJB ELECTRIC LP,<br><br>        Plaintiff,<br><br>vs.<br><br>BRIDGELUX, INC.,<br><br>        Defendant.<br><br>BRIDGELUX, INC.,<br><br>        Counter-Claimant,<br><br>vs.<br><br>BJB ELECTRIC LP,<br><br>        Counter-Defendant. | Case No. 3:22-cv-01886-RS<br><br>**PLAINTIFF BJB ELECTRIC LP'S NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>**[FILED CONCURRENTLY WITH DECLARATION OF DANA M. RICHENS]**<br><br>Date: Date:      July 27, 2023<br>Time: Time:      1:30 p.m.<br>Place: Courtroom:  3 |

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD**

**PLEASE TAKE NOTICE** that on July 27, 2023, at 1:30 p.m., or as soon thereafter as the matter may be heard, in Courtroom 3 of the United States District Court for the Northern District of California, located at 450 Golden Gate Avenue, San Francisco, CA 94012, before the Honorable Richard Seeborg, Plaintiff BJB Electric LP ("BJB Electric") will and hereby does move the Court for partial summary judgment on the issue of the liability of Defendant Bridgelux, Inc. ("Bridgelux") for its failure to meet the Minimum Requirement provision of the March 21, 2016 Letter Agreement between the parties.

BJB Electric's motion is made on the following grounds:

1) Rule 56 of the Federal Rules of Civil Procedure provides that a party may move for summary judgment on a claim or part of a claim, and that the court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

2) The language of the subject Letter Agreement is unambiguous, and the only reasonable interpretation thereof is that Bridgelux failed to meet the Minimum Requirement provision of the contract.

3) Alternatively, the language of the subject Letter Agreement is ambiguous but the parol evidence is not in conflict and supports BJB Electric's claim that Bridgelux failed to meet the Minimum Requirement provision of the contract.

BJB Electric's motion is based on this Notice of Motion, the attached Memorandum of Points and Authorities, the accompanying Declaration of Dana M. Richens, the papers on file in this action, and such further evidence, submissions and other matters as may be considered by the Court.

DATED: June 22, 2023        SMITH, GAMBRELL & RUSSELL, LLP

By:   */s/ Dana M. Richens*
       Patrick J. Cain
       Dana M. Richens
       Attorneys for
       BJB ELECTRIC LP

# **TABLE OF CONTENTS**

Page

INTRODUCTION ........................................................................................................................ 1

I.  STATEMENT OF RELEVANT FACTS .......................................................................... 1

A. The Parties .............................................................................................................. 1
B. The Letter Agreement ............................................................................................ 1
C. Disappointing Demand for Holders ....................................................................... 3
D. P.O. 0801-01 .......................................................................................................... 4

II.  ARGUMENT AND CITATION OF AUTHORITY ......................................................... 5

A. Legal Standard ....................................................................................................... 5
B. The Letter Agreement is Unambiguous and Supports BJB Electric's Position ............................. 6

1. P.O. 0801-01 Is Not an "Order" at All .................................................................. 6
2. BJB Electric Did Not Accept the Purchase Order on Which Bridgelux Relies ............................. 8

C. If the Letter Agreement is Ambiguous, Then Parol Evidence Supports BJB's Position ............... 8

1. Both Parties Understood at the Time of Execution of the Letter Agreement Why
   the 15 Million Units Were to Be Delivered During the Cost Sharing Period ................................ 9
2. The Parties' Course of Performance Demonstrates the Inappropriateness
   of the Six-Year Delivery Window of P.O. 0801-01 ....................................................... 11

CONCLUSION ........................................................................................................................... 12

# TABLE OF AUTHORITIES

**Cases**                                                                                                         **Page**

Digital Envoy, Inc. v. Google, Inc.,
 No. 5:04-cv-1497 RS, 2006 WL 8442984
 (N.D. Cal. Jan. 24, 2006)......................................................................................................6

Lopez v. Smiths Detection, Inc.,
 Case No. 3:20-cv-01453-RBM-WVG, 2023 WL 2904756
 (S.D. Cal. March 16, 2023)...................................................................................................6

Republic Bank v. Marine Nat'l Bank,
 45 Cal. App. 4th 919 (1996)..................................................................................................6

Rosenfeld v. Abraham Joshua Heschel Day School, Inc.,
 226 Cal. App. 4th 886 (2014)................................................................................................9

Walter E. Heller Western, Inc. v. Tecrim Corp.,
 196 Cal. App. 3d 149 (1987).................................................................................................6

**Statutes**

Cal. Civ. Proc. Code § 1856(c) ....................................................................................................9

Cal. Civ. Proc. Code § 1856(g) ....................................................................................................9

Cal. Civ. Proc. Code § 1860..........................................................................................................9

Fed. R. Civ. P. 56(a) ......................................................................................................................5

SMITH, GAMBRELL & RUSSELL, LLP
444 SOUTH FLOWER STREET, SUITE 1700
LOS ANGELES, CALIFORNIA 90071
TELEPHONE: 213-358-7200

# MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

This litigation concerns a March 21, 2016 Letter Agreement between the Plaintiff, BJB Electric LP ("BJB Electric"), and the Defendant, Bridgelux, Inc. ("Bridgelux"). Both companies are active in the lighting industry. The Letter Agreement concerns Bridgelux's purchase from BJB Electric of customized "Holders" for Bridgelux's light-emitting diode, or "LED," products.

The principal issue in the case is whether Bridgelux satisfied a 15-million-unit Minimum Requirement provision of the Letter Agreement. BJB Electric contends that Bridgelux failed to satisfy the Minimum Requirement provision of the Letter Agreement and thus BJB Electric is entitled to liquidated damages under the Letter Agreement, or, alternatively, its actual damages. For its part, Bridgelux likely will contend in a cross-motion that it satisfied the Minimum Requirement provision of the Letter Agreement.

BJB Electric is moving for partial summary judgment on liability – that is, it seeks a ruling that Bridgelux failed to satisfy the Minimum Requirement provision of the Letter Agreement. Because there are disputed factual issues as to the nature and amount of resulting damages to which BJB Electric is entitled, BJB Electric does not move for summary judgment on the issue of damages, reserving that issue for trial.

## I.   STATEMENT OF RELEVANT FACTS

### A.   The Parties

BJB Electric supplies components for lighting manufacturers, such as bulb, or "lamp," holders, LED connectors, LED holders and other related products. (Deposition of Joseph Laufer ("Laufer Depo.,"), excerpted at Ex. 1 to Declaration of Dana M. Richens ("Richens Decl."), p. 35.)

Bridgelux designs, manufactures and sells LEDs for indoor and outdoor lighting applications to large lighting manufacturers. (Deposition of Timothy W. Lester ("Lester Depo."), excerpted at Ex. 2 to Richens Decl., pp. 18-19.)

### B.   The Letter Agreement

In October of 2015, Bridgelux was looking for a manufacturer of a holder for its Vero 2.0 product series, which Bridgelux would market as the "Vero SE" series. (Id., p. 24.) The Vero 2.0 was

to be an integrated holder and LED "chip on board" product with "poke-in" holes for ease of wiring and attachment to the lighting fixture.  (Id., pp. 22, 27; see Exhibit 3 to Richens Decl. (page from Bridgelux website, accessed June 20, 2023, showing images, features and specifications of Vero SE products.)   It would also be compliant with "Zhaga," an industry standard that was beginning to be followed in Europe by lighting fixture manufacturers.  (Lester Depo., p. 22.)  A predecessor Vero product line required soldering to accomplish the electrical connection between the LED and the lighting fixture, and was not Zhaga-compliant.  (Id., p. 23.)

The Vero 2.0 product line would have different sizes, depending on the number of LEDs in the array.  (Id., p. 26.)  For example, the "Vero 10" was an array with 10 LEDs.  (Id., pp. 26-27.)

Bridgelux approached BJB Electric, known by Bridgelux to have a good reputation in the industry as a high-end manufacturer, regarding providing holders for the Vero 2.0 product series ("Holders")(Id., p. 30.)

The result of negotiations between the parties was the subject March 21, 2016 Letter Agreement (the "Letter Agreement") regarding the development and supply of Holders for the Vero 2.0 product series.  A true and correct copy of the Letter Agreement is found at Exhibit 4 to the Richens Decl.

Article 2 of the Letter Agreement provides as follows:

> If BJB is awarded the Holder Project (i.e., Bridgelux designates BJB as the supplier of the Holder), such units will be purchased by Bridgelux (or its designated contract manufacturer) under its purchase order at the pricing designated under Schedule A. However, if BJB fails to obtain orders for at least 15 million units ("Minimum Requirement") of the Vero 2.0 Holder within 4 years after "First Availability" of the Vero 2.0 Holder ("Cost Sharing Period"), Bridgelux agrees that it or its contract manufacturer will purchase the "Shortfall Quantity" of such Vero 2.0 Holders at the pricing designated under Schedule A ($0.08 per unit) pursuant to a Bridgelux purchase order.  Bridgelux (or its designated contract manufacturers) purchase order(s) will become mutually binding upon BJB's written confirmation to Bridgelux of said purchase order(s).  The "Shortfall Quantity" is the difference between the Minimum Requirement and the number of Vero 2.0 Holders ordered ("Ordered Holders") during the Cost Sharing Period.  "First Availability" is the date that "Shippable Holders" are available for sale and shipment by BJB (with such availability then indicated via written confirmation from BJB to Bridgelux).  "Shippable Holders" are the production version of Vero 2.0 Holders which are then available for sale and shipment.

Letter Agreement, art. 2.

On or about March 23-24, 2016, the parties amended Schedule A of the Letter Agreement to correct the language of the Letter Agreement. The correction confirms that in the event of a shortfall, Bridgelux would not actually "purchase" the Shortfall Quantity, as the above excerpt states, but would merely pay "[c]ompensation," *i.e.*, liquidated damages, of $0.08 per shortfall unit. (Ex. 5 to Richens Decl.; Lester Depo., pp. 56-57.)

Thus, under the Letter Agreement, as amended, Bridgelux would purchase Holders from BJB Electric. If BJB Electric "fail[ed] to obtain orders" for 15 million Holders – the "Minimum Requirement" – within a four-year Cost Sharing Period,[1] then Bridgelux would pay to BJB Electric liquidated damages in the amount of $.08 per unit of shortfall (the "Shortfall Quantity").

The four-year Cost Sharing Period began in October of 2016. (Lester Depo., p. 62.) Bridgelux placed purchase orders for Holders with BJB Electric. An example of a standard purchase order from Bridgelux to BJB Electric during the Cost Sharing Period is found at Exhibit 6 to the Richens Decl. This purchase order shows a single order for several thousand units of each model of the Holder, with a delivery date approximately one month after the date of the purchase order. (Richens Decl., Ex. 6; Lester Depo., pp. 60-61.) Payment terms are net 60, meaning that the Holders will be paid for 60 days after delivery. (Richens Decl., Ex. 6; Lester Depo., p. 61).

**C.     Disappointing Demand for Holders**

During the four-year Cost Sharing Period, Bridgelux fell behind what it had expected at the time of execution of the Letter Agreement that its purchases of Holders would be. (Lester Depo., pp. 62-63.) Bridgelux's then-president Tim Lester attributes this to several factors. First, because the Vero 2.0 product line was Zhaga compliant, it was designed for manufacturers in the U.S. and Europe; however, fixture manufacturing was shifting from the U.S. and Europe to lower-cost manufacturing sites in eastern Europe and China, which posed a threat to the Vero 2.0 project. (Id., p. 40-41, 63.) Although Bridgelux expected the Vero SE product to be very well received in Europe, it was not. (Id., p. 63.) The amount of fixture manufacturing in western Europe decreased faster than what Bridgelux had expected. Id. Other problems included the threat of a 25 percent tariff. (Id., p. 63.) Additionally, near the end of the four-year period, the COVID-19 pandemic first

---

[1] This obligation is referred to herein as the "Minimum Requirement provision."

disrupted Bridgelux's supply chain, and then stopped development activity at fixture manufacturers in the U.S. and Europe. (Id., 64.)

### D.     P.O. 0801-01

In the summer of 2020, BJB raised with Bridgelux the fact that the end of the four-year Cost Sharing Period was approaching (in October of 2020). (Id., pp. 65-66.) Bridgelux had ordered only approximately two million Holders (Id., p. 68) – far short of the 15-million-unit Minimum Requirement under the Letter Agreement.

In response to the fact that the four-year Cost-Sharing Period was approaching its end and Bridgelux had not placed orders for 15 million units yet, Bridgelux tendered to BJB Electric what is styled as "P.O. 0801-01." (Ex. 7 to Richens Decl., Lester Depo., pp. 65-66.) The format of this purchase order is very different from the format of the standard purchase order. (Id., p. 66.) Instead of a single order for each type of Holder, with delivery scheduled for a short time later (see, e.g., Ex. 6 to Richens Decl.), P.O. 0801-01 sets forth quantities of a little more than *13 million* Holders, with a series of delivery dates extending for 68 months – roughly *six years*. (Ex. 7 to Richens Decl.; Lester Depo., pp. 68-69.) Payment terms were net 60. (Ex. 7 to Richens Decl.)

Bridgelux had never before placed a purchase order for Vero SE products that looked like this one. (Lester Depo., p. 68.) Bridgelux had no other vendors at the time to whom it had submitted a purchase order that extended as much as six years into the future. (Id., p. 71.) Bridgelux's specific intent in submitting P.O. 0801-01 was to take the total number of units ordered before the end of the Cost-Sharing Period to over 15 million units. (Id., p. 68.)

BJB Electric viewed P.O. 0801-01 as "a joke" – a "kick in the gut because it was so against everything that we ever worked towards together." (Laufer Depo., pp. 150-51.)

On August 18, 2020, BJB Electric sent an email to Bridgelux in response to its receipt of P.O. 0801-01. (Ex. 8 to Richens Decl., Lester Depo., pp. 71-72.) Noting that P.O. 0801-01 called for a majority of the Holders ordered to be delivered years later, in 2025 and 2026, BJB Electric asked Bridgelux to revise P.O. 0801-01. (Ex. 8 to Richens Decl.)

On August 28, 2020, Bridgelux sent to BJB Electric a new purchase order, P.O. 0831. (Ex. 9 to Richens Decl., Lester Depo., pp. 76-77.) In the accompanying email, Bridgelux expressly

4

acknowledged that BJB Electric had not accepted P.O. 0801-01, and that Bridgelux was tendering P.O. 0831 to replace it.  (Id.)  P.O. 0831 spans 66 months instead of 68 months, with delivery dates extending until May of 2026 instead of July of 2026.  (Id., Lester Depo., p. 77.)

On September 3, 2020, BJB Electric confirmed receipt of P.O. 0831, but noted, "We do not see any significant differences from the initial PO [0801-01] and are working with Arnsberg [the location of BJB's affiliate in Germany] on the best way to move forward." (Ex. 10 to Richens Decl., Lester Depo., p. 78.)

The parties negotiated into the fall of 2020.  The end of the Cost-Sharing Period came and went in October 2020 without BJB accepting Bridgelux purchase orders for the 15-million-unit Minimum Requirement.

The parties continued to conduct business together thereafter.  (Amended Complaint for Damages [Dkt. #25], ¶ 18; Answer to Amended Complaint and Counterclaim [Dkt. #26], ¶ 18.)

## II.    ARGUMENT AND CITATION OF AUTHORITY

Bridgelux failed to satisfy the Minimum Requirement provision of the Letter Agreement because BJB Electric failed to obtain orders for the 15-million-unit Minimum Requirement within the Cost Sharing Period.[2]

### A.    Legal Standard

Summary judgment is appropriate under Rule 56 of the Federal Rules of Civil Procedure if the moving party demonstrates that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).

Under California law, which governs here, "the fundamental goal of contract interpretation is to give effect to the mutual intent of the parties as it existed at the time of contracting."  Lopez v. Smiths Detection, Inc., Case No. 3:20-cv-01453-RBM-WVG, 2023 WL 2904756, at *6 (S.D. Cal. March 16, 2023).

"Interpretation of a contract is an issue of law if: (1) the contract is not ambiguous, or (2) the contract is ambiguous but no parol evidence is admitted or the parol evidence is not in conflict."

---

[2] BJB Electric expects that Bridgelux will contend that by tendering P.O. 0801-01, it satisfied the Minimum Requirement provision of the Letter Agreement.

Digital Envoy, Inc. v. Google, Inc., No. 5:04-cv-1497 RS, 2006 WL 8442984, at *2 (N.D. Cal. Jan. 24, 2006)(citing Walter E. Heller Western, Inc. v. Tecrim Corp., 196 Cal. App. 3d 149, 158 (1987)).

### B. The Letter Agreement Is Unambiguous and Supports BJB Electric's Position.

"A contract is ambiguous when on its face it is capable of two different reasonable interpretations." Republic Bank v. Marine Nat'l Bank, 45 Cal. App. 4th 919, 924 (1996). Conversely, then, an unambiguous contract is one that is capable of only one reasonable interpretation.

Here, the Letter Agreement is capable of only one reasonable interpretation. It requires that a) Bridgelux submit orders for 15 million Holders during the Cost Sharing Period, and b) that BJB Electric approve such orders. Neither of these conditions was satisfied.

### 1. P.O. 0801-01 Is Not an "Order" at All.

Bridgelux likely will contend that it satisfied the Minimum Requirement provision of the Letter Agreement by tendering P.O. 0801-01 for more than 13 million Holders in August of 2020, just before the four-year Cost Sharing Period expired. However, this argument fails, as P.O. 0801-01 isn't really a purchase order at all.

As Bridgelux's then-president Tim Lester explained in his deposition, Bridgelux's intention in setting up P.O. 0801-01 as back-end heavy (*i.e.*, much of the product volume falls into the later time periods) was to allow new customers the time to design the Vero SE into their product lines.

Q. What was the reason for this what I've called backend heaviness?
A. To allow more design-in time with new customers, and the front end was more based on existing forecast from existing customers.
Q. Are you saying that the backend aspect is – if I heard you correctly is kind of an estimate of what you foresee for as yet unprocured customers for the product?
 [Counsel objection: misstates testimony]
A. It would be for both existing customers and additional customers coming out of COVID-based disruptions.

(Lester Depo., p. 72.)

6
**PLAINTIFF BJB ELECTRIC LP'S MOTION FOR PARTIAL SUMMARY JUDGMENT - 3:22-CV-01886-RS**
SGR/42949405.1

Mr. Lester conceded that the actual implications of COVID at the time were "not certain." (Lester Depo., p. 73.)  And even the more proximate delivery dates were predicated merely on customer forecasts, not actual orders.  (Id.)

Thus, while P.O. 0801-01 is styled a "purchase order," it is really no such thing.  It is, at best, some type of forecast, predicated on other forecasts, and on Bridgelux's hopes for securing new customers to design the Vero SE series into their product lines.  It also reflects an uncertain demand to be determined by the evolution of the pandemic.  Despite tendering P.O. 0801-01 in August of 2020, Bridgelux did not really know what it actually would be ordering, or when:

> Q.      … So would you agree with me, Mr. Lester, based on how you've laid out how
>
>         [P.O. 0801-01] was put together and how you described the backend heaviness,
>
>         a lot of this for months far into the future is somewhat speculative, is it not?
>
> [Counsel's objection:  argumentative]
>
> A.      Yeah.  It is all – in one respect it's all speculative, yeah.

(Lester Depo., p. 73.)

Bridgelux presented P.O. 0801-01 as an "order" so that it could claim that it submitted "orders for at least 15 million units" within the Cost Sharing Period.  But P.O. 0801-01 is not an order.  It is a series of estimated product volumes and delivery dates well into a very uncertain future. It is a placeholder for a true order.  Bridgelux should not be permitted to elevate the form of its so-called "purchase order" over the substance thereof.  The real substance of P.O. 0801-01 is, as Mr. Lester concedes, nothing more than Bridgelux's speculation as to what it would need to order and when.  Bridgelux tendered the document in the waning months of the Cost Sharing Period just so it could try to claim it had satisfied the Minimum Requirement provision of the Letter Agreement.

### 2. BJB Electric Did Not Accept the Purchase Order on Which Bridgelux Relies.

Even if P.O. 0801-01 could be considered a legitimate purchase order, BJB Electric did not accept the order and thus it does not count for purposes of the Minimum Requirement provision.

The salient language of article 2 of the Letter Agreement is written from BJB Electric's perspective.  Specifically, the Letter Agreement provides that the Minimum Requirement will not

be met "if BJB fails to obtain orders for at least 15 million units" during the Cost Sharing Period. Thus, whether the Minimum Requirement provision is met is not a function of Bridgelux's unilateral conduct. Put another way, the Letter Agreement does not say that the Minimum Requirement will be met if Bridgelux merely tenders purchase orders for at least 15 million units within the Cost Sharing Period.

Instead, the Letter Agreement contemplates that BJB Electric may reject a purchase order submitted by Bridgelux. See Letter Agreement, art. 2 ("purchase order(s) will become mutually binding upon BJB's written confirmation to Bridgelux of said purchase order(s)").

In the summer of 2020, as the end of the Cost Sharing Period approached, Bridgelux purported to submit a massive purchase order – P.O. 0801-01 – to satisfy the Minimum Requirement provision. However, BJB Electric rejected that purchase order due to its concerns about the obvious back-ended heaviness of the delivery schedule. Expressly acknowledging that BJB Electric had not accepted P.O. 0801-01, Bridgelux then submitted a slightly altered version, in the form of P.O. 0831. BJB Electric did not accept P.O. 0831 either, as it posed the same concerns to BJB Electric as P.O. 0801-01.

As BJB Electric did not accept either P.O. 0801-01 or P.O. 0831, it did not "obtain orders for at least 15 million units" during the Cost Sharing Period. Instead, BJB Electric obtained orders for only approximately 2 million Holders during the Cost Sharing Period. Consequently, Bridgelux failed to satisfy the Minimum Requirement provision of the Letter Agreement.

**C.   If the Letter Agreement Is Ambiguous, Then Parol Evidence Supports BJB's Position.**

"The parol evidence rule provides that when parties enter an integrated written agreement, extrinsic evidence may not be relied upon to alter or add to the terms of the writing, but extrinsic evidence is admissible to explain or interpret ambiguous language." Rosenfeld v. Abraham Joshua Heschel Day School, Inc., 226 Cal. App. 4th 886, 897 (2014).

For example, the circumstances under which a contract was made may be shown for purposes of interpreting the terms of the agreement. Cal. Civ. Proc. Code §§ 1856(g), 1860.

Similarly, the terms of an agreement "may be explained or supplemented by course of dealing or usage of trade or by course of performance." Cal. Civ. Proc. Code § 1856(c).

Bridgelux further failed to satisfy the Minimum Requirement provision of the Letter Agreement because P.O. 0801-01 does not contemplate that the 13 million remaining units needed to meet the Minimum Requirement would be delivered during the Cost Sharing Period. For its part, Bridgelux will argue that the Letter Agreement does not require Bridgelux to actually take delivery of the Holders during the Cost Sharing Period. Instead, Bridgelux will contend that P.O. 0801-01 satisfies the Minimum Requirement provision even though it contemplates the delivery of some of the Holders *six years* after the close of the Cost Sharing Period.

To the extent the Letter Agreement is ambiguous as to whether delivery of the Holders must be taken during the Cost Sharing Period in order for the Minimum Requirement provision to be met, then relevant to construction of the Letter Agreement are the circumstances of the parties when the Letter Agreement was entered into, and the parties' course of performance prior to Bridgelux's submission of P.O. 0801-01 in the summer of 2020.

1. **Both Parties Understood at the Time of Execution of the Letter Agreement Why the 15 Million Units Were to Be Delivered During the Cost Sharing Period.**

As BJB Electric's then-president Joe Laufer testified, BJB Electric's purpose in having a four-year Cost Sharing Period was to allow it to recoup the costs of machinery and tooling invested in the Holder project by the BJB family of companies:

Q:   … What does the term cost-sharing period mean to you? In other words, why was that term picked? What does cost-sharing period mean? What does the term cost sharing mean?

A:   I've never used it before. I don't know really where it came from, but I think the concept was that if Bridgelux buys the quantities that they said they were going to buy, which is 15 million, then from a financial standpoint we would be made whole regarding our investment for tooling, et cetera. So I'm not sure how we landed on cost-sharing period as the term. … It would be – Bridgelux

9

would be paying a piece price that would enable us to recoup our investment in tooling if they bought those quantities over that period of time.

(Laufer Depo., pp. 94-95.)

Bridgelux's Tim Lester offered a similar understanding of BJB Electric's motivation:

Q: Do you know where [the term Cost Sharing Period] came from?

A: No.

Q. Okay. Do you know what it refers to?

A. It would refer to – in my mind it would refer to a period of time where the pricing on the units are higher to cover startup investment costs.

Q. And those were BJB's startup investment costs?

A. Correct.

…

Q. So was it Bridgelux's understanding – or excuse me. Bridgelux understood that it was BJB Electric LP [that was] the entity that Bridgelux was negotiating with?

A. Right.

Q. It was their intention to recoup in the four-year cost sharing or the cost sharing period, however long it became, the investment in tooling and equipment that had been made by BJB Electric's affiliate in Germany, which I'm calling BJB Germany, needed for the holders?

[Counsel's objection: compound]

A. So my – my understanding is BJB's worry was that they were – they could invest money, and then Bridgelux could design the holder out of our portfolio without consequence.

Q. What does designing out of your portfolio mean?

A. Meaning the life span of a generation of our product at the time was roughly three to four years, and my understanding was BJB was concerned that the product would be in our next-gen release. And then, depending on how we

>> decided it was doing, we would design it out at the next generation, and they would be left holding the bag.
>
> Q.   Having made the investment –
>
> A.   Correct.

(Lester Depo., pp. 34-36.)

Both parties knew and recognized the importance to BJB Electric of recouping within the first four years the investment that BJB had made in tooling and equipment. For Bridgelux now to take the position that they could schedule delivery and pay for the Holders as long as six years beyond the end of the Cost Sharing Period is simply inconsistent with the shared understanding of the parties as to the significance of the initial four-year period at the time the Letter Agreement was entered into. The whole purpose of the Minimum Requirement provision was not that Bridgelux would buy 15 million Holders at some point in time; it was that Bridgelux would buy 15 million Holders within the first four years so that BJB could be assured of recouping its investment before Bridgelux changed the design of the product in such a way that rendered the Holders obsolete. Otherwise, as Bridgelux's Tim Lester put it, BJB Electric ran the risk of being left "holding the bag."

### 2.   The Parties' Course of Performance Demonstrates the Inappropriateness of the Six-Year Delivery Window of P.O. 0801-01.

One need only compare a standard Bridgelux purchase order for Holders, see Exhibit 6 to Richens Decl., with P.O. 0801-01, see Exhibit 7 to Richens Decl., to conclude that the parties intended at the time of contracting for the 15 million units to be delivered during the Cost Sharing Period – *not*, in some cases, almost six years after the Cost Sharing Period ended. The standard Bridgelux purchase order for Holders set forth a single quantity of each type of Holders, with a single delivery date of approximately one month after the date of the purchase order. (Richens Decl., Ex. 6; Lester Depo., pp. 60-61.) In contrast, P.O. 0801-01 contains 68 months – or nearly six years – of delivery dates. Bridgelux concedes that P.O. 0801-01 was unlike any purchase order that Bridgelux had previously placed for Holders. (Lester Depo., p. 68.) (Richens Decl., Ex. 6; Lester Depo., pp. 60-61.)

The parties' course of performance demonstrates the parties' intent: that Bridgelux would place orders for Holders and take delivery shortly thereafter.  Tellingly, it was not until the Cost Sharing Period was nearly over, and Bridgelux's back was against the wall as to the Minimum Requirement provision, that Bridgelux suddenly changed course and issued a "purchase order" for deliveries as far as 68 months beyond the end of the Cost Sharing Period.

**CONCLUSION**

BJB Electric failed to obtain orders from Bridgelux for 15 million Holders within the four-year Cost Sharing Period.  Thus, Bridgelux failed to satisfy the Minimum Requirement provision of the Letter Agreement.

Bridgelux did tender a "purchase order," P.O. 0801-01, for more than 13 million Holders near the end of the Cost Sharing Period in order to avoid a breach of the Minimum Requirement provision.  However, P.O. 0801-01 is not really an "order" at all.  Bridgelux concedes that P.O. 0801-01 merely reflects Bridgelux's speculation as to what Holders it would purchase, and when.  The actual numbers would be dependent on whether it could convince new customers to design the Vero SE product line into their lighting product offerings, and how the ongoing COVID-19 pandemic would impact future demand for the Vero SE product line.  Thus, although styled a purchase order, P.O. 0801-01 is merely a forecast – one tendered for the very purpose of trying to satisfy the Minimum Requirement provision, but one that falls short because it is not an actual order.

Moreover, even if P.O. 0801-01 could be considered a true "order," Bridgelux rejected P.O. 0801-01, and its replacement, P.O. 0831, as it was entitled to do under the Letter Agreement.

Finally, P.O. 0801-01 does not satisfy the Minimum Requirement provision because it contemplates the delivery of Holders years beyond the four-year window of the Cost Sharing Period.  The Cost Sharing Period is the time period in which, as both parties understood at the time of contracting, BJB Electric intended to recoup its corporate family's investment in machinery and tooling needed to make the Holders by selling 15 million Holders to Bridgelux.  This understanding is further demonstrated by Bridgelux's practice of submitting periodic purchase orders for Holders during the Cost Sharing Period, with delivery scheduled for a short time later, as opposed to the

massive "order" calling for the delivery of 13 million units over a nearly six-year time period exemplified by P.O. 0801-01.

  For the foregoing reasons, BJB Electric respectfully requests that its Motion for Partial Summary Judgment be granted, and that Bridgelux be found liable for breach of the Letter Agreement for its failure to satisfy the Minimum Requirement provision of the contract.

DATED: June 22, 2023    SMITH, GAMBRELL & RUSSELL, LLP

           By:  */s/ Dana M. Richens*
              Patrick J. Cain
              Dana M. Richens
              Attorneys for
              BJB ELECTRIC LP

# PROOF OF SERVICE
**Case Name: BJB ELECTRIC LP v. BRIDGELUX, INC.**
**Case Number: 3:22-cv-01886-RS**

STATE OF CALIFORNIA

COUNTY OF LOS ANGELES

    At the time of service, I was over 18 years of age and not a party to this action. I am employed in the County of Los Angeles, State of California. My business address is 444 South Flower Street, Suite 1700, Los Angeles, CA 90071-2901.

    On June 22, 2023, I served true copies of the following document(s) described as **PLAINTIFF BJB ELECTRIC LP'S NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES – [FILED CONCURRENTLY WITH DECLARATION OF DANA M. RICHENS]** on the interested parties in this action as follows:

CRAIG A. GELFOUND
Craig.gelfoundd@afslaw.com
TRACY LUU-VARNES
Tracy.luu.varnes@afslaw.com
ARENTFOX SCHIFF LLP
555 West Fifth Street, 48th Floor
Los Angeles, CA 90013
Telephone: 213.629.7400
Facsimile: 213.629.7401

    **BY CM/ECF NOTICE OF ELECTRONIC FILING**: I electronically filed the document(s) with the Clerk of the Court by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system. Participants in the case who are not registered CM/ECF users will be served by mail or by other means permitted by the court rules.

    I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

    Executed on June 22, 2023, at Los Angeles, California.

*/s/ Lupe D. Navid*
Lupe D. Navid

---

14

**PLAINTIFF BJB ELECTRIC LP'S MOTION FOR PARTIAL SUMMARY JUDGMENT - 3:22-CV-01886-RS**
SGR/42949405.1