UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BJB ELECTRIC LP,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>BRIDGELUX, INC.,<br><br>　　　　Defendant. | Case No. 22-cv-01886-RS<br><br>**ORDER DENYING MOTIONS TO EXCLUDE** |
| BRIDGELUX, INC,<br><br>　　　　Counter-Claimant,<br><br>　　v.<br><br>BJB ELECTRIC LP,<br><br>　　　　Counter-Defendant. | |

Plaintiff BJB Electric LP filed this lawsuit alleging that Defendant Bridgelux, Inc. breached a Letter Agreement requiring Defendant either to purchase a minimum number of LED holders within four years of the product's first availability (through October 2020) or to pay liquidated damages. Defendant counterclaimed, alleging Plaintiff breached the Letter Agreement by refusing to deliver more LED holders unless payment was made prior to delivery.[1] Each side

---

[1] The report proffered by Defendant's expert Lawrence Leavitt predicates counterclaim damages on an allegation that Plaintiff increased the price of its LED holders in May 2022, which did not seem to be originally alleged in Defendant's counterclaim.

believing the other owes it, Plaintiff and Defendant both proffered expert witnesses to calculate damages—Albert Pruenster and Lawrence Leavitt, respectfully—both of which are subjects of competing motions to exclude. For the reasons discussed below, both Plaintiff's and Defendant's motions to exclude are denied.

## I. BACKGROUND

Defendant proffered a report written by Leavitt, a Certified Public Accountant with over 35 years of experience in the accounting industry, that estimates the parties' damages. *See* Expert Report of Lawrence C. Leavitt, Dkt. 57-1, Ex. A, Ex. A ("Leavitt Report"). Leavitt's report opines on four principal subjects: (1) Defendant's counterclaim damages; (2) a rebuttal to Plaintiff's calculation of Plaintiff's damages; (3) Plaintiff's damages under a "time value of the profit" theory (instead of Plaintiff's lost profit theory); and (4) the reasonableness of the Letter Agreement's liquidated damages clause.

Plaintiff proffered Pruenster, the President of BJB Electric, to opine on Plaintiff's actual damages from Defendant's alleged failure to purchase the minimum number of LED holders specified in the Agreement. An expert disclosure for Pruenster was provided out "of an abundance of caution," since Plaintiff was "not conced[ing]" that Pruenster's testimony was, "in fact, 'expert' testimony." Dkt. 67-6, Ex. D, at 1 n.1.[2] Pruenster's testimony was summarized in a disclosure as: (1) calculating Plaintiff's lost profits by "subtracting the expected cost paid to BJB Germany for such Holders from the expected revenues from Bridgelux for such Holders" and (2) calculating Plaintiff's overhead attributable to the Letter Agreement. *Id.* at 2–3. This disclosure did not include a written report but incorporated by reference Pruenster's deposition testimony. Following Defendant's proffer of the Leavitt Report, Plaintiff proffered a report written by Pruenster rebutting Leavitt's calculation of the parties' damages. Dkt. 68-1, Ex. I, Ex. A ("Pruenster

---

[2] Note to Draft: Plaintiffs moved to seal this language. This does not appear to me to be sensitive enough to be material that should be sealed. But in an abundance of caution ourselves, perhaps this phrasing would be better changed to something more general, like "Plaintiff provided an expert disclosure for Pruenster but maintained that he was not giving expert testimony."

Rebuttal Report").

## II. LEGAL STANDARD

Rule 702 of the Federal Rules of Evidence requires that a witness proffered as an expert be qualified by "knowledge, skill, experience, training, or education." Fed. R. Evid. 702. Under the test laid out in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), expert opinion testimony is reliable if it has a "basis in the knowledge and experience of [the relevant] discipline." *Id.* at 592. Courts reviewing *Daubert* motions focus on the principles and methodology employed by the expert, not the conclusions the expert ultimately reaches. *See id.* at 595. As such, expert testimony may not be excluded simply because it is impeachable. *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013). Instead, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

However, expert testimony is not admissible under Rule 702 if it is based on assumptions that are unsubstantiated by the record. *See Bakst v. Cmty. Mem'l Health Sys., Inc.*, No. CV 09-08241 MMM (FFMx), 2011 WL 13214315, at *20 (C.D. Cal. Mar. 7, 2011) (collecting cases supporting that an expert's "damages calculation . . . based entirely on factual assumptions that are entirely unsupported in the record" may be excluded); *see also Guillory v. Domtar Indus. Inc.*, 95 F.3d 1320, 1331 (5th Cir. 1996) ("Expert evidence based on a fictitious set of facts is just as unreliable as evidence based upon no research at all."). Courts discuss this as a "fit" requirement, a condition primarily related to relevance.[3] *Daubert*, 509 U.S. at 591–92. That being said, "the rejection of expert testimony is the exception rather than the rule." *Caldwell v. City of San Francisco*, No. 12-CV-01892-DMR, 2021 WL 1391464, at *2 (N.D. Cal. Apr. 13, 2021) (quoting

---

[3] Courts use relevance and reliability interchangeably, however, to discuss the exclusion of expert opinions based on speculation or false assumptions. *Compare Bakst*, 2011 WL 13214315, at *20 (discussing expert testimony based on unsupported assumptions as a relevance issue) *with United States v. Rushing*, 388 F.3d 1153, 1156–57 (8th Cir. 2004) (discussing expert testimony based on insufficient facts as a reliability issue).

Fed. R. Evid. 702, Advisory Committee Notes, 2000 Amendments (citing cases)).

## III. ANALYSIS

### A. Plaintiff's Motion to Exclude

Plaintiff advances four arguments for excluding Leavitt's report: (1) the report uses an unreliable "time value of profit" methodology to calculate Plaintiff's damages; (2) it relies upon figures from a purchase order that do not align with Defendant's actual purchases, thereby premising its calculations on inaccurate data; (3) it provides rebuttal testimony using the same inaccurate purchase information; and (4) it improperly opines on the enforceability of the liquidated damages clause, which is a legal determination inappropriate for expert testimony. While some of Plaintiff's arguments have merit and certainly go to the persuasiveness and weight that Leavitt's testimony may have at trial, they fail to persuade that the testimony is such "sheer fantasy" that it should be altogether excluded. *See Maheu v. Hughes Tool Co.*, 569 F.2d 459, 474–76 (9th Cir. 1977).

*1. Time Value of Profit Methodology*

Leavitt's primary methodology, a calculation of the time value of the profit that Plaintiff expects to earn, is centrally premised on Defendant's assertion that it will eventually purchase all holders contemplated by the Letter Agreement. In other words, because Leavitt takes as given that it is only a matter of time when, not if, Defendant will purchase all the LED holders it is required to, Plaintiff will not suffer any lost profits—only deferred ones. Leavitt therefore opines that the appropriate measure of Plaintiff's damages is the time value of the delayed profit—or, in other words, the cost that Plaintiff will incur by earning this profit later than expected.

Plaintiff argues this is unreliable because it finds "no support in accountancy or damages-calculation literature." *See* Dkt. 57 at 7. Yet the time value of money is a well-known and fundamental principle used in a variety of financial calculations. *See, e.g.*, *Conkright v. Frommert*, 559 U.S. 506, 519 (2010) (explaining that, "[i]n the actuarial world," "an interpretation of [an ERISA] plan that does not account for the time value of money . . . is heresy, and highly unforeseeable"); *Finjan, Inc. v. Cisco Sys. Inc.*, No. 17-CV-00072-BLF, 2020 WL 13180005, at

*7 (N.D. Cal. Apr. 21, 2020) (excluding an expert's damages figures that did not apply a time value of money discount because, as the expert acknowledged, a "time value of money discount is intrinsic in the concept of a lump sum payment"); *In re: Cathode Ray Tube (CRT) Antitrust Litig.*, No. C-07-5944 JST, 2016 WL 6216664, at *3 (N.D. Cal. Oct. 25, 2016) (explaining that "the time value of money" and "one's inability to use one's money" are phrases that express the traditional economic concept of "opportunity cost"). It furnishes an acceptable method of calculating at least one form of damages: prejudgment interest. *See* Dan B. Dobbs & Caprice L. Roberts, *Law of Remedies: Damages, Equity, Restitution* § 3.2 (3d ed. 2018) ("Defendant has the use of money during the litigation period that, it turns out, properly should have been paid to plaintiff when the loss occurred. And, correspondingly, plaintiff has lost the use of the money. The use value of money can be represented by interest . . . .").

At least one court, moreover, has accepted damages premised solely on a time value of money methodology for *Daubert* purposes. *Genesys Cloud Servs., Inc. v. Strahan*, No. 1:19-cv-00695-TWP-DML, 2022 WL 19530055, at *13 (S.D. Ind. Sept. 29, 2022). In *Genesys*, one company sued another for allegedly poaching employees. *Id.* at *1. The defendant's expert witness opined that certain HR expenses incurred by the plaintiff would have occurred even without the poaching, based on testimony that plaintiff's employees were unhappy and rumored to be seeking other employment, and that plaintiff's nationwide turnover was between 20 and 50 people per year. *Id.* at *10–11. The expert accordingly opined that the plaintiff was damaged only by incurring these expenses sooner than if the poaching had not occurred, and the time value of money of those expenses was thereby an appropriate measure of damages. *Id.* at *12–*13. The court refused to exclude the expert's testimony, determining that his report was based on sufficient facts and "reliable principles and methods" for *Daubert* purposes. *Id.* So, too, is Leavitt's methodology, which is applied to facts in the record, admissible under *Daubert*.

Plaintiff's frustration is understandable. The record underscores Plaintiff's lament that "[t]here is no telling when, if ever, Bridgelux will purchase 15 million Holders from BJB Electric," Dkt. 59 at 3, and there are indeed serious questions and rebuttals that Plaintiff remains

free to raise at trial. *See id.* at \*13; *Daubert*, 509 U.S. at 596. Perhaps these may even prove dispositive. At this juncture, however, Leavitt's methodology is not so irrelevant or unreliable as to require wholesale exclusion.

*2. Inaccuracy of Defendant's P.O. 1104-07*

Plaintiff argues that Leavitt's report is irrelevant and unreliable because it relies on a purchase order (P.O. 1104-07) that both inaccurately depicts the actual quantities Defendant has purchased, and fails to reflect the most recent agreement between the parties, as P.O. 1104-07 has been superseded by the later purchase order P.O. 1104-08. To the first objection, Plaintiff claims that Defendant purchased 790,650 holders between October 2020 and March 31, 2023, while P.O. 1104-07 called for the purchase of 1,525,600 holders between December 2020 and March 31, 2023. Plaintiff further alleges that the actual LED holders purchased do not match the model mix that were specified in the purchase order—and that Defendant purchased more of the cheaper models and fewer of the expensive models.[4] As a result, Plaintiff argues the figures in P.O. 1104-07 are unlikely to provide accurately for Defendant's future purchases.

Defendant is silent as to the purchase discrepancies, choosing instead in its opposition brief to argue largely that P.O. 1104-07, not P.O. 1104-08, is the controlling purchase order. This, unfortunately, misses the crux of the claimed deficiency: that the purchase schedule contained in P.O. 1104-07 "is no longer accurate." Dkt. 59 at 2. Given the discrepancy between Defendant's actual purchases and the purchases contemplated in the purchase orders—*either* of them, in fact[5]—Leavitt's heavy reliance on data from P.O. 1104-07 raises serious concerns.

That damages calculations derived from erroneous purchase data would be substantially

---

[4] 10% and 16% of the units Defendant purchased were the Vero 10 and Vero 29 products, respectively, even though P.O. 1104-07 called for purchases to be 27% and 10%, respectively. It is important to note that although Plaintiff says these product mixes according to P.O. 1104-07 are 50% and approximately 4-5%, respectively, Plaintiff seems to be referencing product mixes *totaled across the purchase order*, and not according to planned purchases through March 31, 2023, which diminishes the actual disparity.

[5] Even in comparison to the figures in P.O. 1104-08, Defendant has allegedly purchased approximately 450,000 fewer holders than specified therein (as of March 31, 2023).

1  inaccurate is easily illustrated. Leavitt calculates Plaintiff's damages using the time value of the

2  profit expected to be earned. If Defendant purchases a different number of holders, or a different

3  mix of product types, or makes those purchases at different times, Plaintiff would earn different

4  profits, changing the timing of the profits—and, necessarily, the damages. Indeed, this is equally a

5  problem for Leavitt's calculation of Plaintiff's damages as Defendant's counterclaim damages.[6]

6  Yet, having noted these serious deficiencies, Leavitt's testimony nonetheless narrowly

7  passes through the gatekeeping of Rule 702. Leavitt's calculations are not based on a wholly

8  "fictitious set of facts." *See Guillory*, 95 F.3d at 1331. Though Leavitt's opinions may be

9  substantially less helpful since they reflect a scenario that seems unlikely to arise, they are still

10  "tied to the facts" in the record (e.g., taken from a purchase order to which both parties agreed),

11  rather than entirely fabricated. *See Daubert*, 509 U.S. at 591–92; *Bakst*, 2011 WL 13214315, at

12  *20. Use of P.O. 1104-07 may or may not be Defendant's best attempt at projecting future

13  purchases—but the argument that such facts were incorrect or inappropriate to use is an argument

14  best left for trial.

15  *3. Rebuttal Testimony*

16  Plaintiff argues that Leavitt's rebuttal testimony suffers from the same flaw of relying on

17  P.O. 1104-07. As discussed above, this does not provide a basis for exclusion. In addition, this

18  argument fails to account for Leavitt's discussion of the limitations in Plaintiff's calculation of its

19  own damages.[7] Leavitt Report at 5–7. For instance, Leavitt alleges Plaintiff failed to account for

20  overhead costs and included "unsupported" efficiency adjustments. *Id.* at 5–6. This discussion is

21  based in part on Leavitt's conclusion that Plaintiff's "assumption regarding product mix [is]

---

[6] For example: Leavitt calculated that Defendant paid $72,000 in increased prices, while Plaintiff argues the actual figure is only approximately $12,800. Even if Defendant eventually purchases every unit in P.O. 1104-07 at the same price in the schedule, Leavitt's counterclaim damage calculation would likely still be incorrect. Defendant's purchase delays would allow it to accrue more interest than projected, meaning Defendant would receive more damages than necessary.

[7] While Leavitt's calculations raise eyebrows by asserting that Plaintiff would lose approximately $54,000 on a contract that it is trying to enforce, Plaintiff will have ample opportunity to raise its objections to Leavitt's assumptions at trial.

ORDER DENYING MOTIONS TO EXCLUDE
CASE NO. 22-cv-01886-RS

erroneous" because ignoring P.O. 1104-07's product mix "is not reasonable." *Id.* at 6. Which product mix—of purchases to date, or from P.O. 1104-07—is more accurate to support damage calculations is a fact disputed by the parties, and therefore suitable for the factfinder at trial. *See Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1392 (Fed. Cir. 2003).

    4. *Reasonableness of the Liquidated Damages Provision*

Plaintiff argues Leavitt should not be allowed to opine on whether the Letter Agreement's liquidated damages term is reasonable, because "an expert witness cannot give an opinion as to her *legal conclusion,* i.e., an opinion on an ultimate issue of law," *Nationwide Transp. Fin. v. Cass Info. Sys., Inc.*, 523 F.3d 1051, 1058 (9th Cir. 2008), and whether an amount is treated as liquidated damages or an unenforceable penalty is a question of law. *Harbor Island Holdings v. Kim*, 132 Cal. Rptr. 2d 406, 408 (Cal. Ct. App. 2003).

Leavitt's report states in full:

> [T]he Liquidated Damages Clause in the Arrangement and the reasonableness of BLUX paying to BJB US $0.08 per unit for the approximate 12,800,000 "shortfall quantity" or approximately $1,024,000, appears to be far in excess of my opinion of a reasonable range for the damages of BJB US, and therefore is not an appropriate remedy in this matter.

Leavitt Report at 10.

Here, Plaintiff's argument generalizes too broadly. A party "usually present[s] through expert testimony" evidence as to whether a specific amount or methodology "represent[s] a reasonable estimate of the actual damages." *El Centro Mall, LLC v. Payless ShoeSource, Inc.*, 94 Cal. Rptr. 3d 43, 48 (Cal. Ct. App. 2009), *as modified* (May 21, 2009). While the conclusion that "the Liquidated Damages Clause . . . is not an appropriate remedy in this matter" skates close to opining on a legal issue, Leavitt's opinion will be admissible so far as he provides a principled opinion about whether the 8 cents per unit is a reasonable amount for BJB's damages—the type of testimony a court would look to in deciding whether the liquidated damages term is enforceable. *See id.*

    **B. Defendant's Motion to Exclude**

Defendant advances three reasons for excluding Pruenster's testimony: (1) he should have

1  provided a written report pursuant to Federal Rule of Civil Procedure 26(a)(2)(B) because he is a retained expert; (2) his damage calculations are based on sales and pricing data that is too speculative to meet Rule 702's standards; and (3) his Rebuttal Report improperly opines on the operative purchase order and which party breached the Letter Agreement, which are legal determinations inappropriate for expert testimony. Because Pruenster, as Plaintiff's President, has sufficient personal knowledge to testify as a lay witness, Defendant's arguments referencing standards for expert testimony are unavailing. Even if Pruenster were testifying as an expert, he would be a percipient expert from whom a written report would not be required; and as with Leavitt, concerns surrounding Pruenster's methodology do not justify exclusion, but instead go to the persuasiveness and weight of his testimony.

*1. Lay Versus Expert Witness*

Under Rule 701 of the Federal Rules of Evidence, a lay witness may provide opinion testimony so long as it is "rationally based on the witness's perception," helpful, and "not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701. Opinions based on "particularized knowledge that the witness has" are admissible under Rule 701. Fed. R. Evid. 701, Advisory Committee Notes, 2000 Amendments. Accordingly, "most courts have permitted the owner or officer of a business to testify to the value or projected profits of the business, without the necessity of qualifying the witness as an accountant, appraiser, or similar expert." *Id.* (citing *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153 (3d Cir. 1993)). While the Ninth Circuit has not squarely addressed this issue, "district courts within the Ninth Circuit have followed [this] trend." *Bright Harvest Sweet Potato Co. v. H.J. Heinz Co., L.P.*, No. 1:13-CV-296-BLW, 2015 WL 1020644, at *6 (D. Idaho Mar. 9, 2015) (allowing company President and CFO to testify about lost profits as lay witnesses "to the extent that they have personal and particularized knowledge of the facts that form their opinions"); *see also Pet Food Exp. Ltd. v. Royal Canin USA, Inc.*, No. C-09-1483 EMC, 2011 WL 6140874, at *11 (N.D. Cal. Dec. 8, 2011) (surveying cases and finding CEO had sufficient personal experience to predict future contract payments as a lay witness, even though those predictions involved estimating

competitor's sales).

As Plaintiff's President, Pruenster has sufficient personal knowledge of Plaintiff's sales figures and financial information to opine on Plaintiff's lost profits as a lay witness. Pruenster's role involves executing "cost and resource management" and "overseeing logistics, warehousing and assembly operations," Dkt. 72-2 ¶ 3, giving him ample knowledge of Plaintiff's profit and sales figures. Moreover, before becoming Plaintiff's President, Pruenster "learned about production and the cost of production" during his five years as an executive assistant to BJB Germany's management, trained with BJB Germany's finance department for a year, and served as Plaintiff's CFO. *Id.* ¶ 9. Defendant's comparison to *Montalvo v. Am. Fam. Mut. Ins. Co.*, No. CV-12-02297-PHX-JAT, 2014 WL 2986678, at *3–*4 (D. Ariz. July 2, 2014), is inapt: Pruenster's role is unlike an insurance adjuster retained by plaintiff's attorney to estimate losses. Instead, Pruenster's testimony is limited to his personal experience with sales and manufacturing in "his particular business"—Plaintiff and, though slightly out of date, BJB Germany—and does not include opinions derived from "general industry practice." *See Med. Sales & Consulting Grp. v. Plus Orthopedics USA, Inc.*, No. 08CV1595 BEN BGS, 2011 WL 1898600, at *6 (S.D. Cal. May 19, 2011). Accordingly, Pruenster has personal experience from which he can opine on future price adjustments due to BJB Germany's increased manufacturing efficiency.

Pruenster's lost profit calculations based on "simple math," Dkt. 72 at 6, and assumptions derived from his personal experience working for Plaintiff and BJB Germany, are well within the bounds of lay testimony. As a result, Pruenster is not subject to the disclosure requirements of Federal Rule of Civil Procedure 26(a)(2), nor is his testimony subject to Rule 702 gatekeeping.

2. *Lack of a Written Report*

Even if Pruenster were providing expert testimony, it would not be excludable for lack of a written report because Pruenster would be a percipient expert. Under Federal Rule of Civil Procedure 26(a)(2)(B), an expert disclosure must include a written report if "the witness is one retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony." Fed. R. Civ. P. 26(a)(2)(B). A

percipient expert—"restricted to expert opinions rendered in the normal course of their work duties," *Masimo Corp. v. Apple Inc.*, No. SACV2000048JVSJDEX, 2022 WL 18285029, at *3 (C.D. Cal. Nov. 22, 2022) (citation omitted)—is not subject to the written report requirement. A percipient expert transforms into a retained expert only if their opinions are based on material that they had not previously reviewed in the course of their duties. *Goodman v. Staples The Off. Superstore, LLC*, 644 F.3d 817, 826 (9th Cir. 2011). Here, Pruenster's role as Plaintiff's President requires him to have knowledge of Plaintiff's finances, including product costs and overhead. Though calculating lost profits requires the review of certain figures, Pruenster would be familiar with those figures by virtue of performing "cost and resource management." *See* Dkt. 72-2 ¶ 3.

*Masimo*, which Defendant relies upon, only supports this conclusion. In *Masimo*, a company executive was a retained expert because his opinions were based on review during litigation of "documentation concerning a deconstructed Apple Watch, which was compiled by a third party" and those opinions were "far outside his percipient knowledge of Masimo products." *Masimo*, 2022 WL 18285029, at *4. Similarly, another Masimo executive was a retained expert because his "cost-estimate opinions" were based on "hypothetical" counterfactual situations. *Id.* In contrast to the Masimo executives who reviewed records that they had never previously seen and opined on situations that never happened, all in preparation for trial, Pruenster's opinions are based on material that he would review as Plaintiff's President and his historical experiences while employed by Plaintiff and BJB Germany. *See id.*

    3.   *Speculative Pricing and Sales Data*

Likewise, even if Pruenster were providing expert testimony, it would pass muster under Rule 702. Defendant claims the data Pruenster uses to calculate lost profits is speculative. It objects to calculations of lost profits with historical prices that BJB Germany charged Plaintiff on the basis that Plaintiff produced limited documentation to support the claimed prices, which seem to vary "substantially and randomly." Dkt. 67-7 at 9. Defendant also suggests that, as these are intra-company transactions, Pruenster should have shown the pricing was consistent with an arm's length transaction. Finally, Defendant argues that Pruenster's calculation of overhead is likely an

1   underestimate and calculation of efficiency adjustments likely an overestimate, with both lacking
2   sufficient supporting evidence.

3   Some of Defendant's objections are easily dispensed with, including that Pruenster only
4   used pricing for 2 million units to calculate lost profits, since Defendant "only purchased two
5   million units." Dkt. 72 at 9 n.3. Others, however, have more merit. Pruenster fails to explain why
6   the prices he used to calculate lost profits vary so significantly, and the intra-company context of
7   these transactions does prompt concern about the validity of these prices. Nevertheless, just as the
8   information from the purchase orders used in Leavitt's report, Pruenster's calculations are "tied to
9   the facts" in the record of BJB Germany's pricing and Pruenster's finance experience. *See*
10  *Daubert*, 509 U.S. at 591–92; *Bakst*, 2011 WL 13214315, at *20. Arguments over Pruenster's
11  methodology are best left for trial, especially considering "there is less need for the gatekeeper to
12  keep the gate when the gatekeeper is keeping the gate only for himself" at a bench trial. *United*
13  *States v. Flores*, 901 F.3d 1150, 1165 (9th Cir. 2018).

14  *4. Legal Conclusions*

15  Defendant argues that the Pruenster Rebuttal Report improperly provides legal conclusions
16  as to which party breached the Letter Agreement and which purchase order is controlling. Some of
17  Pruenster's opinions, including that "*Bridgelux* breached the Letter Agreement," Pruenster
18  Rebuttal Report ¶ 3, are clearly impermissible legal opinions. However, these limited statements
19  do not justify wholesale exclusion of the Rebuttal Report. Though Pruenster may not offer legal
20  opinions, he may rebut the methodology Leavitt chose to calculate the parties' damages.

## IV. CONCLUSION

For the reasons discussed above, both motions to exclude are denied.

**IT IS SO ORDERED**.

Dated: July 28, 2023

_____
RICHARD SEEBORG
Chief United States District Judge