UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BJB ELECTRIC LP,<br><br>    Plaintiff,<br><br>v.<br><br>BRIDGELUX, INC.,<br><br>    Defendant. | Case No. 22-cv-01886-RS<br><br>**ORDER DENYING MOTIONS FOR PARTIAL SUMMARY JUDGMENT** |
| BRIDGELUX, INC,<br><br>    Counter-Claimant,<br><br>v.<br><br>BJB ELECTRIC LP,<br><br>    Counter-Defendant. | |

Plaintiff BJB Electric LP filed this lawsuit alleging that Defendant Bridgelux, Inc. breached a Letter Agreement requiring Defendant either to purchase a minimum number of LED holders within four years of the product's first availability (through October 2020) or to pay liquidated damages. Defendant counterclaimed, alleging Plaintiff breached the Letter Agreement beginning in April 2022 by changing the terms of the Agreement and refusing to deliver any additional LED holders unless payment was made prior to delivery. Both parties have filed cross-motions for partial summary judgment on Defendant's liability for breach of the Letter Agreement. For the reasons discussed below, both parties' motions are denied.

# I. BACKGROUND

Defendant Bridgelux, Inc. is a designer and manufacturer of LED lighting products. For its new Vero 2.0 product series, Defendant needed LED holders—for which it approached Plaintiff, BJB Electric LP, a supplier of components for lighting manufacturers. After negotiations, Plaintiff agreed to produce the necessary holders for Defendant to purchase, and the parties executed a Letter Agreement (the "Letter Agreement") on March 21, 2016. Notably, the Letter Agreement included a minimum purchase provision—the crux of the parties' present dispute—which reads:

> If BJB is awarded the Holder Project (i.e., Bridgelux designates BJB as the supplier of the Holder), such units will be purchased by Bridgelux (or its designated contract manufacturer) under its purchase order at the pricing designated under Schedule A. However, if BJB fails to obtain orders for at least 15 million units ("Minimum Requirement") of the Vero 2.0 Holder within 4 years after "First Availability" of the Vero 2.0 Holder ("Cost Sharing Period"), Bridgelux agrees that it or its contract manufacturer will purchase the "Shortfall Quantity" of such Vero 2.0 Holders at the pricing designated under Schedule A ($0.08 per unit) pursuant to a Bridgelux purchase order. Bridgelux (or its designated contract manufacturers) purchase order(s) will become mutually binding upon BJB's written confirmation to Bridgelux of said purchase order(s). The "Shortfall Quantity" is the difference between the Minimum Requirement and the number of Vero 2.0 Holders ordered ("Ordered Holders") during the Cost Sharing Period. "First Availability" is the date that "Shippable Holders" are available for sale and shipment by BJB (with such availability then indicated via written confirmation from BJB to Bridgelux). "Shippable Holders" are the production version of Vero 2.0 Holders which are then available for sale and shipment.

Dkt. 65-1, Ex. 4 ("Letter Agreement"), art. 2. According to this provision, if Plaintiff "fail[ed] to obtain orders for at least 15 million units" within four years of the product's first availability (known as the "Cost Sharing Period"), Defendant would pay liquidated damages. *Id.* As the First Availability of the Vero 2.0 Holder occurred in October of 2016, the Cost Sharing Period expired in October of 2020.

By the summer of 2020, Defendant had ordered only about 2.2 million holders. On August 14, 2020, Defendant submitted a purchase order (P.O. 0801-01) for approximately 13 million holders. Rather than requesting delivery a short while after purchase, P.O. 0801-01 set forth a delivery schedule stretching over the following 68 months.

After noting that 53% of the sales volume in P.O. 0801-01 would occur in 2025 and 2026, Plaintiff asked Defendant to revise the purchase order on August 18, 2020. Defendant submitted a

revised purchase order (P.O. 0831) ten days later, on August 28, 2020, which contemplated a delivery schedule of 66 months. When submitting P.O. 0831, Defendant noted that Plaintiff had not accepted P.O. 0801-01. Though Plaintiff acknowledged receipt of P.O. 0831 on September 3, 2020, it told Defendant that it did not see any significant differences between the two purchase orders. Plaintiff told Defendant that it would work with its German counterpart to determine how to proceed, but ultimately never seemed to accept the order. The parties negotiated, but were unable to reach an agreement before the end of the Cost Sharing Period. Believing that Defendant breached the Letter Agreement by failing to order at least 15 million units during the Cost Sharing Period, Plaintiff filed the instant suit.

## II. LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The purpose of summary judgment "is to isolate and dispose of factually unsupported claims or defenses." *Celotex v. Catrett*, 477 U.S. 317, 323–24 (1986). The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323 (internal quotation marks omitted). If it meets this burden, the moving party is then entitled to judgment as a matter of law when the non-moving party fails to make a sufficient showing on an essential element of the case with respect to which it bears the burden of proof at trial. *Id.* at 322–23.

To preclude the entry of summary judgment, the non-moving party must bring forth material facts—that is, "facts that might affect the outcome of the suit under the governing law[.]" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986). The trial court must "draw all justifiable inferences in favor of the nonmoving party, including questions of credibility and of the weight to

be accorded particular evidence." *Masson v. New Yorker Mag., Inc.*, 501 U.S. 496, 520 (1991) (citing *Anderson*, 477 U.S. at 255). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," however, "there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587.

Contract interpretation is a question of law, and thereby amenable to summary judgment, if (1) the contract is not ambiguous; or (2) the contract is ambiguous but no parol evidence is admitted or the parol evidence is not in conflict. *Walter E. Heller W., Inc. v. Tecrim Corp.*, 196 Cal. App. 3d 149, 158 (1987). A contract is ambiguous when "on its face it is capable of two different reasonable interpretations." *Republic Bank v. Marine Nat'l Bank*, 45 Cal. App. 4th 919, 924 (1996). If "a material fact necessary to interpret the contract" is disputed, summary judgment is inappropriate. *Essex Walnut Owner L.P. v. Aspen Specialty Ins. Co.*, 335 F. Supp. 3d 1146, 1150 (N.D. Cal. 2018) (citation omitted).

### III. ANALYSIS

Plaintiff advances three primary arguments for why Defendant did not satisfy the Minimum Requirement, which in turn requires summary judgment on the issue of Defendant's liability for breach of contract: (1) the language of Article 2 is unambiguous and P.O. 0801-01 was not an "order" pursuant to the Letter Agreement (it was, instead, merely a forecast for Defendant's future orders); (2) Plaintiff did not accept P.O. 0801-01, so Plaintiff did not "obtain" the order, as the provision requires; and (3) to the extent that the Letter Agreement is ambiguous, the parties' circumstances when negotiating the Letter Agreement and Defendant's typical style of purchase order establish that delivery of holders must have occurred during the Cost Sharing Period to qualify towards the Minimum Requirement. Defendant counters by asserting that it satisfied the Minimum Requirement by submitting P.O. 0801-01, which demonstrated that Defendant placed orders for the required 15 million holders before the end of the Cost Sharing Period, and insisting that Plaintiff is inserting requirements into the plain language of the Letter Agreement. While elements of the parties' arguments are persuasive, neither party ultimately carries their burden for a grant of summary judgment.

### A. Whether P.O. 0801-01 Constitutes an "Order"

While Defendant argues that its submission of P.O. 0801-01 satisfied the Minimum Requirement, Plaintiff asserts that P.O. 0801-01 was not actually an order because it did not set forth firm purchase commitments. Plaintiff believes that Defendant never actually intended for holders to be delivered at the schedule specified in P.O. 0801-01. In support, it points to the differing style of P.O. 0801-01 (as compared with prior purchase orders issued by Defendant), as well as deposition testimony from Defendant's then-President agreeing that, "in one respect," P.O. 0801-01 was "all speculative." Dkt. 65-1, Ex. 2 (Lester Deposition) at 73:11–18.[1]

Though the Letter Agreement unambiguously requires purchase orders in order to satisfy the Minimum Requirement, both parties fail to establish the absence of a dispute regarding whether P.O. 0801-01 constituted a genuine order that authorized delivery. Drawing all reasonable inferences in favor of the non-moving party, as must be done at this stage, the statement that P.O. 0801-01 was "in one respect . . . speculative," Lester Dep. at 73:11–18, and the purchase order's different form are not facts that compel, as a matter of law, the conclusion it was not actually an order under the Letter Agreement. There is no definitive evidence in the record demonstrating that P.O. 0801-01 was entirely speculative, nor is it clear that Plaintiff could not have sought specific performance. Moreover, the Letter Agreement did not require purchase orders to take a specific form,[2] and P.O. 0801-01 does contain the essential information an order would seem to require, such as the quantities and dates of delivery. To resolve this issue on the current record would require credibility determinations, which are inappropriate at summary judgment. *Best Buy Stores, L.P. v. Manteca Lifestyle Ctr., LLC*, 859 F. Supp. 2d 1138, 1147–48 (E.D. Cal. 2012) (citing *City*

---

[1] Though Plaintiff treats this deposition testimony as an unqualified admission by Defendant, the record makes clear that the statements were more limited. In context, Defendant's President explained that P.O. 0801-01 was developed through "customer forecasts," including "additional customers coming out of COVID-based disruptions." Dkt. 65-1, Ex. 2 (Lester Deposition) at 72:17–73:10. It was in this context that he agreed that, "in one respect," the orders laid out in P.O. 0801-01 were "all speculative." *Id.* at 73:11–18.

[2] Indeed, although the Parties seemingly believe there is no ambiguity, they also furnish little guidance as to what legal standards to look to in order to resolve these disputes.

*of Hope Nat'l Med. Ctr. v. Genentech, Inc.*, 181 P.3d 142, 156–57 (Cal. 2008)).

### B. What it Means to "Obtain" Orders

Next, Plaintiff argues that Defendant did not satisfy the Minimum Requirement because Plaintiff rejected P.O. 0801-01,[3] and for Plaintiff to have "obtain[ed]" an order, it is not enough for Defendant simply to have *placed* an order; Plaintiff must have accepted that order. Defendant, by contrast, argues that it is entitled to summary judgment because it placed orders for at least 15 million holders, thereby satisfying the Minimum Requirement.

Plaintiff's interpretation finds some support in the text of Article 2. As an initial observation, the Minimum Requirement is phrased from Plaintiff's point of view, not Defendant's—it requires *Plaintiff* to "obtain orders," rather than requiring *Defendant* to make orders or purchase holders. Letter Agreement, art. 2. In addition, Article 2 seems to contemplate the possibility that Plaintiff might reject a purchase order, since it provides that "purchase order(s) will become mutually binding upon BJB's written confirmation to Bridgelux of said purchase order(s)." *Id.*

Yet this interpretation is not so obvious as to preclude a contrary conclusion. It seems also possible, based on the text of Article 2, to understand the Minimum Requirement as only requiring action by Defendant. Plaintiff's written confirmation of a purchase order is necessary for the order to be "mutually binding." *Id.* Nothing in the Letter Agreement explicitly limits the Minimum Requirement to orders that are mutually binding.[4] Indeed, Plaintiff's argument seems tantamount to reading the text "upon BJB's written confirmation to Bridgelux of said purchase order(s)" as imbuing Plaintiff with the ability to evaluate and approve of—or reject—potential orders. Construing the contract in such a manner would seem to afford Plaintiff significant power,

---

[3] Defendants dispute Plaintiff's rejection of the purchase order, on the basis of an email dated January 2021 in which Plaintiff purportedly accepted Defendant's P.O. 1104-01, issued in late 2020. As evidenced in the hearing, whether or not this indicates that Plaintiff did actually accept Defendant's order remains a genuine dispute of material fact.

[4] Since one need only "procure" something to obtain it, *see* Obtain, Black's Law Dictionary (11th ed. 2019), Plaintiff could arguably procure an order simply by Defendant transmitting a purchase order, regardless of whether Plaintiff decided to accept it.

especially since the Letter Agreement does not specify conditions under which an order may be rejected, and it is not obvious that the Letter Agreement supports a unilateral ability by Plaintiff to determine which orders may qualify as contributing to the Minimum Requirement. As Defendant argues, such a construction would seem to allow Plaintiff to reject or delay confirming a purchase order just so that it could recover liquidated damages.

On this record, and at this stage, whether Plaintiff's acceptance was necessary for it to "obtain" an order seems ambiguous, and the parties do not present parol evidence to clarify the term's meaning. Accordingly, neither party's arguments on the issue must prevail as a matter of law.

### C. Whether Delivery Must Occur During the Cost Sharing Period

Finally, Plaintiff does offer parol evidence to support its argument that the holders must have been delivered during the Cost Sharing Period to qualify towards the Minimum Requirement, including deposition testimony from both parties showing they understood the Minimum Requirement as intended to compensate Plaintiff for its investment in new tools and equipment, as well as Defendant's prior practice of issuing purchase orders for a single quantity of each type of holders to be delivered approximately one month after purchase. For its part, Defendant argues that the Letter Agreement either unambiguously does not impose this requirement, or, to the extent the Letter Agreement is ambiguous, Plaintiff's proffered parol evidence is inadmissible, does not support Plaintiff's preferred interpretation, and is contradicted by a shipping forecast that Defendant produced in December 2016 showing that it only intended to order 1.4 million holders in 2017.

When interpreting a contract under California law, a court first "provisionally receives any proffered extrinsic evidence that is relevant to prove a meaning to which the language of the instrument is reasonably susceptible." *Wolf v. Walt Disney Pictures & Television*, 162 Cal. App. 4th 1107, 1126 (2008), *as modified on denial of reh'g* (June 4, 2008) (citation omitted). However, parol evidence is limited to "course of dealing, course of performance, or usage of trade" and

"consistent additional terms." Cal. Com. Code § 2202.[5]

Plaintiff's proffered parol evidence regarding the parties' purposes for including the Minimum Requirement does not fit into any of these categories. It is evidence of the parties' circumstances when negotiating the Letter Agreement, not of a course of dealing between the parties or any other category of admissible evidence outlined in Cal. Com. Code § 2202. Likewise, though Defendant's previous purchase orders (which set forth one batch of orders deliverable on a single date) might constitute course of performance evidence, they do not furnish incontrovertible proof that Article 2 of the Letter Agreement requires deliveries to have occurred during the Cost Sharing Period to qualify towards the Minimum Requirement. At best, this evidence supports that the parties intended for Defendant to "place orders for Holders and take delivery shortly thereafter." Dkt. 65 at 16; *see also Tanita Corp. of Am. V. Befour, Inc.*, No. 06 C 4459, 2009 WL 54509, at *5 (N.D. Ill. Jan. 6, 2009) (finding minimum purchase provision ambiguous since interpreting provision to require shipment and payment of the goods would make it "meaningless"). There is no ability at this stage to accept that deliveries *must* have occurred during the Cost Sharing Period to satisfy the Minimum Requirement.[6]

Defendant's proffered parol evidence, a 2017 shipping forecast that it prepared but does not claim to have given to Plaintiff, is also inadmissible. As a singular forecast, it does not show a sequence of conduct between the parties and therefore does not seem to demonstrate the parties' *course of performance*. Even if it did, the forecast also does not establish, in the broader context of the Letter Agreement, that Defendant had entirely free rein to choose the time for delivery of the holders (and, thereby, payment to Plaintiff), so long as it placed the order within the Cost Sharing

---

[5] Plaintiff references the parol evidence standards of Cal. Civ. Proc. Code § 1856, but Cal. Com. Code § 2202 sets forth the relevant standards since the Letter Agreement provides for the sale of goods.

[6] This conclusion is bolstered by the phrasing of Article 2. Had delivery of the Minimum Requirement been required to be completed within the Cost Sharing Period, Article 2 could have easily so stated—but instead, the Minimum Requirement requires *Plaintiff* to "obtain" sufficient *orders*, rather than for Plaintiff to make those deliveries. Letter Agreement, art. 2.

Period.[7] As previously discussed, the Minimum Requirement is not phrased from Defendant's perspective, but instead requires Plaintiff to "obtain" sufficient orders. Letter Agreement, art. 2. Such language thus seemingly contemplates more than the mere submission of a purchase order. Accordingly, summary judgment cannot be entered in favor of either party in this regard.

## IV. CONCLUSION

For the reasons articulated above, both parties' motions for partial summary judgment are denied.

**IT IS SO ORDERED**.

Dated: July 28, 2023

_____
RICHARD SEEBORG
Chief United States District Judge

---

[7] As Defendant's arguments have not suggested any limiting principle to this theory, it is easy to imagine the potential for abuse that this interpretation—not unlike Plaintiff's claimed unilateral ability to reject orders—would engender.