PATRICK J. CAIN (SBN 105331)
pcain@sgrlaw.com
DANA M. RICHENS (Pro Hac Vice)
drichens@sgrlaw.com
**SMITH, GAMBRELL & RUSSELL, LLP**
444 South Flower Street, Suite 1700
Los Angeles, CA 90071
(T) 213.358.7200; (F) 213.358.7313

Attorneys for Plaintiff/Cross-Defendant
BJB ELECTRIC LP

CRAIG A. GELFOUND (SBN 176378)
craig.gelfound@afslaw.com
KIRSTEN A. HART (SBN 258433)
Kirsten.hart@afslaw.com
JESSICA B. DO (SBN 317517)
jessica.do@afslaw.com
**ARENTFOX SCHIFF LLP**
555 West Fifth Street, 48th Floor
Los Angeles, CA  90013
(T) 213.629.7400; (F) 213.629.7401

Attorneys for Defendant and Counter-Claimant
BRIDGELUX, INC.

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BJB ELECTRIC LP,<br><br>          Plaintiff,<br><br>   v.<br><br>BRIDGELUX, INC.,<br><br>          Defendant. | Case No. 22-cv-01886-RS<br><br>**JOINT PRETRIAL STATEMENT AND [PROPOSED] ORDER**<br><br>Pretrial Conference:  August 9, 2023<br>Time:  10:00 a.m.<br>Location:  Courtroom 03, 17th Floor |
| BRIDGELUX, INC,<br><br>          Counter-Claimant,<br><br>  v.<br><br>BJB ELECTRIC LP,<br><br>          Counter-Defendant. | Judge:  Hon. Richard Seeborg<br>Magistrate:  Hon. Laurel Beeler<br><br>Date Filed: March 24, 2022<br>Trial Date: August 21, 2023 |

Plaintiff BJB Electric LP ("BJB Electric") and Defendant Bridgelux, Inc. ("Bridgelux") (collectively, the "Parties") jointly submit this JOINT PRETRIAL STATEMENT AND [PROPOSED] ORDER pursuant to the Guidelines for Final Pretrial Conference in Bench Trials Before Chief District Judge Richard Seeborg.

Pursuant to the Court's Bench Trial Standing Order, the Joint Pretrial Statement and [Proposed] Order is to be filed and served "[a]t least ten days before the Pretrial Conference," which is scheduled for August 9, 2023.  Thus, the filing due date was Sunday, July 20, 2023.  In light of the Court's recent rulings on Friday, July 28, 2023, regarding the Parties' Motions for Summary Judgment and Motions to Exclude Expert Testimony, the Parties stipulated to extend the filing of the Joint Pretrial Statement and [Proposed] Order by one day.  The Parties hereby respectfully submit this Joint Pretrial Statement and [Proposed] Order for the Court's consideration.

## I.   <u>Substance of the Action</u>

This is a breach-of-contract action.  The subject contract is a March 21, 2016 Letter Agreement between the parties, BJB Electric and Bridgelux (the "Letter Agreement").

### a.   <u>Brief Description of Parties</u>

BJB Electric, headquartered in Ringgold, Georgia, supplies components for lighting manufacturers, such as bulb, or, "lamp," holders, light-emitting diode ("LED") connectors, LED holders and related products.

Bridgelux, headquartered in Fremont, California, designs, manufactures and sells LEDs for indoor and outdoor lighting applications to large lighting manufacturers.

### b.   <u>Substance of Claims and Defenses That Remain to Be Decided</u>

Pursuant to the Letter Agreement, BJB Electric agreed to undertake the development of electro-mechanical holders for the Vero 2.0 product series (each a

"Vero 2.0 Holder"), which BJB Electric agreed to make available for sale to Bridgelux (the "Holder Project").

Article 2 of the Letter Agreement provides as follows:

If BJB is awarded the Holder Project (i.e., Bridgelux designates BJB as the supplier of the Holder), such units will be purchased by Bridgelux (or its designated contract manufacturer) under its purchase order at the pricing designated under Schedule A. However, if BJB fails to obtain orders for at least 15 million units ("Minimum Requirement") of the Vero 2.0 Holder within 4 years after "First Availability" of the Vero 2.0 Holder ("Cost Sharing Period"), Bridgelux agrees that it or its contract manufacturer will purchase the "Shortfall Quantity" of such Vero 2.0 Holders at the pricing designated under Schedule A ($0.08 per unit) pursuant to a Bridgelux purchase order. Bridgelux (or its designated contract manufacturers) purchase order(s) will become mutually binding upon BJB's written confirmation to Bridgelux of said purchase order(s). The "Shortfall Quantity" is the difference between the Minimum Requirement and the number of Vero 2.0 Holders ordered ("Ordered Holders") during the Cost Sharing Period. "First Availability" is the date that "Shippable Holders" are available for sale and shipment by BJB (with such availability then indicated via written confirmation from BJB to Bridgelux). "Shippable Holders" are the production version of Vero 2.0 Holders which are then available for sale and shipment.

**By BJB Electric:** It is BJB Electric's contention that the four-year Cost Sharing Period expired without BJB Electric having obtained orders from Bridgelux for the Minimum Requirement of 15 million units, and that Bridgelux thereby breached the Letter Agreement, thus entitling BJB Electric to liquidated damages, or alternatively, its actual damages.

**By Bridgelux:** It is Bridgelux's contention that it satisfied its obligation under the Letter Agreement by placing orders for over 15 million Vero 2.0 Holders prior to the expiration of the Cost Sharing Period. Bridgelux further contends that BJB Electric breached the Letter Agreement by unilaterally increasing the price of the Vero 2.0 Holders contrary to the terms of the Letter Agreement. Bridgelux also

contents that the liquidated damages provision of the Letter Agreement is an unenforceable penalty.

### c.   **Operative Pleadings**

1.   BJB Electric's Amended Complaint for Damages, filed September 1, 2022 [Dkt. #25].

2.   Bridgelux's Answer to the Amended Complaint and Counterclaim, filed September 15, 2022 [Dkt. #26].

3.   BJB Electric's Answer to the Counterclaim, filed September 27, 2022 [Dkt. #27].

## II.   **Relief Prayed**

**By BJB Electric:** For Bridgelux's breach of the Letter Agreement, BJB Electric prays for the liquidated damages provided for in the Letter Agreement – *i.e.*, Shortfall Quantity x $.08 per unit, plus interest.  Alternatively, BJB Electric prays for its actual damages, plus interest.

**By Bridgelux:**  Bridgelux seeks damages for BJB's breach of the Letter Agreement based on BJB's unilateral increase of Vero 2.0 Holder unit prices. Bridgelux also seeks the cost of certifying an alternate source to produce the Vero 2.0 Holders.  Should the Court determine that Bridgelux has breached the Letter Agreement, Bridgelux further seeks an order by the Court that the liquidated damages provision is an unenforceable penalty.  Bridgelux further seeks an order denying BJB Electric actual damages given that Bridgelux continues to purchase Vero 2.0 Holders from BJB Electric, and BJB Electric is obligated to sell Vero 2.0 Holders to mitigate damages. Any award of actual damages would constitute impermissible double recovery.  Finally, the proper measurement of damages incurred by BJB Electric is the cost of money for the delayed purchases.

## III.   **Undisputed Facts.**

a.   On or about March 21, 2016, BJB Electric and Bridgelux entered into the Letter Agreement.

AFDOCS:198611366.1

b.   On or about March 23 or 24, 2016, the parties amended Schedule A of the Letter Agreement to clarify that in the event of a shortfall, the "[c]ompensation (penalty) after 4 years of First Availability for the shortfall quantity will be at a price level of $0.08 per unit" paid by Bridgelux.

## IV.   Disputed Factual Issues.

### By BJB:

a.   The underlying facts supporting the legal conclusion that BJB Electric did not obtain orders for 15 million Vero 2.0 Holders during the Cost Sharing Period.

b.   The underlying facts supporting the legal conclusion that the parol evidence rule permits the use of extrinsic evidence to interpret the Letter Agreement.

c.   To the extent that the parol evidence rule does not preclude the use of extrinsic evidence:  (1) whether PO 0801-01 constitutes an order as contemplated by the Letter Agreement; (2) whether BJB obtained orders for 15 million Vero 2.0 Holders during the Cost Sharing Period; and (3) whether the 15 million Vero 2.0 Holders must be ordered by Bridgelux and delivered by BJB during the Cost Sharing Period.

d.   To the extent BJB Electric did not obtain orders for 15 million Vero 2.0 Holders during the Cost Sharing Period, the underlyling facts to support the legal determination regarding the appropriate measure of damages.

e.   The underlying facts to support the legal determination as to whether the Letter Agreement's liquidated damages provision is enforceable.

f.   The underlying facts to support the legal determination regarding whether the Letter Agreement was terminated at the end of the Cost Sharing Period.

### By Bridgelux:

a.   The underlying facts supporting the legal conclusion that BJB Electric obtained orders for 15 million Vero 2.0 Holders during the Cost Sharing Period. Bridgelux contends that the underlying facts are undisputed and the issue can be decided as a matter of law.

b.   The underlying facts supporting the legal conclusion that the parol evidence rule precludes the use of extrinsic evidence to interpret the Letter Agreement.

c.   To the extent that the parol evidence does not preclude the use of extrinsic evidence: (1) whether PO 0801-01 constitutes an order (Bridgelux contends that the underlying facts are undisputed and the issue can be decided as a matter of law); (2) whether the 15 million Vero 2.0 Holders must be ordered by Bridgelux and accepted by BJB Electric during the Cost Sharing Period; and (3) whether the 15 million Vero 2.0 Holders must be ordered by Bridgelux and delivered by BJB during the Cost Sharing Period.

d.   To the extent BJB Electric did not obtain orders for 15 million Vero 2.0 Holders during the Cost Sharing Period, the underlying facts to support the legal determination regarding the appropriate measure of damages.

e.   The underlying facts to support the legal determination as to whether the Letter Agreement's liquidated damages provision is enforceable.

f.   The underlying facts to support the legal determination regarding whether the Letter Agreement was terminated at the end of the Cost Sharing Period.

g.   The underlying facts to support the legal determination as to whether BJB Electric accepted the revised PO 1104-01 following the negotiation of the delivery schedule in the last order submitted by Bridgelux during the Cost Sharing Period PO 0801.

h.      To the extent that BJB Electric accepted the revised PO 1104-01, the underlying facts to determine whether the 2 cents price increase applies once the delivery schedule was extended into 2025 instead of the 8 cents per unit on the shortfall quantity between the agreed upon delivery schedule and the extended delivery schedule.  This issue related solely to damages incurred by Bridgelux for BJB's breach of the Letter Agreement.  BJB Electric has not raised the issue as a theory of liability in connection with its damages.

i.      The underlying facts to support the legal determination as to whether the Letter Agreement was operative when BJB raised the price for the Vero 2.0 Holders beyond the contract price in the Letter Agreement.

j.      The underlying facts to support the legal determination regarding the controlling purchase order at the time BJB Electric raised the price for the Vero 2.0 Holders beyond the contract price in the Letter Agreement.

k.      To the extent the Letter Agreement was operative at the time BJB Electric raised the price for the Vero 2.0 Holders beyond the contract price in the Letter Agreement, the underlying facts to support the legal determination regarding the appropriate measure of damages.

## V.      <u>Agreed Statement.</u>

This action may be presented upon the above undisputed facts and below stipulations.

## VI.     <u>Stipulations.</u>

a.      On or about March 21, 2016, BJB Electric and Bridgelux entered into the Letter Agreement.

b.      On or about March 23 or 24, 2016, the parties amended Schedule A of the Letter Agreement to clarify that in the event of a shortfall, the "[c]ompensation (penalty) after 4 years of First Availability for the

1    shortfall quantity will be at a price level of $0.08 per unit," paid by

2    Bridgelux.

3    c.   On August 14, 2020, BJB Electric received the document attached

4    hereto as **Exhibit A**.

5 **VII.**  **Witnesses to Be Called.**

6    **By BJB Electric:**

7    a.   **Joseph Laufer.**  Mr. Laufer is expected to testify regarding the business

8    of BJB Electric; the negotiation and execution of the Letter Agreement;

9    BJB Electric's intent as to and interpretation of the terms of the Letter

10    Agreement; the origins of the liquidated damages provision and the $.08

11    per unit thereunder; Holder orders placed by Bridgelux prior to August

12    14, 2020; BJB Electric's receipt of P.O. 0801-01 and the parties'

13    subsequent discussions, negotiations and conduct during the remainder

14    of, and subsequent to the close of, the Cost Sharing Period; the

15    underlying facts supporting the legal conclusion that BJB Electric did

16    not obtain orders for 15 million Vero 2.0 Holders during the Cost

17    Sharing Period; the underlying facts supporting the legal conclusion that

18    parol evidence is permissible to interpret the Letter Agreement; the

19    underlyling facts regarding whether PO 0801-01 constitutes an order;

20    the underlying facts regarding whether BJB Electric obtained orders for

21    15 million Vero 2.0 Holders during the Cost Sharing Period; the

22    underlying facts regarding whether the 15 million Vero 2.0 Holders

23    must be ordered by Bridgelux and delivered by BJB during the Cost

24    Sharing Period; the underlying facts regarding whether the Letter

25    Agreement was terminated at the end of the Cost Sharing Period

26    b.   **Albert Pruenster.**  Mr. Pruenster is expected to testify regarding the

27    business of BJB Electric; the negotiation and execution of the Letter

28    Agreement; BJB Electric's intent as to and interpretation of the terms of

1    the Letter Agreement; the origins of the liquidated damages provision

2    and the $.08 per unit thereunder; Holder orders placed by Bridgelux

3    prior to August 14, 2020; Bridgelux's receipt of P.O. 0801-01 and the

4    parties' subsequent discussions, negotiations and conduct during the

5    remainder of, and subsequent to the close of, the Cost Sharing Period;

6    the underlying facts supporting the legal conclusion that BJB Electric

7    did not obtain orders for 15 million Vero 2.0 Holders during the Cost

8    Sharing Period; the underlying facts supporting the legal conclusion that

9    parol evidence is permissible to interpret the Letter Agreement; the

10    underlyling facts regarding whether PO 0801-01 constitutes an order;

11    the underlying facts regarding whether BJB Electric obtained orders for

12    15 million Vero 2.0 Holders during the Cost Sharing Period; the

13    underlying facts regarding whether the 15 million Vero 2.0 Holders

14    must be ordered by Bridgelux and delivered by BJB during the Cost

15    Sharing Period; the underlying facts regarding whether the Letter

16    Agreement was terminated at the end of the Cost Sharing Period; the

17    amount of actual damages sustained by BJB Electric as a result of

18    Bridgelux's breach of the Letter Agreement; Bridgelux's order history

19    since the close of the Cost Sharing Period; the number of Holders

20    purchased by Bridgelux to date; rebuttal to the expert testimony of

21    Lawrence Leavitt (if Mr. Leavitt is permitted to testify at trial).

22    **By Bridgelux:**

23    a.    **Frank Hu.**  Mr. Hu is expected to testify regarding Bridgelux's efforts

24    to obtain an alternative supplier of Vero 2.0 Holders; BJB Electric's

25    breach of the Letter Agreement based on BJB's unilateral increase of

26    Vero 2.0 Holder unit prices; and the impact on Bridgelux from BJB

27    Electric's breach of the Letter Agreement

28

b.    **Tim Lester.**  Mr. Lester is expected to testify regarding the negotiation of the Letter Agreement and its terms; the circumstances leading up to Bridgelux's submission of PO 0801-01 and 0831-01; the Parties' negotiations after the close of the Cost Sharing Period; the underlying facts supporting the legal conclusion that BJB Electric obtained orders for 15 million Vero 2.0 Holders during the Cost Sharing Period; the underlying facts supporting the legal conclusion that the parol evidence rule precludes the use of extrinsic evidence to interpret the Letter Agreement; the underlying facts regarding whether PO 0801-01 constitutes an order; the underlying facts regarding whether the 15 million Vero 2.0 Holders must be ordered by Bridgelux and accepted by BJB Electric during the Cost Sharing Period; the underlying facts regarding whether the 15 million Vero 2.0 Holders must be ordered by Bridgelux and delivered by BJB during the Cost Sharing Period; the underlying facts regarding the appropriate measure of damages; the underlying facts regarding whether the Letter Agreement's liquidated damages provision is enforceable; the underlying facts regarding whether the Letter Agreement was terminated at the end of the Cost Sharing Period; the underlying facts regarding whether BJB Electric accepted the revised PO 1104-01 following the negotiation of the delivery schedule in the last order submitted by Bridgelux during the Cost Sharing Period PO 0801; the underlying facts regarding whether the Letter Agreement was operative when BJB raised the price for the Vero 2.0 Holders beyond the contract price in the Letter Agreement; the underlying facts regarding the controlling purchase order at the time BJB Electric raised the price for the Vero 2.0 Holders beyond the contract price in the Letter Agreement;  the underlying facts regarding the appropriate measure of damages to the extent the Letter Agreement

1    was operative at the time BJB Electric raised the price for the Vero 2.0

2    Holders beyond the contract price in the Letter Agreement; to the extent

3    that BJB Electric accepted the revised PO 1104-01, the underlying facts

4    to determine whether the 2 cents price increase applies once the delivery

5    schedule was extended into 2025 instead of the 8 cents per unit on the

6    shortfall quantity between the agreed upon delivery schedule and the

7    extended delivery schedule (this issue related solely to damages

8    incurred by Bridgelux for BJB Electric's breach of the Letter Agreement

9    and BJB has not raised the issue as a theory of liability in connection

10   with its damages).

11       c.    **Lawrence Leavitt.**  Mr. Leavitt is expected to provide expert testimony

12            regarding the damages that Bridgelux has or will sustain as a result of

13            BJB's actions.  Mr. Leavitt is also expected to provide expert testimony

14            regarding the damages, if any, that BJB alleges it has sustained as a

15            result of Bridgelux's actions.

16       Each party reserves the right to call any witness listed by the other party, as

17   well as any witness needed for impeachment or rebuttal.

18   **VIII.  Exhibits, Schedules and Summaries.**

19       Joint exhibit list is hereto attached as **Exhibit B**.

20   **IX.    Disputed Legal Issues.**

21            **BJB's Position**

22       a.    The interpretation of the Letter Agreement.

23       b.    Whether parol evidence is admissible to interpret the Letter Agreement.

24       c.    Whether BJB Electric obtained orders for 15 million Vero 2.0 Holders

25            during the Cost Sharing Period.

26       d.    Whether Bridgelux breached the Letter Agreement.

27       e.    If Bridgelux breached the Letter Agreement, whether the liquidated

28            damages provision is enforceable.

f.   If the liquidated damages provision is enforceable, the amount of liquidated damages, if any, to which BJB is entitled.

g.   If the liquidated damages provision is unenforceable, the amount of actual damages, if any, to which BJB Electric is entitled.

h.   The amount of accrued interest, if any, to which BJB is entitled.

**Bridgelux's Position**

a.   The interpretation of the Letter Agreement.

b.   Whether the parol evidence rule precludes the use of extrinsic evidence to interpret the Letter Agreement.

c.   Whether BJB Electric obtained orders for 15 million Vero 2.0 Holders during the Cost Sharing Period under a properly construed Letter Agreement.

d.   Whether PO 0801 constituted an order under the Letter Agreement.

e.   To the extent BJB Electric did not obtain orders for 15 million Vero 2.0 Holders during the Cost Sharing Period, the appropriate measure of damages.

f.   To the extent BJB Electric did not obtain orders for 15 million Vero 2.0 Holders during the Cost Sharing Period, whether the liquidated damages provision is enforceable.

g.   To the extent BJB Electric did not obtain orders for 15 million Holders, whether the Letter Agreement terminated or remained operative.

h.   Whether BJB Electric accepted the revised order PO 1104-01 following the negotiation of the delivery schedule in the last order submitted by Bridgelux during the Cost Sharing Period PO 0801.

i.   To the extent that BJB Electric accepted the revised PO 1104-01,whether the 2 cents price increase applies once the delivery schedule was extended into 2025 instead of the 8 cents per unit on the

shortfall quantity between the agreed upon delivery schedule and the extended delivery schedule.  This issue related solely to damages incurred by Bridgelux for BJB's breach of the Letter Agreement.  BJB Electric has not raised the issue as a theory of liability in connection with its damages.

j.       Whether the Letter Agreement was operative when BJB Electric unilaterally raised the price for the Holders beyond the contract price in the Letter Agreement.

k.       The controlling purchase order at the time BJB Electric raised the price for the Holders beyond the contract price in the Letter Agreement.

l.       To the extent the Letter Agreement was operative at the time BJB Electric raised the price for the Holders beyond the contract price in the Letter Agreement, the appropriate measure of damages.

## X.   **Pending Motions or Matters**

None.

## XI.   **Bifurcation, Separate Trials of Issues.**

The parties do not seek bifurcation or separate trial of specific issues.

## XII.   **Estimate of Trial Time.**

Expected length of the trial is three days.

## XIII.   **Miscellaneous.**

The foregoing admissions having been made by the parties, and the parties having specified the foregoing issues of fact and law remaining to be litigated, this order shall supplement the pleadings and govern the course of trial of this cause, unless modified to prevent manifest injustice.

1
2

Dated: July 31, 2023

**SMITH, GAMBRELL & RUSSELL, LLP**

3
4

By: */s/ Dana M. Richens*

5
6
7
8

Patrick J. Cain
Dana M. Richens
Attorneys for Plaintiff and Cross-Defendant
BJB ELECTRIC LP

9
10
11

Dated: July 31, 2023

**ARENTFOX SCHIFF LLP**

12
13

By: */s/ Craig A. Gelfound*

14
15
16

Craig A. Gelfound
Kirsten A. Hart
Jessica B. Do
Attorneys for Defendant and Counter-Claimant
BRIDGELUX, INC.

17
18
19
20

## SIGNATURE ATTESTATION

21
22
23

I hereby attest that I have obtained the authorization from the signatories to this e-filed document and have been authorized to indicate their consent by a conformed signature (/s/) within this e-filed document.

24
25

By: */s/ Craig A. Gelfound*

Craig A. Gelfound

26
27
28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# **PRETRIAL ORDER**

The above JOINT PRETRIAL STATEMENT AND PROPOSED ORDER is approved as the Pretrial Order for this case and all parties shall comply with its provisions.

IT IS SO ORDERED.


Dated: _____, 2023

_____
RICHARD SEEBORG
Chief United States District Judge

# EXHIBIT A

Bridgelux, Inc.
46430 Fremont Blvd.
Fremont, CA 94538
United States

| | Purchase Order |
|---|---|
| Order# | PO0801-01 |
| Revision | |
| Order date | 14-Aug-20 |
| Created by | ST Teou |
| Revision Date | |
| Buyer | Beryl Wang |

Supplier:  BJB Electric L.P.
6375 Alabama Highway
Ringgold, GA 30736

Ship To:  Alpha Logistics (HK) Ltd
9 & 15 /F, Tai Hing Industrial Building,
No.3 Tsing Yeung Circuit, Tuen Mun , HK

Payment Terms   N60
Freight Terms   Collect

Bill To:  46430 Fremont Blvd
Fremont, CA 94538

|  |  | 596,000 | | | 781,050 | | | 229,200 | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | **Vero 10** | | | **Vero 13** | | | **Vero 18** | | | **Vero 29** | | | **Total** | |
| Line | Requested Delivery Date | Units | Price | Extended | Units | Price | Extended | Units | Price | Extended | Units | Price | Extended | Units | Extended |
| 1 | 10/29/2020 | 1000 | 0.45 | 450 | 2000 | 0.58 | 1,160 | 1000 | 0.55 | 550 | 0 | | - | 4000 | 2,160 |
| 2 | 12/3/2020 | 1000 | 0.45 | 450 | 1000 | 0.58 | 580 | 1000 | 0.55 | 550 | 0 | | - | 3000 | 1,580 |
| 3 | 1/3/2021 | 1000 | 0.45 | 450 | 2000 | 0.58 | 1,160 | 1000 | 0.55 | 1,100 | 0 | | - | 5000 | 2,710 |
| 4 | 2/3/2021 | 1000 | 0.45 | 450 | 1000 | 0.58 | 580 | 1000 | 0.55 | 550 | 5000 | 0.98 | 4,900 | 8000 | 6,480 |
| 5 | 3/6/2021 | 1000 | 0.45 | 450 | 1000 | 0.58 | 580 | 1000 | 0.55 | 550 | 5000 | 0.98 | 4,900 | 8000 | 6,480 |
| 6 | 4/6/2021 | 2500 | 0.45 | 1,125 | 1000 | 0.58 | 580 | 1000 | 0.55 | 550 | 5000 | 0.98 | 4,900 | 9500 | 7,155 |
| 7 | 5/7/2021 | 3500 | 0.45 | 1,575 | 2500 | 0.58 | 1,450 | 2500 | 0.55 | 1,375 | 5000 | 0.98 | 4,900 | 13500 | 9,300 |
| 8 | 6/7/2021 | 3500 | 0.45 | 1,575 | 2500 | 0.58 | 1,450 | 2500 | 0.55 | 1,375 | 5000 | 0.95 | 4,750 | 13500 | 9,150 |
| 9 | 7/8/2021 | 3500 | 0.45 | 1,575 | 5000 | 0.58 | 2,900 | 5000 | 0.55 | 2,750 | 5000 | 0.95 | 4,750 | 18500 | 11,975 |
| 10 | 8/8/2021 | 3500 | 0.45 | 1,575 | 5000 | 0.58 | 2,900 | 5000 | 0.55 | 2,750 | 5000 | 0.95 | 4,750 | 18500 | 11,975 |
| 11 | 9/8/2021 | 3500 | 0.45 | 1,575 | 5000 | 0.58 | 2,900 | 5000 | 0.55 | 2,750 | 5000 | 0.95 | 4,750 | 18500 | 11,975 |
| 12 | 11/9/2021 | 3500 | 0.45 | 1,575 | 5000 | 0.58 | 2,900 | 5000 | 0.55 | 2,750 | 5000 | 0.95 | 4,750 | 18500 | 11,975 |
| 13 | 11/9/2021 | 7500 | 0.45 | 3,375 | 5000 | 0.58 | 2,900 | 5000 | 0.55 | 2,750 | 5000 | 0.95 | 4,750 | 22500 | 13,775 |
| 14 | 12/10/2021 | 7500 | 0.45 | 3,375 | 5000 | 0.55 | 2,900 | 5000 | 0.55 | 2,750 | 0 | | | 17500 | 9,025 |
| 15 | 1/10/2022 | 10000 | 0.45 | 4,500 | 5000 | 0.55 | 2,900 | 5000 | 0.55 | 2,750 | 0 | | | 20000 | 10,150 |
| 16 | 2/10/2022 | 10000 | 0.45 | 4,500 | 7500 | 0.55 | 4,125 | 7500 | 0.55 | 4,125 | 7500 | 0.95 | 7,125 | 32500 | 19,875 |
| 17 | 3/13/2022 | 10000 | 0.45 | 4,500 | 7500 | 0.55 | 4,125 | 7500 | 0.55 | 4,125 | 7500 | 0.95 | 7,125 | 32500 | 19,875 |
| 18 | 4/13/2022 | 50000 | 0.45 | 22,500 | 7500 | 0.55 | 4,125 | 7500 | 0.55 | 4,125 | 7500 | 0.95 | 7,125 | 72500 | 37,875 |
| 19 | 5/14/2022 | 50000 | 0.45 | 22,500 | 15000 | 0.55 | 8,250 | 15000 | 0.55 | 8,250 | 7500 | 0.95 | 7,125 | 87500 | 46,125 |
| 20 | 6/14/2022 | 50000 | 0.45 | 22,500 | 15000 | 0.55 | 8,250 | 15000 | 0.55 | 8,250 | 7500 | 0.95 | 7,125 | 87500 | 46,125 |
| 21 | 7/15/2022 | 50000 | 0.45 | 22,500 | 15000 | 0.55 | 8,250 | 15000 | 0.55 | 8,250 | 7500 | 0.95 | 7,125 | 87500 | 46,125 |
| 22 | 8/15/2022 | 50000 | 0.45 | 22,500 | 15000 | 0.55 | 8,250 | 15000 | 0.55 | 8,250 | 7500 | 0.95 | 7,125 | 87500 | 46,125 |
| 23 | 9/15/2022 | 50000 | 0.45 | 22,500 | 15000 | 0.55 | 8,250 | 15000 | 0.55 | 8,250 | 7500 | 0.95 | 7,125 | 87500 | 46,125 |
| 24 | 10/16/2022 | 50000 | 0.45 | 22,500 | 15000 | 0.55 | 8,250 | 15000 | 0.55 | 8,250 | 7500 | 0.95 | 7,125 | 87500 | 46,125 |
| 25 | 11/16/2022 | 50000 | 0.45 | 22,500 | 20000 | 0.55 | 11,000 | 20000 | 0.53 | 11,000 | 7500 | 0.95 | 7,125 | 97500 | 51,625 |
| 26 | 12/17/2022 | 50000 | 0.45 | 22,500 | 20000 | 0.55 | 11,000 | 20000 | 0.53 | 10,600 | 7500 | 0.95 | 7,125 | 97500 | 51,225 |
| 27 | 1/17/2023 | 50000 | 0.45 | 22,500 | 20000 | 0.55 | 11,000 | 20000 | 0.53 | 10,600 | 0 | 0.95 | | 90000 | 44,100 |
| 28 | 2/17/2023 | 50000 | 0.45 | 22,500 | 20000 | 0.55 | 11,000 | 20000 | 0.53 | 10,600 | 0 | 0.95 | | 90000 | 44,100 |
| 29 | 3/20/2023 | 50000 | 0.45 | 22,500 | 20000 | 0.55 | 11,000 | 20000 | 0.53 | 10,600 | 10000 | 0.95 | 9,500 | 100000 | 53,600 |
| 30 | 4/20/2023 | 75000 | 0.45 | 33,750 | 20000 | 0.55 | 11,000 | 20000 | 0.53 | 10,600 | 10000 | 0.95 | 9,500 | 125000 | 64,850 |
| 31 | 5/21/2023 | 100000 | 0.45 | 45,000 | 35000 | 0.55 | 19,250 | 35000 | 0.53 | 18,550 | 10000 | 0.95 | 9,500 | 180000 | 92,300 |
| 32 | 6/21/2023 | 100000 | 0.45 | 45,000 | 35000 | 0.55 | 19,250 | 35000 | 0.53 | 18,550 | 10000 | 0.95 | 9,500 | 180000 | 92,300 |
| 33 | 7/22/2023 | 100000 | 0.45 | 45,000 | 35000 | 0.55 | 19,250 | 35000 | 0.53 | 18,550 | 10000 | 0.95 | 9,500 | 180000 | 92,300 |
| 34 | 8/22/2023 | 100000 | 0.45 | 45,000 | 35000 | 0.55 | 19,250 | 35000 | 0.53 | 18,550 | 10000 | 0.95 | 9,500 | 180000 | 92,300 |
| 35 | 9/22/2023 | 100000 | 0.45 | 45,000 | 35000 | 0.55 | 19,250 | 35000 | 0.53 | 18,550 | 10000 | 0.95 | 9,500 | 180000 | 92,300 |
| 36 | 10/23/2023 | 100000 | 0.45 | 45,000 | 35000 | 0.55 | 19,250 | 35000 | 0.53 | 18,550 | 10000 | 0.95 | 9,500 | 180000 | 92,300 |
| 37 | 11/23/2023 | 100000 | 0.45 | 45,000 | 50000 | 0.55 | 27,500 | 50000 | 0.53 | 26,500 | 10000 | 0.91 | 9,100 | 210000 | 108,100 |
| 38 | 12/24/2023 | 100000 | 0.45 | 45,000 | 50000 | 0.55 | 27,500 | 50000 | 0.53 | 26,500 | 0 | 0.91 | | 200000 | 99,000 |
| 39 | 1/24/2024 | 100000 | 0.45 | 45,000 | 50000 | 0.55 | 27,500 | 50000 | 0.53 | 26,500 | 0 | 0.91 | | 200000 | 99,000 |
| 40 | 2/24/2024 | 100000 | 0.45 | 45,000 | 50000 | 0.55 | 27,500 | 50000 | 0.51 | 25,500 | 12500 | 0.91 | 11,375 | 212500 | 110,375 |
| 41 | 3/26/2024 | 100000 | 0.45 | 45,000 | 50000 | 0.55 | 27,500 | 50000 | 0.51 | 25,500 | 12500 | 0.91 | 11,375 | 212500 | 110,375 |
| 42 | 4/26/2024 | 100000 | 0.45 | 45,000 | 50000 | 0.55 | 27,500 | 50000 | 0.51 | 25,500 | 12500 | 0.91 | 11,375 | 212500 | 110,375 |
| 43 | 5/27/2024 | 100000 | 0.45 | 45,000 | 50000 | 0.55 | 27,500 | 50000 | 0.51 | 25,500 | 12500 | 0.91 | 11,375 | 212500 | 110,375 |
| 44 | 6/27/2024 | 100000 | 0.45 | 45,000 | 50000 | 0.55 | 27,500 | 50000 | 0.51 | 25,500 | 12500 | 0.91 | 11,375 | 312500 | 109,375 |
| 45 | 7/28/2024 | 100000 | 0.45 | 45,000 | 50000 | 0.55 | 27,500 | 50000 | 0.51 | 25,500 | 12500 | 0.91 | 11,375 | 312500 | 109,375 |
| 46 | 8/28/2024 | 200000 | 0.45 | 90,000 | 50000 | 0.55 | 27,500 | 50000 | 0.51 | 25,500 | 12500 | 0.91 | 11,375 | 312500 | 154,375 |
| 47 | 9/28/2024 | 200000 | 0.45 | 90,000 | 50000 | 0.55 | 27,500 | 50000 | 0.51 | 25,500 | 12500 | 0.85 | 10,625 | 312500 | 153,625 |
| 48 | 10/29/2024 | 200000 | 0.45 | 90,000 | 75000 | 0.55 | 41,250 | 75000 | 0.51 | 38,250 | 12500 | 0.85 | 10,625 | 362500 | 180,125 |
| 49 | 11/29/2024 | 200000 | 0.45 | 90,000 | 75000 | 0.55 | 41,250 | 75000 | 0.51 | 38,250 | 0 | 0.85 | | 350000 | 169,500 |
| 50 | 12/30/2024 | 200000 | 0.45 | 90,000 | 75000 | 0.55 | 41,250 | 75000 | 0.51 | 38,250 | 0 | 0.85 | | 350000 | 169,500 |
| 51 | 1/30/2025 | 200000 | 0.45 | 90,000 | 75000 | 0.53 | 39,750 | 75000 | 0.51 | 38,250 | 15000 | 0.85 | 12,750 | 365000 | 180,750 |
| 52 | 3/2/2025 | 200000 | 0.45 | 90,000 | 75000 | 0.53 | 39,750 | 75000 | 0.51 | 38,250 | 15000 | 0.85 | 12,750 | 365000 | 180,750 |
| 53 | 4/2/2025 | 200000 | 0.45 | 90,000 | 75000 | 0.53 | 39,750 | 75000 | 0.46 | 34,500 | 15000 | 0.85 | 12,750 | 365000 | 177,000 |
| 54 | 5/3/2025 | 200000 | 0.45 | 90,000 | 75000 | 0.53 | 39,750 | 75000 | 0.46 | 34,500 | 15000 | 0.85 | 12,750 | 365000 | 177,000 |
| 55 | 6/3/2025 | 200000 | 0.45 | 90,000 | 75000 | 0.53 | 39,750 | 75000 | 0.46 | 34,500 | 15000 | 0.85 | 12,750 | 365000 | 177,000 |
| 56 | 7/4/2025 | 200000 | 0.45 | 90,000 | 75000 | 0.53 | 39,750 | 75000 | 0.46 | 34,500 | 15000 | 0.85 | 12,750 | 365000 | 177,000 |
| 57 | 8/4/2025 | 200000 | 0.45 | 90,000 | 75000 | 0.53 | 39,750 | 75000 | 0.46 | 34,500 | 15000 | 0.85 | 12,750 | 365000 | 177,000 |
| 58 | 9/4/2025 | 200000 | 0.45 | 90,000 | 75000 | 0.53 | 39,750 | 75000 | 0.46 | 34,500 | 15000 | 0.85 | 12,750 | 365000 | 177,000 |
| 59 | 10/5/2025 | 200000 | 0.45 | 90,000 | 75000 | 0.53 | 39,750 | 75000 | 0.46 | 34,500 | 15000 | 0.85 | 12,750 | 365000 | 177,000 |
| 60 | 11/5/2025 | 200000 | 0.45 | 90,000 | 75000 | 0.53 | 39,750 | 75000 | 0.46 | 34,500 | 0 | 0.85 | | 350000 | 164,250 |
| 61 | 12/6/2025 | 200000 | 0.45 | 90,000 | 75000 | 0.53 | 39,750 | 75000 | 0.46 | 34,500 | 0 | 0.85 | | 350000 | 164,250 |
| 62 | 1/6/2026 | 200000 | 0.45 | 90,000 | 100000 | 0.53 | 53,000 | 100000 | 0.46 | 46,000 | 20000 | 0.85 | 17,000 | 420000 | 206,000 |
| 63 | 2/6/2026 | 200000 | 0.45 | 90,000 | 100000 | 0.53 | 53,000 | 100000 | 0.46 | 46,000 | 20000 | 0.85 | 17,000 | 420000 | 206,000 |
| 64 | 3/9/2026 | 200000 | 0.45 | 90,000 | 100000 | 0.53 | 53,000 | 100000 | 0.46 | 46,000 | 20000 | 0.85 | 17,000 | 420000 | 206,000 |
| 65 | 4/9/2026 | 200000 | 0.45 | 90,000 | 100000 | 0.53 | 53,000 | 100000 | 0.46 | 46,000 | 20000 | 0.85 | 17,000 | 420000 | 206,000 |
| 66 | 5/10/2026 | 200000 | 0.45 | 90,000 | 100000 | 0.53 | 53,000 | 100000 | 0.46 | 46,000 | 20000 | 0.85 | 17,000 | 420000 | 206,000 |
| 67 | 6/10/2026 | 200000 | 0.45 | 90,000 | 100000 | 0.53 | 53,000 | 100000 | 0.46 | 46,000 | 20000 | 0.85 | 17,000 | 420000 | 206,000 |
| 68 | 7/11/2026 | 200000 | 0.45 | 90,000 | 100000 | 0.53 | 53,000 | 100000 | 0.46 | 46,000 | 0 | 0.85 | | 400000 | 189,000 |
| | | 6,848,500 | | 3,081,825 | 2,790,500 | | 1,505,715 | 2787500 | | 1,374,175 | 590000 | | 529,200 | 13018500 | 6,492,015 |

This purchase order, together with Bridgelux Purchase Order Terms and Conditions, and any attachments hereto (collectively, "Order"), shall constitute an offer by Bridgelux to Supplier and a purchase order placed in accordance with the Arrangement between Bridgelux and Supplier dated March 21, 2016. A copy of Bridgelux Purchase Order Terms and Conditions is attached and available at www.bridgelux.com and is incorporated herein by reference. Each line of this Order is a seperate portion of the Order subject only to changes as allowed under section 5 of the Terms and Conditions. This Order can be accepted by Seller only upon the exact terms and conditions set forth in the Order. Any additional or different terms included by Seller are hereby objected to by Bridgelux and shall not become part of, or in any way alter, the contract. The Order shall become a binding contract upon said terms and conditions upon acceptance by Seller. To the extent that Seller's acceptance is expressly made conditional on assent to the additional or different terms, Bridgelux hereby rejects such additional or different terms and shall not be bound thereby.

Authorized By:

EXHIBIT A PAGE NO. 17

BJB0001927

**BRIDGELUX PURCHASE ORDER TERMS AND CONDITIONS**

## 1. BINDING AGREEMENT

**1.1 Parties.** These terms and conditions, together with any additional terms appearing on the purchase order and attachments or documents referenced herein, including without limitation, product or service specifications, requirements documents, statements of work, standards of care, or supplier code of conduct (collectively "Order") are incorporated by reference into each purchase order issued by BRIDGELUX, INC., or any other BRIDGELUX entity identified in the purchase order, including any and all applicable subsidiaries ("BRIDGELUX"). Each purchase order is issued by Bridgelux to the party identified in the "Issued To" box ("Seller" or "Supplier").

**1.2 Master Agreement.** This Order is incorporated by reference into any written agreement that is signed by an authorized representative of each party covering the same goods ("Goods") or services ("Services") described in the purchase order ("Master Agreement"). In the event of a conflict between this Order and any such Master Agreement, the terms and conditions of the Master Agreement shall prevail to the extent of such conflict, unless otherwise agreed upon by both parties in writing signed by an authorized representative.

**1.3 Purchase Order.** Absent a Master Agreement, this Order shall constitute an offer by Bridgelux to Supplier upon the terms and conditions of the Order. The Order shall become a binding agreement upon said terms and conditions upon acceptance by Supplier (as provided in Section 1.4) and shall constitute the entire agreement between Bridgelux and Supplier with respect to the sale of Goods or Services. Any and all prior agreements, quotes, requests for quotes, negotiations, correspondence, promises, covenants, communications, undertakings, arrangements, representations and warranties, whether oral or written, of Bridgelux or Supplier shall be superseded by the Order.

**1.4 Acceptance.** Supplier's written acceptance or commencement of performance shall constitute Supplier's acceptance of the Order. This Order can be accepted by Supplier only upon the exact terms and conditions set forth in the Order. Any additional or different terms included by Supplier in any purchase order confirmation, acknowledgement, invoice, billing statement, or other expression of acceptance, whether oral or written, regardless of timing, are hereby objected to by Bridgelux and shall not become part of, or in any way alter, the agreement between the parties. To the extent that Supplier's acceptance is expressly made conditional on assent to the additional or different terms, Bridgelux hereby rejects such additional or different terms and shall not be bound thereby.

**1.5 No Modification.** No modification of this Order shall be binding unless in writing and signed by an authorized representative of each party.

## 2. PRICES AND PAYMENT

**2.1 Price.** Supplier shall sell to the Goods or render the Services shown on the face of this Order at the prices specified. Any forecasts provided by BRIDGELUX are provided as an accommodation to Supplier, and shall not constitute a commitment of any type by BRIDGELUX. All quantities listed in this Order are only estimates and may be revised by BRIDGELUX if its requirements change. Except as otherwise provided in this Order, prices are exclusive of applicable freight charges and duties. Supplier warrants that such prices are not in excess of the lowest prices charged by Supplier to other similarly situated customers for similar quantities of Goods or Services of like kind and quality.

**2.2 Extension of Pricing.** Supplier agrees upon BRIDGELUX's request to offer to sell and to sell the Goods and Services that are the subject of this Order to Bridgelux's suppliers, contract manufacturers, and subcontractors ("Bridgelux Suppliers"), on terms and pricing no less favorable than those in this Order. Supplier further agrees that Goods sold and Services provided to Bridgelux Suppliers shall count towards any volume discounts extended to Bridgelux and Bridgelux Suppliers.

**2.2 Taxes.** BRIDGELUX shall be responsible for any applicable sales taxes, provided Supplier has submitted appropriate information or documentation to allow BRIDGELUX to recover such taxes as appropriate. BRIDGELUX shall include such taxes with the payment or provide Supplier with the appropriate information or documentation to support exemption from such taxes. BRIDGELUX shall have no other or further liability to Supplier with respect to any tax, duty, levy or like imposition for which Supplier may be liable as a result of the supply of the Goods or Services.

**2.3 Payment.** Unless indicated otherwise on the face of this purchase order, payment shall be due forty-five (45) days after the latter of BRIDGELUX'S receipt of either an appropriate invoice from Supplier or the relevant Goods or Services. BRIDGELUX may deduct from such payment any monies owed by Supplier to BRIDGELUX.

**2.4 Not Acceptance.** Payment by BRIDGELUX shall neither constitute acceptance of the Goods or Services, nor impair BRIDGELUX'S right to inspect such Goods or Services or invoke any available remedies.

## 3. TOOLING; CONSIGNED PROPERTY; AND STORAGE OF GOODS

**3.1 Tooling.** Unless otherwise specified in this Order, all tooling and/or all other articles for the performance of this Order, shall be furnished by Supplier, maintained in good condition and replaced when necessary at Supplier's expense. If Bridgelux agrees to pay Supplier for special tooling or other items, either separately as a stated part of the unit price of Goods purchased under this Order, title to such tooling shall be and remain in Bridgelux upon payment therefore.

**3.2 Consigned Bridgelux Property.** If Bridgelux furnishes any tooling, materials, supplies, components, replacements, and/or equipment to Supplier ("Consigned Property") such Consigned Property constitutes a lease or a bailment and is not a sale or the creation of a security interest. All rights, title to, and ownership of Consigned Property shall remain in Bridgelux and Supplier shall not at any time take any action inconsistent with Bridgelux's ownership and rights in any Consigned Property. Supplier shall only use the Consigned Property to fulfill its obligations under the Order and shall not indirectly or directly use any Consigned Property for the benefit of a third party or to the detriment of Bridgelux in any way. Supplier shall not alter, rework, or reverse engineer any Consigned Property and shall not remove or relocate any Consigned Property unless approved in writing by Bridgelux. To the extent possible, Consigned Property shall be segregated from Supplier's property, and be individually marked as Bridgelux's Property. Supplier at its sole expense, shall maintain Consigned Property in good condition and store, protect, preserve, repair and service such Consigned Property in accordance with sound commercial practice and any manufacturer instructions or instructions made available to Supplier. Supplier shall bear all risk of loss and damage with respect to Consigned Property from receipt until return to Bridgelux and shall at its sole expense insure all Consigned Property against loss or damage. Upon reasonable advanced notice (which shall not exceed three business days), Supplier shall permit inspection of the Consigned Property and promptly upon Bridgelux's request provide Bridgelux with detailed information on any Consigned Property. At Bridgelux's request, Supplier shall make Consigned Property available for shipment to the recipient or destination identified by Bridgelux and permit Bridgelux to enter Supplier's premise to obtain possession of any Consigned Property upon three (3) days advanced notice. Supplier agrees not to pledge, sell, lease, mortgage or encumber, dispose of, or subject to a lien or security interest any Consigned Property. Should this Order or the transactions under this Order be deemed for any reason to pass title to any Consigned Property to Supplier, Bridgelux will be deemed to hold, and Supplier hereby grants to Bridgelux, a purchase money security interest in the Consigned Property and the proceeds thereof, to secure all of Suppliers obligations to Bridgelux, including its obligation to return Consigned Property and Supplier's other obligations under this Order.

**3.3 Storage of Goods.** If Bridgelux arranges for Supplier to store Bridgelux's Goods, products, components, and/or materials at Supplier's facility(ies) ("Stored Goods"), all rights, title to, and ownership of the Stored Goods shall remain in Bridgelux and Supplier shall not at any time take any action inconsistent with Bridgelux's ownership, title, and rights in the Stored Goods. Supplier shall bear all risk of loss and damage with respect to the Stored Goods from receipt until return to Bridgelux and shall at its sole expense insure all Stored Goods against any loss and damage with a reputable insurance carrier. Supplier shall at all times maintain the traceability and trackability of the Stored Goods and shall keep all Stored Goods under 24 hour security. Upon Bridgelux's request, Supplier shall promptly provide all information requested by Bridgelux regarding the Stored Goods. Upon reasonable advanced notice (which shall not exceed three (3) business days), Supplier shall permit inspection of the Stored Goods; and make Stored Goods available for shipment to the recipient or destination identified by Bridgelux or permit Bridgelux and its agents and representatives to enter Supplier's premise to obtain possession of any Stored Goods. Supplier agrees not to pledge, sell, lease, mortgage or encumber, dispose of, or subject to a lien or security interest any Stored Goods.

## 4. SHIPMENT AND DELIVERY

**4.1 Shipment Terms.** Supplier shall ship Goods by the method identified by BRIDGELUX to permit Supplier to meet the delivery date(s) identified by BRIDGELUX on the face of this purchase order ("Delivery Date"). Time is of the essence. If Supplier ships by any other method, Supplier shall pay any resulting increase in the cost of freight. Unless otherwise stated on Bridgelux's Purchase Order or otherwise agreed upon in advance by Bridgelux, shipments of Goods shall be Incoterms 2010 FCA (Supplier's Shipping Point). Supplier's place of shipment/export, and title and risk of loss or damage shall pass from Supplier to BRIDGELUX upon Supplier's delivery of the Goods to the designated carrier at the place of shipment/export.

**4.2 Costs.** Except as otherwise provided in this Order, BRIDGELUX shall bear all shipping and transport expenses. Supplier shall bear all expenses related to handling, packing, packaging, loading, clearing for export, and delivery of Goods to the designated carrier, and loading of Goods onto carrier's conveyance.

**4.3 Packaging.** Supplier shall handle, pack and package the Goods so as to protect the Goods from loss or damage, in conformance with good commercial practice, BRIDGELUX specifications, government regulations (including those applicable to chemicals and hazardous materials) and other applicable requirements. Without limiting the generality of the foregoing sentence, Supplier shall use packaging materials, including pallets, that are free of pests and comply with all applicable regulations regarding Solid Wood Packing Materials; Supplier shall use recycled or reusable packaging materials and minimize the number of different types of packaging materials whenever possible; and Supplier shall comply with all applicable requirements regarding packaging recycling, reuse and return, and furnish to BRIDGELUX, upon request, information or documentation of Supplier's compliance. Supplier shall be responsible for any loss or damage due to its failure to handle, pack and package the Goods in a proper and lawful manner; BRIDGELUX shall not be required to assert any claims for such loss or damage against the carrier involved. In each shipment, Supplier shall include a packing list that contains the following: (a) this Order number; (b) the BRIDGELUX part number; (c) the quantity shipped; and (d) the date of shipment. The information on the packing list must agree

7.31.2013

BJB0001928

with the information on Supplier's invoice. Supplier shall mark each container with the necessary lifting, loading and shipping information, including the Order number, date of shipment, and name and address of the consignor and consignee as further specified within the applicable Bridgelux packaging specification.

**4.4 Prospective Failure.** Failure to meet the Delivery Date specified on the face of this Order shall constitute a breach of this Order. Supplier shall give BRIDGELUX notice of any prospective failure to ship Goods or provide Services in time for the Delivery Date as soon as Supplier is aware that the shipment will not be on time. Such notification shall include action plans for expediting the affected Goods. If only a portion of Goods is available for shipment to meet the Delivery Date, Supplier shall ship the available Goods unless directed by BRIDGELUX to reschedule shipment. If only a portion of the Services can be performed on the Delivery Date, Supplier shall perform such Services unless directed by BRIDGELUX to reschedule performance. Partial deliveries shall be deemed late shipments and be considered complete only when all Goods and Services have been shipped. Notwithstanding the above, upon Supplier's notice of any prospective failure to ship Goods or provide Services in time to meet the Delivery Date, BRIDGELUX reserves the right to terminate the Order and any subsequent Orders without any charge or liability, provided that any cancelled portion shall nevertheless be counted as purchased for purposes of determining Bridgelux's right to any quantity discounts.

**4.5 Late Shipment.** If due to Supplier's failure to ship Goods in a timely manner, the identified method of transportation would not permit Supplier to meet the Delivery Date, Supplier shall ship the Goods by air transportation or other means acceptable to BRIDGELUX for expedited delivery and Supplier shall pay for any resulting increase in the cost of freight.

**4.6 Early Shipment.** If BRIDGELUX receives any shipment more than three working days prior to the Delivery Date, BRIDGELUX may either return the Goods or accept the Goods and delay processing the corresponding invoice until the Delivery Date and charge Supplier for any costs of storage of the Goods.

**4.7 Non-Complying Goods.** Supplier shall be responsible for all risk and expenses, including transportation charges, associated with (a) the return of all Non-Complying Goods (as defined in section 7.1 below), over shipments, and early shipments returned by BRIDGELUX to Supplier, and (b) the shipment to BRIDGELUX by Supplier of all repaired, replacement and reworked Goods.

## 5. CHANGES

**5.1 Change or Cancellation.** BRIDGELUX may, without any charge or liability, change or cancel any portion of this Order, provided BRIDGELUX gives Supplier notice (a) for customized Goods or Services (i.e., supplied exclusively in accordance with BRIDGELUX's designs or specifications), at least thirty (30) calendar days prior to the Delivery Date; and (b) for all other Goods or Services at any time prior to shipment.

**5.2 Actual Costs.** If BRIDGELUX changes or cancels any portion of this Order other than as provided above, as its sole and exclusive liability and as Supplier's sole and exclusive remedy, BRIDGELUX shall be responsible for any resulting out-of-pocket costs incurred by Supplier that cannot be avoided by commercially reasonable mitigation efforts such as the sale of the Goods, or provision of Services to other parties. In no event will Bridgelux's liability in the aggregate exceed the total price which would have been paid under the Order for the Goods had the Order not been changed or canceled. Prior to BRIDGELUX's payment, Bridgelux may inspect Supplier's records at reasonable times or require Supplier to provide reasonable documentation and invoices to substantiate any cancellation charges.

**5.3 Design or Specification Changes.** BRIDGELUX may, without any charge or liability, change, effective upon notice to Supplier, BRIDGELUX's designs or specifications at any time prior to shipment of corresponding Goods or receipt of corresponding Services. If any such change directly affects the prices or delivery schedules of Goods or Services, an equitable adjustment may be made, provided that Supplier makes a written claim for an adjustment within five (5) days of BRIDGELUX's notice and prior to shipment of the Goods or provision of the Services, and provided that such equitable adjustment is documented in writing signed by authorized representatives of both parties. If, after reasonable and good-faith efforts, the parties are unable to agree upon the amount of the adjustment, BRIDGELUX may terminate, without any charge or liability, this Order as to all Goods and Services affected.

**5.4 No Process or Design Changes.** Supplier shall not, without the prior written consent of BRIDGELUX, make any process or design changes affecting the Goods.

## 6. QUALITY, INSPECTION, RECORDS, AND WARRANTY

**6.1 Quality Control.** Supplier shall maintain an objective quality assurance program for all Goods and Services in accordance with (a) the latest revision of BRIDGELUX's Supplier Quality Systems Requirements; and (b) any specification set forth in this Order or otherwise supplied by BRIDGELUX. Supplier's quality assurance program shall include without limitation, verification of the effectiveness of the quality assurance system of any subcontractor or vendor used by Supplier in connection with the manufacture or production of the above deliverables. Supplier shall furnish to BRIDGELUX, upon request, a copy of Supplier's quality program and supporting test documentation. Supplier shall also comply with the Bridgelux Supplier Principles, a copy of posted on Bridgelux's website.

**6.2 Inspection.** Supplier shall test each lot to ensure that the Goods meet Bridgelux's specifications, and acceptance criteria, and Supplier shall not ship any Goods that do not conform to such requirements. All Goods and the facilities where the Goods are manufactured or produced may be inspected by Bridgelux, its' representatives, agents, contractors, and customers ("Representatives") at all reasonable times upon reasonable advanced notice to Supplier. Inspection of Goods at Supplier's facility will be without prejudice to Bridgelux's right to inspect and reject such Goods upon delivery to the destination facility and shall not alleviate Supplier's obligations to comply with all applicable laws or

be viewed as Bridgelux's acquiescence to any non-compliance by Supplier. In the event that Supplier is not in complete control of the premise in question, Supplier agrees that it will use its best efforts to obtain all necessary and proper consents that will allow Bridgelux and its Representatives to exercise the rights set forth in this Section.

**6.3 Records.** Supplier will maintain complete and accurate records of all activities relating to the sale of the Goods and/or Services and other obligations hereunder, including without limitation, adequate authenticated inspection test documents that relate to work performed under this Order (including without limitation, technical and/or testing reports regarding product quality, safety, and/or reliability), and retain such documents for a period of three (3) years after completion of the Order, making such documents available to Bridgelux upon its request.

**6.4 Conformance Defects and Liens.** Supplier warrants that all Goods and Services shall (a) conform strictly to the specifications, design criteria, statements of work, quality requirements, descriptions, drawings, sales literature, samples and other requirements described or referenced in this Order or provided by Supplier; (b) be free from defects in design, materials and workmanship and be of merchantable quality; and (c) be free of all liens, encumbrances and other claims against title.

**6.5 Non-Infringement Warranty.** Supplier warrants that all Goods and Services do not and shall not infringe any patent, trademark, copyright, trade secret or other intellectual property right of a third party, unless an infringement arises exclusively from a design that is proprietary to and provided by Bridgelux.

**6.6 General Warranties.** Supplier warrants that (a) Goods are new, and do not contain any used, or reconditioned parts or materials, unless otherwise specified or approved by BRIDGELUX; (b) Goods are not counterfeit goods and do not contain counterfeit parts and/or materials; and (c) all Services shall be performed in a professional manner. The express warranties in this Section 6 are in addition to any warranty implied by law.

**6.7 Duration of Warranties.** All of Supplier's warranties referenced in this Order shall be in effect for the longer of either (i) Supplier's normal warranty period, or (ii) sixty three (63) months following the date of acceptance of the Goods or Services by BRIDGELUX. All other warranties provided by Supplier under this Order shall be in effect perpetually.

## 7. NONCOMPLYING GOODS AND SERVICES

**7.1 Non-Complying Goods and Services.** In addition to the remedies specified in Section 11 below, if any Goods or Service is defective or otherwise not in conformity with an express warranty provided under Section 6 or any other requirement of this Order ("Non-Complying Goods" and "Non-Complying Services", respectively), BRIDGELUX shall have the right, whether or not payment has been made, to reject them and receive a refund of the purchase price or require that any Non-Complying Goods to be corrected or replaced promptly or require Supplier to re-perform the Services at Supplier's expense. Replaced or corrected Goods shall be subject to the warranties provided under Section 6 to the same extent of the original Goods except the warranty from run from the last delivery date. Shipment of returned, replaced or corrected Goods will be at Supplier's cost and risk of loss.

**7.2 Time for Compliance.** If BRIDGELUX returns the Non-Complying Goods, Supplier shall return the corrected or replacement Non-Complying Goods no later than five working days after receipt of the Non-Complying Goods from BRIDGELUX. If BRIDGELUX requires Supplier to re-perform the Non-Complying Services, Supplier shall re-perform the Services within five working days after notice from BRIDGELUX that Services are defective or not in conformity with the requirements of this Order. The cure period specified in Section 11.1 below shall apply only once to any breach of this section.

**7.3 Failure to Provide Complying Goods.** If Supplier fails to return corrected or replacement Goods to BRIDGELUX within five (5) working days of receipt of Non-Complying Goods as referenced in Section 7.2, BRIDGELUX may reject the Non-Complying Goods, and Supplier shall reimburse BRIDGELUX all associated costs paid by or incurred by BRIDGELUX with respect to such non-compliance. If BRIDGELUX rejects the Non-Complying Goods, BRIDGELUX may procure, upon such terms and in such manner as BRIDGELUX deems appropriate, replacement goods. Supplier shall reimburse BRIDGELUX upon demand for all additional costs incurred by BRIDGELUX in purchasing any such replacement goods.

**7.4 Failure to Re-Perform Services.** If Supplier fails to re-perform the Services within five working days after notice from BRIDGELUX, BRIDGELUX may procure, upon such terms and in such manner as BRIDGELUX deems appropriate, replacement services. Supplier shall reimburse BRIDGELUX upon demand for all additional costs incurred by BRIDGELUX in purchasing any such replacement services.

**7.5 Epidemic Failures.** Supplier warrants the Goods against Epidemic Failures. An "Epidemic Failure(s)" means the occurrence of the same failure type in any 1% (or more) of Goods in the same family of Goods within a consecutive 90 day time frame ("Epidemic Failure"). The following procedures and remedies for Epidemic Failures are in addition to all other of Bridgelux's rights and remedies under the Agreement and shall apply for a period of five (5) years after the date of first shipment of the Goods (or family of Goods) at issue. Upon the occurrence of an Epidemic Failure as described herein, Supplier will provide Bridgelux with a root cause analysis no later than two (2) business days following Bridgelux's notice of an Epidemic Failure. Supplier will also provide Bridgelux with a corrective action plan as soon as commercially and reasonably possible, but no later than ten (10) calendar days following Bridgelux's notice of an Epidemic Failure. If after review of the root cause analysis and corrective active plan, Bridgelux determines that the Epidemic Failure necessitates a recall of the Goods and that the Goods suffering the Epidemic Failure are Non-Conforming Goods,

BJB0001929

Bluelux may then elect, at its sole discretion, to have the Goods returned to Supplier for replacement free of charge to Bridgelux (or its designated shipping destination[s]) and Supplier shall be liable for all costs and expenses associated with any such recall and Epidemic Failure, including without limitation, any retrofit, installation, and de-installation as well as all repair, replacement, and shipping fees and charges.

**7.6 Disposal.** Where lawfully required, Supplier shall, without any charge or liability to BRIDGELUX, accept and properly dispose of, the Goods and any materials included in the Goods and their packaging.

## 8. ASSIGNMENT OF RIGHTS AND LICENSE

**8.1. Assignment.** Bridgelux shall be the owner of, and Supplier agrees to assign and does hereby assign to Bridgelux all right, title, and interest worldwide, in and to any invention(s) and/or Goods, originally created, conceived, developed, reduced to practice or otherwise made by Supplier and any works of authorship created by Supplier, whether alone or jointly with others, and whether considered to be "work made for hire" or not in the course of performing Services for Bridgelux under an Order. Supplier agrees to assist Bridgelux in every reasonable way, at Bridgelux's expense, to secure, perfect, register, maintain, and defend for Bridgelux's benefit all such developed intellectual property, including without limitation, executing documents as may be reasonably requested by Bridgelux and confirming Bridgelux's ownership.

**8.2 License Grant.** If Goods include software, Supplier grants to BRIDGELUX a non-exclusive, royalty-free, worldwide license to use, import, reproduce, and distribute the software in object code form for internal use directly or as integrated into BRIDGELUX products. Supplier also grants to BRIDGELUX a non-exclusive, royalty-free, worldwide license to use, import, distribute and offer for sale any copies of the software purchased that remain in the original shrink-wrapped packaging. If Goods include documentation, Supplier grants to BRIDGELUX a non-exclusive, royalty-free, worldwide license to use, reproduce, distribute and prepare derivative works in BRIDGELUX's name all documentation furnished by Supplier. BRIDGELUX may reproduce such documentation without Supplier's logo or other identification of source, subject to affixing copyright notices to all copies of documentation, and Supplier hereby waives and shall cause to be waived all applicable moral rights with respect to such documentation. These rights with respect to software and documentation shall extend to (a) third parties to use and reproduce the Goods for BRIDGELUX's internal use; and (b) third-party channels of distribution.

## 9. INDEMNIFICATION, INTELLECTUAL PROPERTY AND CONFIDENTIAL INFORMATION

**9.1 Indemnification.** Supplier agrees to defend, indemnify and hold harmless BRIDGELUX and its affiliates, subsidiaries, assigns, subcontractors and customers from and against all claims, losses, demands, fees, damages, liabilities, costs, expenses (including attorneys' fees), obligations, causes of action, suits or injuries of any kind or nature arising from, in connection with or related in any way to any breach or alleged breach of this Order or any of the warranties made by Supplier, failure to comply with applicable federal, state and local laws and regulations, willful misconduct or negligence, or any actual or claimed infringements of patents, trademarks, service marks, trade secrets or copyrights with respect to the Goods or Services, excluding any claims of infringement exclusively based upon a design proprietary to and provided by Bridgelux with respect to this Order.

**9.2 Infringing Goods And Services.** Without limiting the above remedy, if BRIDGELUX's use of any Goods or receipt of any Service is enjoined because of any actual or claimed infringement of patent, trademark, copyright, trade secret or other intellectual property right of a third party (collectively, "Infringing Product"), Supplier shall at its expense use its best efforts to procure the right for BRIDGELUX to continue using or receiving the Infringing Product. If Supplier is unable to do so, Supplier shall at its expense (a) replace the Infringing Product with non-infringing goods or service (as applicable) without loss of functionality; (b) modify the Infringing Product to be non-infringing; or (c) if unable to replace or modify the Infringing Product, refund in full all costs paid by BRIDGELUX for the Infringing Product and reimburse BRIDGELUX upon demand for all additional costs incurred by BRIDGELUX in purchasing any replacement goods or services.

**9.3 Removal of BRIDGELUX's Trademarks.** Unless otherwise specified or approved by BRIDGELUX, Supplier shall remove BRIDGELUX'S name and any of BRIDGELUX's trademarks, trade names, insignia, part numbers, symbols or decorative designs from all Goods rejected or returned by BRIDGELUX or not sold or shipped to BRIDGELUX.

**9.4 Confidential Information.** Except as required to supply Goods or Services pursuant to this Order or as otherwise instructed by BRIDGELUX, Supplier shall not use or disclose any confidential information of BRIDGELUX. Confidential information includes, without limitation, all information designated by BRIDGELUX as confidential; all information or data concerning BRIDGELUX's Goods (including the discovery, invention, research, improvement, development, manufacture or sale thereof) or general business operations (including costs, forecasts, profits, pricing methods and processes); information obtained through access to any BRIDGELUX information system ("Information System"), including but not limited to, computers, networks and voice mail; and any other information that is of such a nature that a reasonable person would believe it to be confidential. Upon Bridgelux's request, Supplier shall return to Bridgelux or destroy all such disclosed confidential information. Supplier shall not disclose or use any such confidential information for the benefit of any other party.

**9.5 Limited Information System Access.** Supplier's access to BRIDGELUX'S Information Systems is limited to those specific Information Systems, time periods and personnel authorized by BRIDGELUX, and is subject to BRIDGELUX information protection policies. Any other access is expressly prohibited. Supplier warrants that it shall comply with these obligations and that access granted hereunder shall not impair the integrity and availability of BRIDGELUX'S Information System. BRIDGELUX may audit Supplier to verify compliance. Supplier warrants that each employee, agent or subcontractor who performs work pursuant to this Order has been informed of the obligations contained herein and has agreed to be bound by them.

**9.6** Supplier agrees not to sue Bridgelux, or its customers, distributors, agents, contract manufacturers, contractors, affiliates, or subsidiaries ("Channel Parties"), or to bring, assert, prosecute, or participate in any judicial, administrative action, claim or proceeding against Bridgelux, or a Channel Party(ies) for infringement of any Supplier owned patents for the manufacture, use, sale, or import of any Bridgelux product (or component thereof) developed, supplied, manufactured or serviced by Supplier.

## 10. LEGAL COMPLIANCE

**10.1 General Compliance.** Supplier shall comply with all applicable federal, state, local and foreign laws, rules, and regulations related to its obligations under an Order. Without limiting the generality of the foregoing sentence, Supplier warrants the following:

**10.1.1 Environmental Compliance.** All Goods and their packaging shall comply with all applicable environmental, health and safety (EHS) laws, rules and regulations, including The General Specification for the Environment (GSE) DWG A-5951-1745-1.

**10.1.2 Chemical Substances.** Each chemical substance contained in Goods is on the inventory of chemical substances compiled and published by the U.S. Environmental Protection Agency pursuant to the Toxic Substances Control Act; and all required Material Safety Data Sheets, Chemical Safety Data Sheet and other product-content information shall be provided to BRIDGELUX prior to or with the shipment of the Goods and shall be complete and accurate.

**10.1.3 Substance Classification.** No Goods nor any component of any Goods contains any "Class I substance" or "Class II substance" as those terms are defined by U.S. law at 42 U.S.C. Section 7671, as now in existence or hereafter amended; or has been manufactured with a process that uses any Class I substance or Class II substance within the meaning of U.S. law at 42 U.S.C. Section 7671| (d) (2), as now in existence or hereafter amended.

**10.1.4 Invoice Certification.** As a condition precedent to payment thereof, Supplier shall, upon request, certify each invoice as follows: "We certify that contract deliverables listed hereon were produced in compliance with all applicable requirements of Sections 6, 7, and 12 of the U.S. Fair Labor Standards Act, as amended, and of regulations and orders of the U.S. Department of Labor issued under Section 14 thereof. We further certify that any and all additional contract deliverables shall be produced in compliance with the same requirements."

**10.1.5 Procurement Regulations.** If the Goods and Services are to be sold by BRIDGELUX under a contract or subcontract with the U.S. government, all applicable procurement regulations required by U.S. law or regulation to be inserted in contracts or subcontracts apply to this Order.

**10.1.6 Conflict Minerals.** No Goods nor any component of any Goods contains "Conflict Minerals" (as defined by Title XV of the Dodd-Frank Wall Street Reform and Consumer Protection Act, Section 1502) that originate from the Democratic Republic of the Congo and other "Covered Countries" (as defined by Title XV of the Dodd-Frank Wall Street Reform and Consumer Protection Act, Section 1502).

**10.1.7 Anti-Bribery and Anti-Corruption.** Supplier shall comply with, and not take any actions that would cause it or Bridgelux to violate, the U.S. Foreign Corrupt Practices Act of 1977, ("FCPA") as amended, or any other applicable anti-corruption and/or anti-bribery legislation and shall certify compliance as requested by Bridgelux from time to time.

**10.2 Other Requirements.** Supplier shall furnish to BRIDGELUX, upon request, information or documentation of Supplier's compliance with applicable laws, rules and regulations, as well as any other information or documentation required to enable BRIDGELUX to comply with such laws, rules and regulations applicable to its use of any Goods or receipt of any Service.

## 11. BREACH

**11.1 Breach by Supplier.** If Supplier breaches any provision of this Order, BRIDGELUX may terminate the whole or any part of this Order, unless Supplier cures the breach within ten (10) working days after receipt of BRIDGELUX'S notice of breach.

**11.2 Definition of Breach.** For purposes of section 11.1 above, the term "breach(s)" shall, without limitation, include (a) any proceeding, whether voluntary or involuntary, in bankruptcy or insolvency by or against Supplier; (b) the appointment, with or without Supplier's consent, of a receiver or an assignee for the benefit of creditors; (c) Supplier's failure to provide BRIDGELUX, upon request, with reasonable assurances of performance; or (d) any other failure by Supplier to make delivery of the Goods or perform the Services within the time specified in this Order or any authorized extension, or otherwise comply with or meet its obligations under this Order.

**11.3 Rights Upon Termination for Breach.** In the event that BRIDGELUX terminates this Order in whole or in part as provided above, BRIDGELUX may (i) procure, upon such terms and in such manner as BRIDGELUX deems appropriate, replacement goods or services, and Supplier shall reimburse BRIDGELUX upon demand for all additional costs incurred by BRIDGELUX in purchasing such replacement goods or services; and (ii) require Supplier to transfer title and deliver to Bridgelux any completed or partially completed Goods and any materials, parts, tools, dies, jigs, fixtures, plans, drawings, information and manufacturing materials specifically produced or acquired for performance of this Order,

**11.4 Rights and Remedies.** The rights and remedies granted to BRIDGELUX pursuant to this Order are in addition to, and shall not limit or affect, any other rights or remedies available at law or in equity.

## 12. IMPORT/EXPORT REQUIREMENTS

**12.1 General Compliance.** Supplier shall comply with all applicable import and export requirements, and shall furnish to BRIDGELUX, upon request, information or documentation of Supplier's compliance, as well as any other information or documentation required to enable BRIDGELUX to comply with such requirements applicable to its receipt of any Goods. Without limiting the generality of the foregoing sentence, Supplier warrants the following:

**12.1.1 Certification.** Upon BRIDGELUX'S request, Supplier shall provide BRIDGELUX with an appropriate certification stating the country of origin for Goods, sufficient to satisfy the requirements of (a) the customs authorities of the country of receipt; and (b) any applicable export licensing regulations, including those of the United States.

**12.1.2 Required Marking.** All Goods shall be marked (or the container shall be marked if there is no room on the Goods themselves or unless exempted from marking) with the country of origin and such other requirements referenced by Bridgelux in an Order, and shall be in compliance with the requirements of the customs authorities of the country of receipt.

**12.1.3 Commercial Invoice.** Supplier shall issue a commercial invoice containing, without limitation, the following information: invoice number, invoice date, name and address of the shipper, name and address of the seller (if different from the shipper), name and address of the consignee, name and address of the buyer (if different from the consignee), a detailed description of the Goods, model number, BRIDGELUX part-numbers, serial number of Goods (if goods are serialized), BRIDGELUX-assigned Harmonized Tariff Schedule (HTS) number for the destination country, order number, box number, total number of boxes, total box weight ( in kilograms), country of origin, quantities in the weight and measure of the country to which the Goods are shipped, unit price of each Good, value of any customs assists, total invoice value, currency of the invoice, invoice type, Incoterms 2010 term of sale, carrier name and bill of lading number. The invoice must be issued in the language required by the country to which the Goods are shipped.

**12.2 Importer of Record.** If any Goods are imported, Supplier shall when possible allow BRIDGELUX to be the importer of record, unless otherwise specified or approved by BRIDGELUX. If BRIDGELUX is not the importer of record and Supplier obtains duty drawback rights to the Goods, Supplier shall furnish to BRIDGELUX, upon request, information and documentation required by the customs authorities of the country of receipt to prove importation and to transfer duty drawback rights to BRIDGELUX.

## 13. MISCELLANEOUS

**13.1 Assignment.** Neither party may, directly or indirectly, in whole or in part, either by operation of law or otherwise, assign or transfer this Order or delegate any of its obligations under this Order without the other party's written consent. Any attempted assignment, transfer or delegation without prior written consent shall be void. Notwithstanding, either party, may, without obtaining the prior written consent of the other party, assign or transfer this Order or delegate any rights or obligations hereunder: (1) to any entity controlled by, or under common control with such party, or its permitted successors or assigns; or (2) in connection with merger, reorganization, transfer, sale of assets or product lines, or change of control or ownership of such party, or its permitted successors, assigns or transferees; provided, however that, prior to such assignment or transfer, such party shall provide the other party hereto with reasonable assurances that the performance of all of such party's obligations hereunder shall continue after such assignment or transfer. Such assurances shall include, without limitation, reasonable assurances from Supplier that BRIDGELUX shall continue to receive its supply of Products hereunder, or reasonable assurances from BRIDGELUX that Supplier shall continue to receive timely payments as required under any such Orders. Without limiting the foregoing, this Order will be binding upon and inure to the benefit of the parties and their permitted successors and assigns.

**13.2 Waiver.** The waiver of any term or condition of this Order must be in writing. No such waiver shall be construed as a waiver of any other term or condition, nor as a waiver of any subsequent breach of the same term or condition.

**13.3 Choice of Law.** The laws of the State of California, without giving effect to any conflicts of laws principles, and each party hereby expressly consents to the personal jurisdiction and venue in the state and federal courts of Alameda County, California for any lawsuit filed or arising from or related to this Order.

**13.4 LIMITATION OF LIABILITY. TO THE FULLEST EXTENT PERMITTED BY LAW, UNLESS EXPRESSLY PROVIDED OTHERWISE, IN NO EVENT SHALL BRIDGELUX BE LIABLE FOR ANY INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES BASED ON CONTRACT, TORT OR OTHER LEGAL THEORY, EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGES IN ADVANCE.**

**13.5 Non-Restrictive Relationship.** Nothing in this Order shall be construed to preclude BRIDGELUX from producing, distributing or marketing the same or similar goods or services as the Goods or Services provided under this Order or purchasing such same or similar goods or services from other third parties.

**13.6 Severability.** If a body of competent jurisdiction holds any term or provision of this Order to be invalid or unenforceable, such term or provision will be construed, limited or, if necessary, severed to the extent necessary to eliminate such invalidity or unenforceability, and the other provisions

**13.7 Notices.** All notices hereunder shall be in writing and be deemed to have been duly given if delivered personally, two days after delivery to an internationally or nationally recognized overnight delivery service, charges prepaid, five days after sent by registered or certified mail, postage prepaid, or when receipt is confirmed by telex, confirmed facsimile or email to such address as shall be

provided by the parties from time to time in writing. Any party may change its address for such communications by giving notice thereof to the other party in conformance with this section.

**13.8 Survival.** The provisions of this Order which by their nature are intended to survive this Order shall survive the termination or expiration of this Order, which include without limitation, Sections 3, 6, 7, 8, 9, 10, 11.3, 11.4, and 13.

EXHIBIT A PAGE NO. 21

BJB0001931

# EXHIBIT B

1
2
3
4
5
6
7
8              UNITED STATES DISTRICT COURT
9            NORTHERN DISTRICT OF CALIFORNIA
10

11   BJB ELECTRIC LP,                    Case No. 22-cv-01886-RS

12              Plaintiff,               **JOINT TRIAL EXHIBIT LIST**

13         v.

14   BRIDGELUX, INC.,

15              Defendant.

16   _____

17   BRIDGELUX, INC,

18              Counter-Claimant,        Judge:  Hon. Richard Seeborg
                                         Magistrate:  Hon. Laurel Beeler
19         v.
                                         Date Filed: March 24, 2022
20   BJB ELECTRIC LP,                    Trial Date: August 21, 2023

21              Counter-Defendant.

22   _____

23
24
25
26
27
28

ARENTFOX SCHIFF LLP
ATTORNEYS AT LAW
LOS ANGELES

22-cv-01886-RS

JOINT TRIAL EXHIBIT LIST

EXHIBIT B PAGE NO. 23

| Ex. No. | Description | Witness | Authentication Stipulated | Date Marked | Date Admitted |
|---|---|---|---|---|---|
| 1 | 3/21/16 Letter from Aris Karabetsos to Timothy Lester (BJB000001-BJB000005) | | | | |
| 2 | E-mail String Containing 10/14/15 E-mail from Phil Oliael to Aris Karabetsos and Holder Requirements Bridgelux Holder Requirements (BJB000006; BJB000007-BJ0000015) | | | | |
| 3 | 1/15/16 Letter from Aris Karabetsos to Timothy Lester (BJB0000109-BJB0000111) | | | | |
| 4 | E-mail String Containing 2/19/16 E-mail from Aris Karabetsos to Brian Cumpston and Tim Lester (BJB0000152) | | | | |
| 5 | E-mail String Containing 2/25/16 E-mail from Irene Ong to Aris Karabetsos (BJB0000183-BJB0000185) | | | | |
| 6 | 3/9/16 E-mail from Brian Cumpston to Aris Karabetsos (BJB0000223-BJB0000228) | | | | |
| 7 | E-mail String Containing 3/21/16 E-mail from Aris Karabetsos to Brian Cumpston and Tim Lester | | | | |

ARENTFOX SCHIFF LLP
ATTORNEYS AT LAW
LOS ANGELES

22-cv-01886-RS
- 2 -
EXHIBIT B PAGE NO. 24
JOINT TRIAL EXHIBIT LIST

| Ex. No. | Description | Witness | Authentication Stipulated | Date Marked | Date Admitted |
|---|---|---|---|---|---|
| | (BJB0000273-BJB0000279) | | | | |
| 8 | E-mail String Containing 3/21/16 E-mail from Tom Lester to Aris Karabetsos, Brian Cumpston and Irene Ong (BJB0000293-BJB0000294) | | | | |
| 9 | E-mail String Containing 3/22/16 E-mail from Brian Cumpston to Aris Karabetsos (BJB0000303-BJB0000309) | | | | |
| 10 | E-mail String Containing 3/23/16 E-mail from Aris Karabetsos to Brian Cumpston and Tim Lester (BJB0000336-BJB0000343) | | | | |
| 11 | E-mail String Containing 3/23/16 from Brian Cumpston to Aris Karabetsos and Tim Lester (BJB0000352-BJB0000354) | | | | |
| 12 | E-mail String Containing 3/23/16 E-mail from Aris Karabetsos to Brian Cumpston and Tim Lester (BJB0000361-BJB0000363) | | | | |
| 13 | E-mail String Containing 3/23/16 Email from Aris Karabetsos to Brian Cumpston | | | | |

| Ex. No. | Description | Witness | Authentication Stipulated | Date Marked | Date Admitted |
|---|---|---|---|---|---|
| | and Tim Lester (BJ00000373-BJB0000381) | | | | |
| 14 | E-mail String Containing 3/23/16 E-mail from Brian Cumpston to Aris Karabetsos and Tim Lester (BJB0000391-BJB0000394) | | | | |
| 15 | 4/26/16 E-mail from Bridgelux-PR to All (Bridgelux000001-Bridgelux000002) | | | | |
| 16 | 7/11/19 Order 5100000560 (BJB0001902-BJB0001908) | | | | |
| 17 | Composite Exhibit of Bridgelux Purchase Orders (BJB0000439-0000626; BJB0001097-0001109; BJB0001117-0001151; BJB0001159-0001192 | | | | |
| 18 | E-mail String Containing 8/14/20 E-mail from Nicholas Ippolito to Joseph Laufer (BJB0001926-BJB0001931) | | | | |
| 19 | 8/18/20 E-mail from Nicholas Ippolito to Brenda Lu and Siow Tin Teou (BJB0001981-BJB0001986) | | | | |
| 20 | E-mail String Containing B/31/20 E-mail from Nicholas | | | | |

| Ex. No. | Description | Witness | Authentic ation Stipulated | Date Marked | Date Admitted |
|---|---|---|---|---|---|
| | Ippolito to Albert Pruenster and Joseph Laufer (BJB0001932-BJB0001938) | | | | |
| 21 | E-mail String Containing 9/3/20 E-mail from Nicholas Ippolito to Tim Lester and Brenda Lu (BJB0001939-BJB0001945) | | | | |
| 22 | 10/12/20 E-mail from Joseph Laufer to Tim Lester (BJB0000643-BJB0000644) | | | | |
| 23 | E-mail String Containing 10/14/20 E-mail from Joseph Laufer to Tim Lester (BJB0000647-BJB0000648) | | | | |
| 24 | 10/22/20 E-mail from Tim Lester to Joseph Laufer (BJB0000660-BJB0000661) | | | | |
| 25 | E-mail String Containing 10/22/20 E-mail from Joseph Laufer to Tim Lester (BJB0000662-BJB0000663) | | | | |
| 26 | E-mail String Containing 10/29/20 E-mail from Joseph Laufer to Tim Lester (BJB0000681-BJB0000682) | | | | |
| 27 | E-mail String Containing 10/29/20 E-mail from Tim Lester | | | | |

ARENTFOX SCHIFF LLP
ATTORNEYS AT LAW
LOS ANGELES

22-cv-01886-RS

- 5 -

EXHIBIT B PAGE NO. 27

JOINT TRIAL EXHIBIT LIST

| Ex. No. | Description | Witness | Authentication Stipulated | Date Marked | Date Admitted |
|---|---|---|---|---|---|
| | to Joseph Laufer (BJB0000683-BJB0000684) | | | | |
| 28 | 11/10/20 E-mail from Joseph Laufer to Tim Lester (BJB0000687) | | | | |
| 29 | E-mail String Containing 11/11/20 E-mail from Tim Lester to Joseph Laufer (BJB0000688-BJB0000693) | | | | |
| 30 | 11/16/20 E-mail from Joseph Laufer to Tim Lester (BJB0000694-BJB0000695) | | | | |
| 31 | 12/21/20 E-mail from Joseph Laufer to Albert Pruenster and Nicholas Ippolito (BJB0000712) | | | | |
| 32 | 12/24/20 E-mail from Tim Lester to Joseph Laufer (BJB0000713) | | | | |
| 33 | E-mail String Containing 1/6/21 E-mail from Joseph Laufer to Tim Lester (BJB0000721) | | | | |
| 34 | E-mail String Containing 1/19/21 E-mail from Joseph Laufer to Tim Lester (BJB0000723) | | | | |
| 35 | 1/22/21 E-mail from Tim Lester to Joseph Laufer (BJB0000725) | | | | |
| 36 | E-mail String Containing 2/24/21 E- l from Tim Lester to Albert | | | | |

ARENTFOX SCHIFF LLP
ATTORNEYS AT LAW
LOS ANGELES

22-cv-01886-RS

- 6 -

EXHIBIT B PAGE NO. 28

JOINT TRIAL EXHIBIT LIST

| Ex. No. | Description | Witness | Authentication Stipulated | Date Marked | Date Admitted |
|---|---|---|---|---|---|
| | Pruenster (BJB0000735-BJB0000736) | | | | |
| 37 | E-mail String Containing 3/9/21 E-mail from Tim Lester to Siow Tin Teou (Bridgelux000037-Bridgelux000043 | | | | |
| 38 | E-mail String Containing 2/9/22 E-mail from Vanessa Simpson to Albert Pruenster (BJB0001954-BJB0001961) | | | | |
| 39 | E-mail String Containing 2/9/22 E-mail from Vanessa Simpson to Albert Pruenster (BJB0001962-BJB0001967 | | | | |
| 40 | E-mail String Containing 2/9/22 E-mail from Vanessa Simpson to Albert Pruenster (BJB0001968-BJB0001973) | | | | |
| 41 | E-mail String Containing 2/9/22 E-mail from Vanessa Simpson to Albert Pruenster (BJB0001974-BJB0001979) | | | | |
| 42 | 10/11/21 E-mail from Siow Tin Teou to Vanessa Simpson and Jesse Coxwell (BJB0000840-BJB0000845) | | | | |
| 43 | E-mail String Containing 10/11/21 E-mail from Siow Tin Teou to Vanessa Simpson and Jesse Coxwell | | | | |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

ARENTFOX SCHIFF LLP
ATTORNEYS AT LAW
LOS ANGELES

22-cv-01886-RS

- 7 -

EXHIBIT B PAGE NO. 29

JOINT TRIAL EXHIBIT LIST

| Ex. No. | Description | Witness | Authentication Stipulated | Date Marked | Date Admitted |
|---------|-------------|---------|---------------------------|-------------|---------------|
| | (BJB0000847-BJB0000852) | | | | |
| 44 | 6/2/2022 Email from Coxwell to Tin Teou Siow and Frank Hu re PO (BJB0001005-BJB0001006) | | | | |
| 45 | Purchase Order #1104-01 (BJB0000689-BJB0000693) | | | | |
| 46 | Purchase Order #1104-07 (Bridgelux000194 - Bridgelux000198) | | | | |
| 47 | Purchase Order #1104-08 (BJB0001006) | | | | |
| 48 | Alternative Vero SE Holder Supply Comparison (Bridgelux000254 - Bridgelux000262) | | | | |
| 49 | 7/6/2022 PPT Development & Innovation Partner of the Lighting and Appliance Industry (Bridgelux001371 - Bridgelux001423) | | | | |
| 50 | Financial Overhead for Holder Statement of BJB Electric (Attorneys Eyes Only) | | | | |
| 51 | Spreadsheet of internal cost calculation to produce the Holder (product) listed (BJB0001075-BJB0001082) | | | | |
| 52 | 12/12/2016 PPT PDP MPV Phase Vero SE Series | | | | |

| Ex. No. | Description | Witness | Authentication Stipulated | Date Marked | Date Admitted |
|---|---|---|---|---|---|
| | (Bridgelux001424 - Bridgelux001465) | | | | |
| 53 | Bridgelux Vero SE Series LED Lighting Features, Product Specifications | | | | |
| 54 | 11/13/2015 Phil Oliael Email to Aris Karabetsos re Vero2 holder requirement (BJB0000027- BJB0000030) | | | | |
| 55 | Bridgelux Order 5100003871 | | | | |
| 56 | 9/21/2022 BJB Electric Order Confirmation for Bridgelux Order 5100003871 | | | | |
| 57 | Bridgelux Order 5100004265 | | | | |
| 58 | 1/19/2023 BJB Electric Order Confirmation for Bridgelux Order 5100004265 | | | | |
| 59 | Chart comparing P.O. #1104-01 with actual Holder sales | | | | |
| 60 | Sample Holders | | | | |
| 61 | Interest Calculation Worksheet | | | | |
| 62 | 6/22/2022 Defendant and Counter-Claimant Bridgelux, Inc.'s Initial Disclosures | | | | |
| 63 | 6/22/22 Plaintiff's Initial Rule 26(a) Disclosures | | | | |
| 64 | 9/26/2022 Plaintiff's Responses to Defendant's First Set of Interrogatories | | | | |

ARENTFOX SCHIFF LLP
ATTORNEYS AT LAW
LOS ANGELES

22-cv-01886-RS

- 9 -

EXHIBIT B PAGE NO. 31

JOINT TRIAL EXHIBIT LIST

| Ex. No. | Description | Witness | Authentication Stipulated | Date Marked | Date Admitted |
|---|---|---|---|---|---|
| 65 | 9/26/2022 Plaintiff's Responses to Defendant's Request for Production of Documents, Set One | | | | |
| 66 | 1/10/2023 Plaintiff's Responses to Defendant's Second Set of Interrogatories | | | | |
| 67 | 1/12/2023 Plaintiff's Responses to Defendant's First Request for Admissions | | | | |
| 68 | 1/12/2023 Plaintiff's Responses to Defendant's Request for Production of Documents, Set Two | | | | |
| 69 | 1/12/2023 Plaintiff's Responses to Defendant's Request for Production of Documents, Set Three | | | | |
| 70 | 9/2/2022 Defendant's Response to Plaintiff's First Continuing Interrogatories | | | | |
| 71 | 9/2/2022 Defendant's Response to Plaintiff's First Request for Production of Documents | | | | |
| 72 | 1/12/23 Defendant's Response to | | | | |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

| Ex. No. | Description | Witness | Authentication Stipulated | Date Marked | Date Admitted |
|---|---|---|---|---|---|
| | Plaintiff's Second Continuing Interrogatories | | | | |
| 73 | 1/12/2023 Defendant's Response to Plaintiff's Second Request for Production of Documents | | | | |
| 74 | 9/1/2022 Amended Complaint for Damages | | | | |
| 75 | 9/15/2022 Defendant's Answer to the Amended Complaint and Counterclaim | | | | |
| 76 | 9/27/2022 Plaintiff's Answer to the Counterclaim | | | | |
| 77 | Plaintiff's Disclosure of Expert Testimony, including exhibits | | | | |
| 78 | Plaintiff's Disclosure of Rebuttal Expert Testimony, including exhibits | | | | |
| 79 | Defendant's Expert Witness Disclosures | | | | |
| | | | | | |
| 201 | 10/22/2020 Email chain from J. Laufer to N. Ippolito; A. Pruenster re: FW: PO with attachments (BJB0000664 – BJB0000668) | | | | |
| 202 | BJB Invoice re PO1104-06 dated 10/26/2021 (BJB0000911) | | | | |

ARENTFOX SCHIFF LLP
ATTORNEYS AT LAW
LOS ANGELES

22-cv-01886-RS

- 11 -

EXHIBIT B PAGE NO. 33

JOINT TRIAL EXHIBIT LIST

| Ex. No. | Description | Witness | Authentication Stipulated | Date Marked | Date Admitted |
|---|---|---|---|---|---|
| 203 | BJB Email Confirmation re PO1104-07 with attachment dated 4/18/2022 (BJB0000628-BJB0000630) | | | | |
| 204 | Letter to Bridgelux regarding new contract dated 11/16/2020 (BJB0000695) | | | | |
| 205 | Spreadsheet of internal cost calculation to produce the Holder (product) listed (BJB0001075) | | | | |
| 206 | Calculation and Schedule of Damages (BJB0002097 CONFIDENTIAL) | | | | |
| 207 | Email re Vero 2.0 Blanket PO_Rev 08 20220516_Review, dated 7/6/2022 (BJB0000504-BJB0000505) | | | | |
| 208 | PO1104-08 (Bridgelux0000506) | | | | |
| 209 | Email re BJB's order confirmation materially changes the terms dated 4/22/2022 (Bridgelux000578-Bridgelux000579) | | | | |
| 210 | Email re Vero SE Shipment Plan dated 3/28/2022 (BJB0000962-BJB0000965) | | | | |
| 211 | Vero 2.0 Blanket PO_Rev 07 20211222_Final | | | | |
| 212 | PO Summary | | | | |