CRAIG A. GELFOUND (SBN 176378)
craig.gelfound@afslaw.com
KIRSTEN A. HART (SBN 258433)
Kirsten.hart@afslaw.com
JESSICA B. DO (SBN 317517)
jessica.do@afslaw.com
**ARENTFOX SCHIFF LLP**
555 West Fifth Street, 48th Floor
Los Angeles, CA 90013
Telephone: 213.629.7400
Facsimile: 213.629.7401

Attorneys for Defendant and Counter-Claimant
BRIDGELUX, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BJB ELECTRIC LP,<br><br>Plaintiff,<br><br>v.<br><br>BRIDGELUX, INC.,<br><br>Defendant. | Case No. 22-cv-01886-RS<br><br>**TRIAL BRIEF**<br><br>Trial Date: August 21, 2023<br>Time: 9:00 a.m.<br>Courtroom: 3 |
| BRIDGELUX, INC,<br><br>Counter-Claimant,<br><br>v.<br><br>BJB ELECTRIC LP,<br><br>Counter-Defendant. | Judge: Hon. Richard Seeborg<br>Magistrate: Hon. Laurel Beeler<br><br>Date Filed: March 24, 2022 |

# TABLE OF CONTENTS

Page

I. OVERVIEW ............................................................................................................ - 3 -
II. WITNESSES .......................................................................................................... - 3 -
    A. BJB ............................................................................................................. - 4 -
    B. Bridgelux ................................................................................................... - 4 -
III. KEY CONTRACT TERMS .................................................................................. - 5 -
IV. LEGAL CLAIMS – BREACH OF CONTRACT ................................................ - 7 -
    A. Bridgelux did not breach the Letter Agreement ............................... - 7 -
        1. Bridgelux complied with the plain language of the Letter Agreement ..................................................................................... - 7 -
        2. The scope of parol evidence, if any is admitted, should be governed by California Commercial Code § 2202, not California Code of Civil Procedure § 1856. .......................... - 8 -
        3. BJB's proposed interpretation of "order" as both offer and acceptance would lead to an absurd result. ......................... - 9 -
        4. BJB's argument that PO 0801-01 does not "look" like prior purchase orders is not evidence of Bridgelux's breach. ................................................................................................ - 10 -
    B. BJB breached the Letter Agreement .................................................. - 11 -
V. DAMAGES .......................................................................................................... - 11 -
    A. BJB damages ........................................................................................... - 11 -
        1. The liquidated damages provision in the letter agreement is unenforceable because it constitutes a penalty with no relation to BJB's actual damages ......................................... - 12 -
        2. BJB waived its right to enforce any liquidated damages provision in the Letter Agreement. ........................................ - 13 -
        3. BJB's damages, if any, are limited the cost of money on their deferred profits. ................................................................ - 14 -
    B. Bridgelux's damages ............................................................................. - 15 -
        1. Increased cost of Holders ....................................................... - 15 -
        2. Source new supplier ................................................................ - 15 -
        3. Intellectual Property Related to Holders. ............................ - 16 -
VI. CONCLUSION .................................................................................................... - 16 -

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Berman v. Bromberg,*
  56 Cal.App.4th 936 (1997) ........................................................................................... 7

*Hebberd-Kulow Enterprises, Inc. v. Kelomar, Inc.,*
  218 Cal. App. 4th 272 (2013) ....................................................................................... 9

*Titan Group, Inc. v. Sonoma Valley County Sanitation Dist.,*
  164 Cal.App.3d 1122 (1985) ........................................................................................ 7

*Winograd v. American Broadcasting Co.,*
  68 Cal.App.4th 624 (1998) ........................................................................................... 7

**Statutes**

Cal. Civ. Code, § 1638 ..................................................................................................... 7

Cal. Civ. Code, § 1639 ..................................................................................................... 7

Cal. Com. Code § 2202(a) ........................................................................................ 3, 8, 9

California Code of Civil Procedure § 1856 ............................................................... 3, 8, 9

**Other Authorities**

4 Witkin, Summary of Cal. Law (10th ed. 2005) Sales, § 33 ......................................... 9

## I.  OVERVIEW

This is a case of contract interpretation.  Bridgelux contends that it satisfied the plain language of the Parties' Letter Agreement by placing purchase orders for over 15 million Holders within the four-year Cost Sharing Period.  Bridgelux further asks the Court for damages from BJB's unilateral amendment to Letter Agreement, charging Bridgelux in excess of the agreed amount for Holders, as well as costs incurred sourcing a new supplier, since BJB became an unreliable source of Holders.

BJB does not dispute that Bridgelux submitting orders for over 15 million Holders within the Cost Sharing Period.  Rather, after admitting in depositions and written discovery that Bridgelux submitted orders for the mandatory minimum Holders, BJB now takes the position that the last purchase order submitted during the Cost Sharing Period (PO0801) was not actually an order under the Letter Agreement.  To this end, BJB asks the Court to find Bridgelux breached the Letter Agreement by interpreting "obtain orders" to mean BJB had to receive and accept orders, *and* deliver the associated Holders to Bridgelux within the Cost Sharing Period.  To bolster this tortured view of the contract, BJB asks the Court to admit parol evidence under the California Code of Civil Procedure's expansive parol evidence rule, found at § 1856(g).  But where, as there, the contract terms are unambiguous, parol evidence is not admissible.  Even if it were, since a contract for the sale of goods is indisputably at issue, California's Commercial Code's more limited parol evidence rule, allowing only evidence of "course of dealing, course of performance, or usage of trade" to explain or supplement contract terms, applies.  Cal. Com. Code § 2202(a).  And under this paradigm, BJB proffers no evidence to show that "obtained orders" also means accepted by BJB and delivered to Bridgelux.

## II.  WITNESSES

The Parties anticipate the following witnesses will testify at trial.

TRIAL BRIEF
CASE NO. 22-CV-01886-RS

### A. BJB

Mr. Laufer is BJB's former president. He was also BJB's main contact charged with negotiating the Letter Agreement. For its part, Bridgelux will cross-examine Mr. Laufer as to contract negotiations, various purchase orders, and BJB's accounting for costs related to the Holder project.

BJB will also have its current president, Mr. Pruenster, testify to the implementation of the Letter Agreement and BJB's alleged damages. Bridgelux disputes that Mr. Pruenster is qualified to provide expert testimony on damages, and contends that his testimony lacks any merit. Mr. Pruenster's damages calculation is based on lost profits, which equals sales revenue less cost of goods and overhead allocated to the goods sold. Mr. Pruenster improperly includes *BJB Germany's* efficiency gains in the manufacturing process when computing the cost of goods. Mr. Pruenster also is not an expert in industrial engineering or manufacturing, and therefore, not competent to opine on efficiency gains in BJB Germany's manufacturing process.

### B. Bridgelux

Mr. Lester is Bridgelux's former CFO and CEO. He was intimately involved in the Letter Agreement negotiations, and re-negotiation of purchase orders on and after August 2020.

Mr. Hu was with Bridgelux for fifteen years, and rose to the level of COO. Bridgelux anticipates he will testify as to the increased price BJB unilaterally charged for certain Holders, and the costs associated with sourcing an alternative Holder supplier.

Mr. Leavitt is an expert witness that will opine as to Bridgelux's damages suffered as a result of BJB unilaterally increasing the price of Holders and forcing Bridgelux to develop a new source for Holders. Mr. Leavitt will also testify as to the appropriate measure of BJB's damages, if any.

## III. KEY CONTRACT TERMS

The Vero 2.0 Holder consists of a combination of metal and plastic parts that are assembled into a Holder that allows Bridgelux to pop in various sized LED arrays. Bridgelux developed the Vero 2.0 as an alternative to its original holder, that required soldering as opposed to the more functional pop-in application.

Testimony will confirm that, in or around March 21, 2016, BJB and Bridgelux entered into the Letter Agreement (**Tr. Ex. 1**), wherein BJB agreed to undertake the development of electromechanical holders for the Vero 2.0 product series (each a "Holder"), and to make available for sale to Bridgelux such Holders.

Key terms of the Letter Agreement include:
> 1. BJB undertakes the development of electro-mechanical holders . . . which BJB will make available for sale to Bridgelux . . . at a mutually agreed upon time schedule.
> …
> 2. If BJB is awarded the Holder Project (…), such units will be purchased by Bridgelux (…) under its purchase order at the pricing designated under Schedule A. However, if BJB fails to obtain orders for at least 15 million units ("Minimum Requirement") of the Vero 2.0 Holder within 4 years after "First Availability" of the Vero 2.0 Holder ("Cost Sharing Period"), Bridgelux agrees that it is or its contract manufacturer will purchase the "Shortfall Quantity" of such Vero 2.0 Holders at the pricing designated under Schedule A ($0.08 per unit) pursuant to a Bridgelux purchase order. Bridgelux (…) purchase order(s) will become mutually binding upon BJB's written confirmation to Bridgelux of said purchase order(s). The "Shortfall Quantity" is the difference between the Minimum Requirement and the number of Vero 2.0 Holders ordered ("Ordered Holders") during the Cost Sharing Period…
> …
> 10. BJB and Bridgelux agree that Bridgelux's Purchase Order Terms and Conditions ("T&C") shall apply to the sale and purchase of the Vero 2.0 Holder products, however, based on the following assumptions:

…

10(h). Section 11.2 of the T&C shall be rephrased as follows:
   Definition of Breach.  For purposes of section 11.1 above, the term "breach(s)" shall, without limitation, include . . . (c) [BJB]'s failure to provide [Bridgelux], upon request, **with reasonable assurances of performance**; or (d) any other serious and persistent failure by [BJB] to make delivery of the [products] or perform the Services within the time specific in this Order or any authorized extension, …

**Tr. Ex. 1 (Letter Agreement, Arts. 2, 10, 10(h)).**

T&C 1.1: These terms and conditions, together with any additional terms appearing on the purchase order and attachments or documents referenced herein, including without limitation, product or service specifications, requirements documents, statements of work, standards of care, or supplier code of conduct (collectively "Order") are incorporated by reference into each purchase order issued by BRIDGELUX, INC.

…

T&C 1.3 Purchase Order.  Absent a Master Agreement, this Order shall constitute an offer by Bridgelux to Supplier upon the terms and conditions of the Order.  The Order shall become a binding agreement upon said terms and conditions upon acceptance by Supplier (as provided in Section 1.4) and shall constitute the entire agreement between Bridgelux and Supplier with respect to the sale of Goods or Services.  And any and all prior agreements, quotes, requests for quotes, negotiations, correspondence promises, covenants, communications, undertakings, arrangement, representation and warranties, whether oral or written, of Bridgelux or Supplier shall be superseded by the Order.

…

T&C 4.1 Shipment Terms.  Supplier shall ship Goods by the method identified by BRIDGELUX to permit supplier to meet the delivery date(s) identified by BRIDGELUX on the face of this purchase order ("Delivery Date")

…

T&C 5.1 Change or Cancellation.  BRIDGELUX may,

without any charge or liability, change or cancel any portion of this order, provided BRIDGELUX gives Supplier notice (a) for customized Goods or Services (i.e., supplied exclusively in accordance with BRIDGELUX's designs or specifications), at least thirty (30) calendar days prior to the Delivery Date. . .

## IV.   LEGAL CLAIMS – BREACH OF CONTRACT

Both Parties assert breach of contract claims.  The evidence shows Bridgelux complied with its obligations under the Letter Agreement, while BJB did not.

### A.   Bridgelux did not breach the Letter Agreement

#### 1.   Bridgelux complied with the plain language of the Letter Agreement.

The Letter Agreement is clear an unambiguous; order means order.  As such, the parol evidence rule prohibits introduction of extrinsic evidence to define its terms.  To the extent admissible, the testimony of both Mr. Lester for Bridgelux and Mr. Laufer for BJB will show that Bridgelux met its obligation.

"When a contract is reduced to writing, the parties' intention is determined from the writing alone, if possible. Cal. Civ. Code, § 1639. "It is the objective intent, as evidenced by the words of the contract, rather than the subjective intent of one of the parties, that controls interpretation." *Titan Group, Inc. v. Sonoma Valley County Sanitation Dist.*, 164 Cal.App.3d 1122, 1127 (1985). The parties' undisclosed intent or understanding is irrelevant to contract interpretation. *Winograd v. American Broadcasting Co.*, 68 Cal.App.4th 624, 632 (1998); *Berman v. Bromberg*, 56 Cal.App.4th 936, 948 (1997).  If the language of the contract is clear and explicit, it governs its interpretation. Cal. Civ. Code, § 1638.

Further, to the extent that BJB subjectively believed that "obtain orders" for holders means Bridgelux must submit orders to BJB for Holders, BJB must accept those orders, and BJB must deliver the ordered Holders, the Letter Agreement is defective at formation based on mutual mistake.  There was never mutual assent,

and therefore, the Letter Agreement fails at a matter of law at formation.

Article 2 of the Letter Agreement requires Bridgelux submit orders for at least 15 million Holders within the Cost Sharing Period. **Tr. Ex. 1 [Letter Agreement, Art. 2]**. It is undisputed that, as of August 2020, Bridgelux had submitted orders for 2,220,398 Holders. Also in August 2020, Bridgelux submitted PO 0801-01 for an additional 13,018,500 Holders, bringing the total Holders Bridgelux ordered to 15,238,898. **Tr. Ex. 18, BJB0001927**. PO 0801-01 specifies the type, quantity, price, and delivery date for each Holder. *Id*. Section 1.1 of Bridgelux's Purchase Order T&C's, which is incorporated into the Letter Agreement, defines "order" as a purchase order containing Bridgelux's T&C along with additional terms. The T&Cs are fixed terms that apply to every Bridgelux purchase order and the additional terms are those unique to each purchase order: product, quantity, price and deliver schedule. PO 801-01 meets the definition of "order" in Section 1.1. Moreover, BJB admitted in its written discovery and its deposition testimony that PO801-01 is an order. Thus, pursuant to the plain language of the Letter Agreement, Bridgelux satisfied its obligation to submit orders for at least 15 million Holders within the Cost Sharing Period.

2.  **The scope of parol evidence, if any is admitted, should be governed by California Commercial Code § 2202, not California Code of Civil Procedure § 1856.**

Under the California Commercial Code, which applies here because the Letter Agreement regards the sale of goods, "[t]erms . . . set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement." Cal. Com. Code § 2202 (Section 2202). However, such terms "may be explained or supplemented . . . [b]y course of dealing, course of performance, or usage of trade." *Id*. at § 2202(a).

Section 2202 further removes written agreements for the sale of goods from the operation of Code of Civil Procedure section 1856, the general parol evidence

statute. See 4 Witkin, Summary of Cal. Law (10th ed. 2005) Sales, § 33, p. 46; *Hebberd-Kulow Enterprises, Inc. v. Kelomar, Inc.*, 218 Cal. App. 4th 272, 279 (2013). Thus, Section 2202 alone controls what evidence is admissible to explain or supplement the terms of an agreement. *Id.*, citing § 2202; 4 Witkin, supra, § 33, p. 46.

For its part, BJB promotes the far more expansive parol evidence rule found in California Code of Civil Procedure section 1856 (Section 1856). But the Law Revision Commission Comments to Section 1856 expressly state, "For the law applicable to contracts for the sale of goods, see Commercial Code Section 2202." Meaning, the notes to Section 1856 expressly direct analysis pertaining to contracts for the sale of goods (such as the Letter Agreement) to rely instead on Section 2202 instead.

Accordingly, if any parol evidence is admissible, it should be limited to that which explains or supplement the Parties "course of dealing, course of performance, or usage of trade." And BJB has no evidence limited to this realm that establishes that "obtain orders" for Holders actually means Bridgelux must submit orders to BJB for Holders, BJB must accept those order, and BJB must deliver the order Holders.

### 3. **BJB's proposed interpretation of "order" as both offer and acceptance would lead to an absurd result.**

BJB's proposed interpretation of "obtain orders" as submit orders, acceptance of those orders, and delivery of the Holders ordered would lead to an absurd result; if BJB were correct, BJB could simply delay written confirmation of the orders or delivery of the Holders until after the Cost Sharing Period to recover an additional $1.2 million in liquidated damages. But a breach of a contractual obligation can only flow from that party's failure to perform an obligation. Here, Bridgelux satisfied its obligation to order 15 million Holders during the Cost Sharing Period. The acceptance of those orders was in BJB's sole control—it was a

duty imposed on BJB, not Bridgelux. Therefore, Bridgelux cannot be held in breach as a result of BJB's failure to accept Bridgelux's orders.

In any event, BJB ultimately accepted Bridgelux's order for the remaining Holders (meeting the Minimum Requirement). After initiating negotiations over PO 0801 in August 2020 (**Tr. Ex. 19**), negotiating for months, BJB accepted PO 1104 (**Tr. Ex. 45**). Therefore, even BJB's tortured interpretation of the term "submit orders" (as offer, acceptance, and delivery during the Cost Sharing Period) fails to create a path for Bridgelux's breach. Rather, the acceptance by BJB worked exactly as it is supposed to under the Letter Agreement. Bridgelux set the delivery schedule (T&Cs 4.1). The delivery schedule was not acceptable to BJB, so the Parties negotiated an acceptable delivery schedule (per Article 1). Once the delivery schedule was agreed upon, BJB sent a written confirmation, whereby the purchase order became a binding contract.

Alternatively, if a party interferes or prevents another party from completing their contract obligations, it is the interfering party that has breached the contract. Thus, to the extent that BJB's interpretation of the Letter Agreement is accepted by the court, BJB breached the Letter Agreement by not accepting the orders, thereby preventing Bridgelux from performing its obligations under the Letter Agreement.

4. **BJB's argument that PO 0801-01 does not "look" like prior purchase orders is not evidence of Bridgelux's breach.**

BJB also objects to the format of PO 0801 because it contains an extended delivery schedule. This is a superficial claim, not grounded in the Letter Agreement terms; nothing in the Letter Agreement prohibits an extended delivery schedule. And, in this instance, Bridgelux set the delivery schedule (per T&C 4.1), subject to the Parties' mutual agreement (Art. 1). And, notably, BJB later accepted PO 1104-01, which also contains an extended delivery schedule. **Tr. Ex. 45**.

To that end, the evidence will show that, in August 2020, BJB asked Bridgelux to revise PO 0801-01. **Tr. Ex. 19**. Over the next few months the Parties

exchanged written and oral communications negotiating the delivery of the remaining Holders. Then, in January 2021, BJB formally accepted PO 1104-01. **Tr. Ex. 33** [BJB000723]. As with PO 0801-01, PO1104-01 met the definition of order in the Letter Agreement by including Bridgelux's T&Cs along with additional terms: product, quantity, price, and delivery schedule. **Tr. Ex. 45**. This process is also consistent with the Letter Agreement's requirement that the Parties negotiate a mutually agreeable delivery schedule. **Tr. Ex. 1 [Letter Agreement, Art. 1]**. Further, over the next year, BJB delivered yet more Holders pursuant to various iterations of PO 1104. Thus, the Parties' actions reveal that the format of the purchase order(s) in no way impaired their legally binding effect and a breach, if any was not material.

### B.   BJB breached the Letter Agreement

BJB breached the Letter Agreement in two distinct ways. First, BJB unilaterally increased the price of Holders, contrary to Schedule A to the Letter Agreement. Second, BJB unilaterally demanded Bridgelux pre-pay for Holders, also contrary to the terms of the Letter Agreement and Terms & Conditions. BJB's Mr. Pruenster will testify as to both. Significantly, this conduct further fails to provide Bridgelux with reasonable assurance of performance, another violation of the Letter Agreement. And, despite Bridgelux's outstanding purchase order compliant with the Letter Agreement, since April 2022, BJB has not delivered any Vero 2.0 Holders to Bridgelux.

Accordingly, the evidence at trial will show BJB's multiple breaches of the Letter Agreement.

## V.   DAMAGES

### A.   BJB damages

BJB seeks as damages either liquidated damages, by way of an unenforceable clause in the Letter Agreement, or actual damages, based on the unsubstantiated and improper expert testimony of its current president, Albert Pruenster.

1. **The liquidated damages provision in the letter agreement is unenforceable because it constitutes a penalty with no relation to BJB's actual damages.**

The Letter Agreement, as amended just after being executed, provides,

> For purposes of Article 3, the Minimum Requirement for the Vero 2.0 Holders is 15 million units within 4 years of First Availability. Compensation (penalty) after 4 years of First Availability for the shortfall quantity will be at a price level of $0.08 per unit.

**Tr. Ex. 1, BJB0000005** (the "Liquidated Damages Provision").

BJB's repeated sworn deposition testimony (and anticipated trial testimony of Joseph Laufer and Albert Pruenster) makes clear that the intent behind this section was for BJB to recover its engineering or research and development fees to cover the cost for development of the product.[1]  But it is undisputed that BJB did not incur any engineering costs to develop the Holder.  Rather, BJB Germany, the plaintiff's parent, was solely responsible for developing the tooling equipment necessary to manufacture the Holders.

With this admission, BJB changed its position on the liquidated damages clause, claiming that it is still a reasonable estimate of its actual damages based on BJB's administrative role in implementing the contract.  To this end, and instead of engaging an expert, BJB relies on the testimony of its President, Albert Pruenster, to opine on BJB's purported lost profits.

BJB's profits are roughly calculated as

**cost of goods sold + overhead – sale price to Bridgelux = BJB's profits**

But BJB has no admissible evidence of its cost of goods sold (COGS).  Mr. Pruenster's supposed expert testimony is not sufficiently reliable as to be relied upon because BJB failed and refused to produce any underlying documents to

---

[1] Bridgelux also believes that trial testimony from Albert Pruenster will review that the actual manufacturing costs are a fraction of the value of liquidated damages, and thus are also not an accurate estimate of BJB's damages flowing from Bridgelux's alleged breach.

verify Mr. Pruenster's representations of COGS. For example, BJB produced invoices reflecting the purported cost of the Holders BJB Germany charged to BJB. But Bridgelux has no way to independently verify whether BJB actually paid BJB Germany for the Holders. And BJB Germany is BJB's parent – BJB Germany could (and did!) charge BJB whatever it wanted. This is reflected in **Tr. Ex. 51**, the spreadsheet BJB produced just before Mr. Pruenster's deposition. Specifically, the tabs for each Holder show wildly fluctuating prices for the Holders, with no pattern or indication for the basis in the price swings. The reason this is a problem here is because BJB Germany could easily change its pricing to manipulate BJB's profits (which BJB is seeking to recover in this lawsuit).

Part of Mr. Pruenster's analysis also relies on supposed efficiency gains. But Mr. Pruenster is not qualified to opine on manufacturing efficiencies, and does not rely on any documentation that would lend credibility to his estimates.

Finally, BJB's Mr. Laufer may testify that BJB repaid BJB Germany for its costs developing the manufacturing equipment. But not only is this claim not substantiated with any evidentiary support, basic contract law also does not allow for the recovery of investment costs as contract damages.

2. **BJB waived its right to enforce any liquidated damages provision in the Letter Agreement.**

Even if the Liquidated Damages Provision were enforceable, which it is not, BJB waived its right to claim this penalty by negotiating alternative terms with Bridgelux. As stated above, the Liquidated Damages Provision is only triggered if Bridgelux does not order 15 million Holders within the Cost Sharing Period. For Bridgelux, the analysis ends there since Bridgelux ordered over 15 million Holders through August 2020. But even from BJB's perspective, that PO0801 was not an "order" and therefore did not satisfy the Minimum Requirement, BJB waived its right to enforce the Penalty by instead negotiating an alternative purchase order.

As extensive email traffic, the trial testimony of Joseph Laufer and Timothy

Lester, and the purchase order BJB ultimately accepted (PO 1104-01, Tr. Ex. 45) reflect, BJB instead chose to negotiate for Bridgelux to purchase the remaining Holders to satisfy the Minimum Requirement. And then BJB and Bridgelux performed under agreed terms for more than another year. Thus, the Parties agreed in writing and by their conduct to waive any Liquidated Damages Provision in favor of ongoing performance of the contract.

By seeking to enforce the Liquidated Damages Provision, BJB asks the Court to unwind the clock and ignore both Parties' performance through March 2022. Specifically, BJB demands $1,022.368.16 as Liquidated Damages (calculated at 12,779,602 units x $0.08/Holder) despite having delivered (and Bridgelux having paid for) many more Holders (after the last undisputed PO in August 2020). In other words, BJB insists on being compensated through a defunct Liquidated Damages Provision for Holders that it actually made, delivered, and for which Bridgelux paid.

### 3. BJB's damages, if any, are limited the cost of money on their deferred profits.

To the extent BJB was damaged at all, which Bridgelux contests, BJB's damages are limited to the cost of money since their profits are not lost, but deferred.[2] Namely, using the actual product mix from the last accepted Purchase Order (1104-07), and applying Mr. Pruenster's efficiency adjustments, Bridgelux determined BJB's purported profits on the contract to be $539,833. But, again, as the Letter Agreement remains in force, and the Parties remain in business, these are

---

[2] BJB promotes its purported lost profits as its damages. This is based on Mr. Pruenster's testimony alone, unsupported by any documentary evidence. Also detracting from the reliability of BJB's damages are the data Mr. Pruenster used for his calculations. For example, Mr. Pruenster used a product mix based on past orders rather than using the mix from the last agreed purchase order, PO 1104-07. Then, Mr. Pruenster applied a series of efficiency adjustments also unsupported by evidence, and on which he is not qualified to opine. In fact, if Mr. Pruenster's data were adjusted to reflect the actual ordered product mix (from PO 1104-07), and the add-on, one-time, inexplicable $0.20/unit adjustment to the Vero 10 alone in year 2 of 4, then instead of having any profits at all, BJB would have actually lost $54,000. That is all to say, Mr. Pruenster's recitation of BJB's damages should be disregarded in its entirety.

profits deferred, not profits lost. Therefore, taking the $539,833 as the value of profits BJB should have realized as of October 2020 (assuming Bridgelux's breach, which it does not concede), extended across the extended lifetime of PO1104-07, at an interest rate of 7.125% (which is BJB's testified to cost of borrowing money), the time value of this money (i.e., BJB's damages) would be $117,702.

### B. Bridgelux's damages

Bridgelux's damages fall into two buckets – (1) the increased cost of Holders and (2) the cost of sourcing a new supplier.[3]

#### 1. Increased cost of Holders

Following BJB's acceptance of PO1104-01 (which contained a delivery schedule for Holders sufficient for Bridgelux to reach 15 million), BJB unilaterally increased the cost of Holders and demanded pre-payment to effectuate shipping. As a result, to meet its customers' demands, Bridgelux has overpaid for Holders by an amount that will be proven at trial. Notably, this increased cost has deeply cut into Bridgelux's profit margins so as to make any profits negligible.

#### 2. Source new supplier

Section 11.2 of the Terms and Conditions (fully incorporated into the Letter Agreement) define breach as including "(c) Supplier's failure to provide BRIDGELUX, upon request, with reasonable assurances of performance" and "(d) any other failure by Supplier to make delivery of the Goods or perform the Services within the time specified in the Order or any authorized extension, or otherwise comply with or meet its obligations under this Order." **Tr. Ex. 46 at**

---

[3] Bridgelux acknowledges that one of the Court's questions during the summary judgment hearings was whether the purchase orders are enforceable by way of specific performance. While PO 1104-07 is a binding contract, BJB is not seeking specific performance of the agreement. If BJB were to seek specific performance of this last purchase order, then Bridgelux's damages would be $1.6 million (discounted to present value), which constitutes the unilaterally increased price of each Holder represented in PO1104-07 that Bridgelux would be forced to pay. However, since BJB is not seeking specific performance as a remedy, Bridgelux is not seeking the full $1.6 million as damages. Of course, Bridgelux reserve the right to amend its damages posture should BJB's demands change.

**Bridgelux0000197**. Here, not only do the facts establish that BJB is not a reliable source (through its failure to deliver goods as contracted, but BJB also required, for any delivery to take place, for Bridgelux pay an increased price per Holder. As a result of the former breach, Bridgelux could not rely on BJB to deliver the ordered Holders consistent with customer needs. And as a result of the latter breach, Bridgelux had no profit margin on the Holders it purchased from BJB. Therefore, Bridgelux had no choice but to find a new supplier for the Holders.

To mitigate its losses, Bridgelux has engaged two potential manufacturers to replace BJB. But finding and securing a manufacturer for the Holders is not simple. Bridgelux incurred costs for sourcing and working with a new manufacturer to get Zhaga compliant. Bridgelux expects this cost will rise, as neither replacement manufacturer is yet online and Zhaga compliant.

### 3. Intellectual Property Related to Holders.

Because BJB has failed and refused to provide reasonable assurances that it will deliver Holders to Bridgelux as the Terms and Conditions require, and unilaterally increased the cost of the Holders such that Bridgelux's profit margin is eliminated, Bridgelux has no recourse but to seek an alternative source to manufacture the Holders. Bridgelux acknowledges, though, that the Letter agreement also provides at Section 5 that Supplier shall own all intellectual property rights in and to the Vero 2.0 Holders. *Id*. Therefore, Bridgelux requests an unlimited license (including, without limitation, all copyrights, patents, and rights in unpatented inventions) and that BJB provide Bridgelux with all documents and materials in BJB's possession (including, without limitation, tooling, drawings, and product specifications) that are required to manufacture the Holders so that Bridgelux can procure the Holders from a third party.

## VI. CONCLUSION

A plain reading of the Letter Agreement reveals that Bridgelux met its contractual obligations by placing orders for over 15 million Holders within the

Cost Sharing Period.  Reading the contract as requiring both Bridgelux's offer and BJB's acceptance for Bridgelux to satisfy its obligations would put Bridgelux in an untenable position, and BJB at an unfair advantage of simply being able to wait out the Cost Sharing Period to collect hefty penalties.  Moreover, the Commercial Code does not allow for parol evidence beyond course of dealing, course of performance, or usage of trade.  BJB does not provide, and therefore the Court has no evidence to consider, that falls within these categories that would explain the term "order" in the Letter Agreement.  In any event, even if the Court find there was a breach, it was not a material breach.  Rather, the Parties continued negotiating and operating under the terms of the contract.

For BJB's part, the evidence will show that it breached the Letter Agreement and Terms and Conditions by requiring pre-payment and an increased price/Holder. It is these breaches that have resulted in damage to Bridgelux, for which it is entitled to compensation.

Dated:  August 16, 2023                              **ARENTFOX SCHIFF LLP**

By: */s/ Kirsten A. Hart*
Craig A. Gelfound
Kirsten A. Hart
Jessica B. Do
Attorneys for Defendant and
Counter-Claimant
BRIDGELUX, INC.