United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BJB ELECTRIC LP,

    Plaintiff,

v.

BRIDGELUX, INC.,

    Defendant.

Case No. 22-cv-01886-RS

**OPINION AND ORDER**

## I. Introduction

Plaintiff BJB Electric LP ("BJB Electric") and Defendant Bridgelux, Inc. ("Bridgelux") contracted in March 2016 hoping to sell tens of millions of units of their product: light-emitting diodes ("LEDs") made by Bridgelux encased in BJB Electric-provided holders (the "Holders"). Their contract (the "Letter Agreement") contemplated BJB Electric would obtain orders for approximately 15 million Holders within a four-year Cost Sharing Period spanning from October 2016 to October 2020. This did not happen.

This case proceeded to a bench trial in August 2023. The parties presented testimony and other evidence related to what the parties intended at the time of contracting and their subsequent course of dealing. In particular, the parties focused on the meaning of the phrase "obtain orders" in Article 2 of the Letter Agreement. BJB Electric's breach of contract claim boils down to whether it "obtained orders" for 15 million Holders during the Cost Sharing Period and, therefore, was entitled to liquidated damages as specified in Article 2. This Opinion and Order comprises the

findings of fact and conclusions of law required by Federal Rule of Civil Procedure 52(a).[1] It is based on the evidence presented at trial, the oral arguments of counsel, and the parties' pre- and post-trial briefing. For the reasons explained below, BJB Electric prevails on its breach of contract claim and is entitled to the liquidated damages provided for in the Letter Agreement.

## II. Parties

Plaintiff BJB Electric is a company that sells products to lighting manufacturers, including the Holders at issue in this case. BJB Electric is the American subsidiary of BJB Germany, where BJB is headquartered. Defendant Bridgelux is a lighting company that produces LEDs.

## III. The Letter Agreement and the Cost Sharing Period

BJB Electric and Bridgelux contracted on or around March 21, 2016, to engage in a joint business endeavor where BJB Electric would provide Holders for Bridgelux's Vero 2.0 product series. The parties agreed BJB Electric would obtain orders for 15 million Holders within the four-year Cost Sharing Period; if it did not, the parties agreed Bridgelux would pay $0.08 per unit of the Shortfall Quantity to BJB Electric. The Cost Sharing Period lasted from October 2016 to October 2020. BJB Germany was the manufacturing entity responsible for producing the Holders. As of Summer 2020, Bridgelux had purchased only about 2.2 million Holders from BJB Electric (significantly fewer than expected), and BJB Electric pointed this out to Bridgelux. BJB Electric was far behind in obtaining the 15-million-unit Minimum Requirement for several potential reasons, including "the migration of lighting manufacturing" away from Western Europe, the imposition of a tariff on goods exchanged between the United States and China, and the COVID-19 pandemic. Dkt. 123, at 6. On August 14, 2020, Bridgelux tendered P.O. 0801-01 to BJB Electric. P.O. 0801-01 purported to order the remaining 13 million Holders from BJB Electric for delivery to occur over the span of the next six years (until July 2026) in accordance with the 15-

---

[1] To the extent any conclusions of law are inadvertently labeled as findings of fact (or vice versa), the findings and conclusions shall be considered "in [their] true light, regardless of the label that the . . . court may have placed on [them]." *Tri–Tron Int'l v. Velto*, 525 F.2d 432, 435–36 (9th Cir. 1975).

million-unit Minimum Requirement. Under the terms of P.O. 0801-01, the majority of units were scheduled for delivery in the 2025 to 2026 period. Bridgelux's prior orders did not contain similarly delayed delivery dates—indeed, Bridgelux did not have other vendors at the time to which it had submitted orders that extended six years into the future.

BJB Electric did not immediately accept P.O. 0801-01. It viewed P.O. 0801-01 as a gesture that Bridgelux would continue selling the Holders despite falling behind on its original sales projections. BJB Electric asked Bridgelux to revise P.O. 0801-01 to condense the order to last four years instead of six and more evenly distribute the volumes of ordered Holders across time. Bridgelux replaced P.O. 0801-01 with P.O. 0831, but BJB Electric concluded this new purchase order was not substantially different than the purchase order it replaced. By the end of the Cost Sharing Period, BJB Electric had not accepted orders for 15 million Holders from Bridgelux. The parties continued negotiating until, a few months later (on December 24, 2020), Bridgelux submitted P.O. 1104-01.[2]

### IV. BJB Electric's Breach of Contract Claim

Article 2 of the Letter Agreement executed by BJB Electric and Bridgelux provides as follows:

> If BJB is awarded the Holder Project (i.e. Bridgelux designates BJB as the supplier of the Holder), such units will be purchased by Bridgelux (or its designated contract manufacturer) under its purchase order at the pricing designated under Schedule A. However, if BJB fails to obtain orders for at least 15 million units ("Minimum Requirement") of the Vero 2.0 Holder within 4 years after "First Availability" of the Vero 2.0 Holder ("Cost Sharing Period"), Bridgelux agrees that it or its contract manufacturer will purchase the "Shortfall Quantity" of such Vero 2.0 Holders at the pricing designated under Schedule A ($0.08 per unit) pursuant to a Bridgelux purchase order. Bridgelux (or its designated contract manufacturers) purchase order(s) will become mutually binding upon BJB's written confirmation to Bridgelux of said purchase order(s). The "Shortfall Quantity" is the difference between the Minimum Requirement and the number of Vero 2.0 Holders ordered ("Ordered Holders") during the Cost Sharing Period. "First Availability" is the date that "Shippable Holders" are available for sale and shipment by BJB (with such availability then indicated via written confirmation from BJB to Bridgelux). "Shippable Holders" are the

---

[2] It is somewhat unclear whether BJB Electric ever accepted P.O. 1104-01. BJB Electric claims any such acceptance was explicitly conditioned on delivery dates and quantities remaining firm.

production version of Vero 2.0 Holders which are then available for sale and shipment.

The crux of this dispute requires interpreting the 15-million-unit Minimum Requirement in the context of the four-year Cost Sharing Period. BJB Electric claims Bridgelux breached the Letter Agreement because (1) BJB Electric did not "obtain orders for at least 15 million units" within the Cost Sharing Period and (2) BJB Electric is entitled to, but has not received, liquidated damages for the Shortfall Quantity amounting to $1,022,368.16.[3] Bridgelux disputes that it breached the Letter Agreement and claims it submitted orders for 15 million Holders. The parties also dispute whether the liquidated damages sum constitutes an unenforceable penalty provision. *See* Cal. Civ. Code § 1671 (contractual damages provisions unenforceable where they were "unreasonable under the circumstances existing at the time the contract was made").

## V. Summary of Evidence

In this bench trial, the parties presented evidence regarding the meaning of key terms contained in Article 2 and the scope of the parties' dealings with one another. They submitted a number of trial exhibits detailing, among other things, the parties' communications with one other, past purchase orders submitted by Bridgelux, and damages calculations.

BJB Electric called three witnesses to the stand: Joe Laufer, Tim Lester, and Albert Pruenster. Laufer, BJB Electric's President between 2009 and 2021, provided testimony on topics including the circumstances under which the parties entered into the Letter Agreement, the motivation behind including a Cost Sharing Period, and BJB Electric's reaction when it received P.O. 0801-01. Laufer testified a six-year delivery schedule—as contemplated in P.O. 0801-01— was simply not done in the lighting industry. Lester, Bridgelux's Chief Financial Officer and Chief Operating Officer when the Letter Agreement was signed, testified about the purpose of the Cost Sharing Period and Bridgelux's intention in submitting P.O. 0801-01. BJB Electric presented testimony at trial that the Cost Sharing Period was intended to ensure BJB Germany recovered its investment costs in producing the Holders. *See* Trial Transcript at 126 (Aug. 21, 2023) (8/21 Trial

---

[3] BJB Electric reaches this sum by multiplying 12,779,602 (the Shortfall Quantity) by $0.08 per unit.

Transcript) (testimony from Lester that the Cost Sharing Period referred to a "period of time from which the pricing would include the cost BJB needed to get their return investment . . . from the investment they made to prepare the product for production"). Pruenster, BJB Electric's current President, testified about BJB Electric's actual damages ($1,148,367 in lost profits) from Bridgelux's alleged breach of the Letter Agreement and the parties' intentions in drafting the Letter Agreement.

Bridgelux called a damages expert, Lawrence Leavitt, during trial. Leavitt, a Certified Public Accountant, opined on Pruenster's calculation of BJB Electric's actual damages. Leavitt took issue with several of Pruenster's assumptions relating to potential efficiency gains in BJB Germany's manufacturing of Holders and, accordingly, with Pruenster's estimates of BJB Electric's actual damages. Leavitt also offered his own opinion regarding the actual damages BJB Electric suffered if Bridgelux breached the Letter Agreement, concluding that BJB Electric's actual damages were $117,000 under a "time value of money" theory.

## VI. Breach of Contract

### A. Legal Standard

The parties agree California law governs interpretation of the Letter Agreement. "The elements of a breach of contract claim are that a contract was formed; that the plaintiff did everything required by the contract; that the defendant did not do something required by the contract; and that the plaintiff was harmed as a result." *CSAA Ins. Exch. v. Hodroj*, 72 Cal. App. 5th 272, 276 (2021). "A contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful." Cal. Civ. Code § 1636. A contract is ambiguous when "on its face it is capable of two different reasonable interpretations." *Republic Bank v. Marine Nat'l Bank*, 45 Cal. App. 4th 919, 924 (1996) (citation omitted). Extrinsic evidence is admissible to interpret an ambiguous contract when evidence is proffered to "prove a meaning" to which the contract language is "reasonably susceptible." *See Pac. Gas & Elec. Co. v. G.W. Thomas Drayage & Rigging Co.*, 69 Cal. 2d 33, 37 (1968).

### B. Discussion

#### i. Whether P.O. 0801-01 was an "order"

The parties first dispute whether P.O. 0801-01 qualified as an "order" under the Letter Agreement. If P.O. 0801-01 was not an order, the argument goes, BJB Electric could not have "obtained" orders capable of satisfying the Minimum Requirement upon its submission. As explained below, regardless of whether P.O. 0801-01 constituted an order, BJB Electric did not "obtain orders" for 15 million Holders within the Cost Sharing Period and thus was obligated to pay $0.08 per unit of the Shortfall Quantity. It is unnecessary, therefore, to determine whether P.O. 0801-01 technically qualified as an order. For purposes of the analysis below, it is assumed P.O. 0801-01 was an order.[4]

#### ii. The meaning of "obtain orders"

Article 2 of the Letter Agreement requires that BJB Electric "obtain orders" for 15 million Holders within the four-year Cost Sharing Period. "Obtain orders" is reasonably susceptible to more than one interpretation. *See Pac. Gas & Elec. Co.*, 69 Cal. 2d at 37. For instance, it is not immediately clear whether all that is required for an order to be "obtained" is for the order to be placed, or if something more is needed.

At trial, the parties offered competing interpretations of "obtain orders." BJB Electric contended it had to accept a particular order in order to "obtain" it and, further, that all 15 million Holders had to be delivered and paid for within the Cost Sharing Period. Bridgelux, in contrast, argued it merely needed to place an order for BJB Electric to "obtain" that order. Both arguments—if taken to their extremes—go too far. BJB Electric's proposed reading would allow it

---

[4] The speculative nature of P.O. 0801-01 does not, standing alone, prevent it from being an "order." Former Bridgelux executive Tim Lester testified that for line-item orders contained in P.O. 0801-01 intended to be delivered further in the future, Bridgelux had neither (1) orders from customers in hand nor (2) specific forecasts for how many Holders it might need. 8/21 Trial Transcript at 136–37. He then confirmed that Bridgelux, when it placed P.O. 0801-01, intended to "adjust these numbers over the course of time" after it knew what its customers would need. *Id.* at 137. Bridgelux's reasoning for ordering specific quantities at specific times, however, would not seem to dictate whether the underlying order was an "order" capable of being filled, or whether BJB Electric could seek specific performance of P.O. 0801-01.

to preclude "obtaining orders" for 15 million Holders (and thus trigger entitlement to liquidated damages) simply by rejecting Bridgelux's orders for *any* reason. The Letter Agreement is not reasonably susceptible to such an interpretation. Article 1 of the agreement contemplates BJB Electric would make Holders "available for sale to Bridgelux . . . at a mutually agreed upon time schedule." If BJB Electric could reject unobjectionable Bridgelux purchase orders under any circumstances, it would be violating its obligation to make those Holders available for sale under Article 1. Further, if the parties intended that the Letter Agreement would require that all 15 million Holders be delivered and paid for by the end of the Cost Sharing Period, they could have written that requirement into the contract. They did not do so.

Bridgelux's argument that it needed only to place an order for BJB Electric to have "obtained" it runs into comparable difficulties. Consider, for example, a scenario in which Bridgelux purported to place an order for 15 million Holders from BJB Electric to be delivered and paid for on a date 50 years in the future. It would be unreasonable to find BJB Electric had actually "obtained" an order under such circumstances. Bridgelux offers no limiting principle for when an "order" would cease to satisfy its obligations under the Letter Agreement regardless how far into the future it might request holders or otherwise nebulous it might be. Article 2 is phrased from BJB Electric's perspective ("if BJB fails to obtain orders") rather than from Bridgelux's. In California, courts "strive to interpret the parties' agreement to give effect to all of a contract's terms, and to avoid interpretations that render any portion superfluous, void or inexplicable." *Brandwein v. Butler*, 218 Cal. App. 4th 1485, 1507 (2013). If "obtain orders" merely required submission of those orders by Bridgelux, the Letter Agreement could easily have said so (for instance, "if Bridgelux does not submit orders for 15 million Holders").

"Obtain orders" is not, unfortunately, made unambiguous merely by rejecting the parties' more extreme interpretations of the phrase. The evidence presented by the parties at trial, however, is helpful in resolving the ambiguity that remains. P.O. 0801-01 requested delivery of Holders as far as six years into the future (proposing periodic shipments until July 2026). *See* Trial Ex. 18-2. BJB Electric argued the format of P.O. 0801-01, in combination with the delayed delivery

schedule it proposed, meant P.O. 0801-01 did not fulfill the condition that BJB Electric "obtain orders" for 15 million Holders within the Cost Sharing Period. Former Bridgelux executive Tim Lester explained that the "Cost Sharing Period" term referred to a "period of time" associated with ensuring BJB Electric would recoup its investment in the Holders. 8/21 Trial Transcript at 126. Similarly, former BJB Electric CEO Joe Laufer testified the Cost Sharing Period was "Bridgelux paying [BJB Electric] . . . for those start-up costs rather than paying [BJB Electric] up-front." *Id.* at 48.[5] The fact a four-year Cost Sharing Period exists at all tends to show an order is not "obtained" where an unaccepted (but submitted) purchase order merely references shipments to be delivered years into the future. If Bridgelux could satisfy the Minimum Requirement by submitting P.O. 0801-01, the parties could have drafted a contract without a Cost Sharing Period and requiring only that BJB Electric receive orders, in any form, for 15 million Holders by October 2020.[6]

Thus, it is necessary to interpret "obtain orders" within the temporal context of the four-year Cost Sharing Period. The Cost Sharing Period is not (and should not be read to be) a superfluous term in the Letter Agreement. *See Brandwein*, 218 Cal. App. 4th at 1507; *see also* Cal. Civ. Code § 1641 ("The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other."). The reading of "obtain orders" for which Bridgelux advocates would render the inclusion of a Cost Sharing Period term effectively superfluous. A better reading of the Letter Agreement is that the parties included a Minimum Requirement, in combination with the Cost Sharing Period, to protect BJB Electric from the type of future-looking order Bridgelux submitted right before the four-year deadline.[7]

---

[5] Lester's and Laufer's testimony are admissible "evidence of the circumstances under which the [Letter Agreement] was made." Cal. Civ. Proc. Code § 1856(g).

[6] Bridgelux applies this same logic when it explains (correctly) why the Letter Agreement should not be read as strictly requiring that delivery of Holders occur within the Cost Sharing Period. *See* Dkt. 124, at 6 ("Had the parties intended delivery of the Minimum Requirement during the Cost Sharing Period, they would have drafted Article 2 to expressly require that.").

[7] This analysis might look different had BJB Electric accepted, without issue, P.O. 0801-01 when it was submitted and within the Cost Sharing Period. It did not do so.

The parties' course of performance prior to Bridgelux's submission of P.O. 0801-01 sheds further light on how both parties behaved once an order had been "obtained." *See* Cal. Com. Code § 2202(a) (permitting course of performance evidence to explain or supplement, but not contradict, contract terms). As Bridgelux noted in its briefing on the parties' parol evidence dispute, Trial Exhibit 17—a compendium of purchase orders spanning the bulk of the Cost Sharing Period—demonstrates that anywhere between 5 days and 60 days would normally elapse between the order and delivery of Holders pursuant to previous purchase orders. Bridgelux points to no instances during the first few years of the Cost Sharing Period where it ordered Holders to be delivered years in the future. Instead, for the majority of the Cost Sharing Period, the parties dealt with an "obtained order" by filling it within weeks or months.[8] All told, BJB Electric did not "obtain orders" for 15 million Holders at the instant Bridgelux submitted P.O. 0801-01.

### iii. The end of Cost Sharing Period

The Cost Sharing Period ended without BJB Electric agreeing to P.O. 0801-01. Bridgelux argues it satisfied any obligations it had pursuant to Article 2 of the Letter Agreement at the moment it submitted P.O. 0801-01. *See* Dkt. 124, at 8. BJB Electric, however, was concerned with P.O. 0801-01 for several reasons, including its extended time horizon, backloaded orders, and novelty compared to previous purchase orders.

Bridgelux claims it cannot be held liable for breach of contract because it was BJB Electric that failed "to accept the orders submitted by Bridgelux and deliver the ordered Holders to Bridgelux." *Id.* at 7 (referring to P.O 0801-01). It cites the legal principle that where a party "prevents or makes impossible the performance or happening of a condition precedent, the condition is excused." *Lortz v. Connell*, 273 Cal. App. 2d 286, 290 (1969). A party to a contract

---

[8] The parties' course of performance is not dispositive of the issue of whether BJB Electric obtained orders for the remaining 13 million or so Holders when Bridgelux submitted P.O. 0801-01, or of whether an order for Holders to be delivered years in the future *could be* deemed "obtained." Nor is this course of performance evidence interpreted to impose on Bridgelux an "affirmative obligation" to submit orders to be delivered or paid for within a certain amount of time. *See* Dkt. 124, at 9. It is merely additional evidence regarding types of orders the parties, in the past, considered to be orders "obtained" by BJB Electric.

OPINION AND ORDER
CASE NO. 22-cv-01886-RS
9

1   has an obligation to act in good faith and "do everything that the contract presupposes that [it] will
2   do to accomplish its purpose." *Nystrom v. First Nat'l Bank of Fresno*, 81 Cal. App. 3d 759, 767
3   (1978). Bridgelux's "prevention doctrine" argument mirrors its claim that all it had to do was
4   submit an order—*any* order—to satisfy the Minimum Requirement.

5   The text of the Letter Agreement suggests Bridgelux's obligations were not so limited, or,
6   conversely, that BJB Electric would not necessarily violate its own duties by rejecting a purchase
7   order. Under Article 1, BJB Electric was to sell Holders to Bridgelux at a "mutually agreed upon
8   time schedule." Similarly, under Article 2, purchase orders became binding "upon BJB's written
9   confirmation to Bridgelux of said purchase order(s)." If P.O. 0801-01, when Bridgelux submitted
10  it, had proposed a shipment or payment schedule comparable to any prior, accepted purchase order
11  and BJB Electric had still rejected it, Bridgelux prevention doctrine argument would be stronger
12  because it would be able to argue BJB Electric had rejected the purchase order in bad faith.
13  P.O. 0801-01, though, purported to order millions of Holders according to a novel delivery
14  schedule that left BJB Electric with the same concerns it likely had when it negotiated a Cost
15  Sharing Period in the first place. The Letter Agreement imposed on BJB Electric a duty to make
16  Holders available for sale to Bridgelux at a "mutually agreed upon time schedule"—not to agree to
17  any time schedule proposed by Bridgelux regardless of reasonability.[9] BJB Electric did not
18  prevent or make impossible the condition that it "obtain orders" for 15 million Holders by the end
19  of the Cost Sharing Period by declining to accept P.O. 0801-01 immediately.

20  Thus, the end of the Cost Sharing Period came and went without BJB Electric obtaining
21  orders for 15 million Holders. Under these circumstances (absent other issues), the Letter Agreement
22  required Bridgelux to pay BJB Electric $0.08 per unit of the Shortfall Quantity.

---

[9] If any party violated its duty to act in good faith, the testimony presented at trial suggests it was Bridgelux. When BJB Electric received P.O. 0801-01, at least one of its executives was stunned. *See* 8/21 Trial Transcript at 60 (Joe Laufer's testimony that he had never seen a purchase order with such an extended time frame); *id.* at 63 ("Tim, it's me. Come on. I know what this is."). Bridgelux's own executive, Tim Lester, did not view P.O. 0801-01 as a firm commitment to particular delivery dates or product mixes. *Id.* at 137.

### iv. Purchase orders submitted after the Cost Sharing Period ended

The parties dispute whether BJB Electric eventually accepted a purchase order substantially similar in form to P.O. 0801-01, and, if it did, what the significance of such acceptance might have been. Bridgelux replaced P.O. 0801-01 with P.O. 0831, and, later, with P.O. 1104-01, which Bridgelux claims (1) BJB Electric accepted on January 19, 2021, and (2) was substantially similar to P.O. 0801-01. P.O. 1104-01 detailed potential deliveries of Holders that would last through the end of 2024. *See* Trial Exhibit 45-1.

Bridgelux presents several arguments as to why it is not obligated to pay liquidated damages to BJB Electric that relate to P.O. 1104-01. First, Bridgelux claims BJB Electric breached the Letter Agreement when it raised prices for Holders scheduled to be delivered pursuant to P.O. 1104-01 above the prices specified in the Letter Agreement, and that once BJB Electric breached, Bridgelux had no further contractual obligations. If Bridgelux already was obligated to pay BJB Electric $0.08 per unit for the Shortfall Quantity under the Letter Agreement, however, it is unclear why it would suddenly be absolved of this obligation because of a later price change for Holders.[10] Nor does Bridgelux provide any basis for quantifying any damages it might have suffered even assuming BJB Electric breached the Letter Agreement. At trial, Bridgelux abandoned its counterclaim except to the extent it might bear on the accuracy of BJB Electric's claimed damages. *See* 8/23 Trial Transcript at 367–68. The price increases at issue appear to have occurred years after the end of the Cost Sharing Period. *See* Trial Exhibit 79-21. Bridgelux has not provided a sufficient basis to discount any damages to which BJB Electric is entitled relating to the Minimum Requirement.

Second, Bridgelux, citing no authority, contends P.O. 1104-01 constituted a second agreement between the parties that, by setting forth its own penalty, "superseded the liquidated damages provision" in the Letter Agreement. Dkt. 127, at 2. P.O. 1104-01 makes no reference to

---

[10] Bridgelux does not explain, for instance, why the Letter Agreement would have continued to govern all dealings between the parties after the end of the Cost Sharing Period.

the $0.08 per unit payment for the Shortfall Quantity, and Bridgelux does not explain why the Letter Agreement and P.O. 1104-01's liquidated damages provision are inconsistent. *See Mountain Air Enters., LLC v. Sundowner Towers, LLC*, 3 Cal. 5th 744, 759–60 (2017) (inquiry into whether new contract displaces old contract involves determination of whether the two are inconsistent and/or capable of being simultaneously operative). Nothing about the Letter Agreement and this later purchase order suggests they are incompatible or that P.O. 1104-01's terms could not operate independently from the liquidated damages provision in the Letter Agreement.

### VII. Liquidated Damages

**A. Legal Standard**

A contractual liquidated damages provision in California is presumptively "valid unless the party seeking to invalidate the provision establishes that the provision was unreasonable under the circumstances existing at the time the contract was made." Cal. Civ. Code § 1671(b).[11] Liquidated damages provisions are favored, in part, because of their role in reducing litigation. *See Weber, Lipshie & Co. v. Christian*, 52 Cal. App. 4th 645, 654 (1997). Whether a liquidated damages provision is unreasonable depends on whether it bears a "reasonable relationship to the range of actual damages that the parties could have anticipated would flow from a breach." *Ridgley v. Topa Thrift & Loan Ass'n*, 17 Cal. 4th 970, 977 (1998). This inquiry involves determining whether the parties engaged in a "reasonable endeavor" at the time of contracting to "estimate a fair average compensation for any loss that may be sustained." *Garrett v. Coast & Southern Fed. Sav. & Loan Ass'n*, 9 Cal. 3d 731, 738–39 (1973). Where liquidated damages appear to be a contractual penalty rather than a reasonable compensation attempt, they are unenforceable. *See, e.g., Applied Elastomerics, Inc. v. Z-Man Fishing Prods., Inc.*, 521 F. Supp. 2d 1031, 1046 (N.D. Cal. 2007).

---

[11] There are exceptions to this liberal rule for certain types of contracts, such as contracts governing retail purchases and contracts for leases of real property. Cal. Civ. Code § 1671(c).

OPINION AND ORDER
CASE NO. 22-cv-01886-RS
12

**B. Discussion**

The parties disagree whether the liquidated damages provision in Article 2 is enforceable. This dispute is focused on (1) whether actual damages were easily calculable at the time of contracting and (2) the subsidiary-parent relationship between BJB Electric and BJB Germany and the fact BJB Germany is not a party to this case.

The $0.08 per unit liquidated damages provision was calculated by dividing BJB Germany's estimated $1.2 million in tooling costs by the 15-million-unit Minimum Requirement. Several witnesses testified at trial to the motivation underlying inclusion of this provision. Laufer explained BJB Electric wanted assurance it would recoup at least its parent company's investment in tooling machinery for manufacturing Holders within the four-year Cost Sharing Period. 9/21 Trial Transcript at 44–45. The Minimum Requirement, in combination with the Shortfall Quantity provision, provided assurance that in the event demand for Holders failed to meet the parties' expectations, Bridgelux would make up the difference to BJB Electric. Lester confirmed this understanding in his testimony at trial. *See id.* at 126 ("[The Cost Sharing Period] refers to a period of time from which the pricing would include the cost BJB needed to get their return investment that they were looking for from the investment they made to prepare the product for production"). For the reasons below, Bridgelux has not met its burden of establishing the liquidated damages provision was unreasonable under the circumstances that existed when the parties agreed to the Letter Agreement.

**1. Ease of calculating actual damages**

It is worth first establishing whether the liquidated damages to which the parties contracted would be enforceable absent the subsidiary-parent relationship between BJB Electric and BJB Germany. Liquidated damages must be reasonable to be enforceable, and all of the circumstances of contracting are relevant to determining reasonability. *See, e.g.*, *Gormley v. Gonzalez,* 84 Cal. App. 5th 72, 81 (2022). Relevant factors for courts to consider in determining whether liquidated damages are reasonable include "the relative equality of the bargaining power of the parties," whether the parties were both represented by counsel at contract formation, whether the parties

foresaw difficulty in calculating actual damages, "the difficulty of proving causation and foreseeability," and whether the contract was a form contract. Cal. Civ. Code § 1671 cmt. b (1977).

Bridgelux points to one factor—the ease of calculating actual damages—and argues that damages from any breach in this case were "clearly identifiable and quantifiable at the time of contracting" because any "investment in tools and equipment" was built into the pricing of the Holders. Dkt. 127, at 5. Bridgelux appears to acknowledge, however, that calculating actual damages implicates lost profits (further complicated by the subsidiary-parent relationship between BJB Electric and BJB Germany) and earned interest calculations, in addition to investment costs. *See id.* at 8 (accusing BJB Electric's lost-profits analysis as being "unreliable" and lacking evidentiary support). Bridgelux does not explain how BJB Electric's actual damages would be a matter of "simple math" given these complications, even if BJB Germany's initial investment in equipment was easily calculable. *See id.* Indeed, while Pruenster testified to BJB Germany's predicted efficiency gains in manufacturing Holders in his model of BJB Electric's actual damages, Bridgelux's damages expert criticized Pruenster's estimates of likely efficiency gains as "speculative and unreliable." Trial Transcript at 356–57 (Aug. 23, 2023) ("8/23 Trial Transcript"). This contradicts Bridgelux's argument that calculating lost profits would be straightforward.

The other factors identified in the Comments to § 1671, such as the significance of the fact both Bridgelux and BJB Electric were represented by counsel when negotiating the Letter Agreement, the parties' relatively equal bargaining power, and the fact that Bridgelux and BJB Electric negotiated the terms of the liquidated damages provision are also relevant. *See* Cal. Civ. Code § 1671 cmt. b. Each of these factors weighs in favor of finding the liquidated damages provision in the Letter Agreement reasonable and enforceable. Bridgelux, with the benefit of counsel and, presumably, its experience negotiating contracts in the lighting industry, negotiated the scope of a provision it now asks to be deemed unenforceable.

**2. The relationship between BJB Electric and BJB Germany**

BJB Germany (and not BJB Electric) was the entity that invested in tooling machinery to

manufacture Holders and liquidated damages were estimated according to this investment. Bridgelux argues the fact that liquidated damages were tied to BJB Germany's investment in tooling and machinery renders those damages unreasonable and, thus, unenforceable under California Civil Code § 1671(b) (at least to the extent BJB Electric, rather than BJB Germany, is seeking liquidated damages) because BJB Electric is not legally entitled to BJB Germany's damages. Dkt. 127, at 4–5. Whether BJB Electric could use BJB Germany's investment in manufacturing Holders as a reasonable marker for its own damages when the parties negotiated the Letter Agreement, however, is a separate question from whether BJB Electric is attempting to collect BJB Germany's damages. Bridgelux bears the burden of establishing the $0.08 per unit liquidated damages provision was an unreasonable estimate of BJB Electric's potential losses at the time the Letter Agreement was negotiated. *See* Cal. Civ. Code § 1671(b).

The first indication BJB Germany's manufacturing investment costs were a reasonable marker for BJB Electric's potential damages is that the liquidated damages clause is directly tied to how many Holders BJB Electric sold. The parties agreed liquidated damages would be inversely related to the Shortfall Quantity such that as BJB Electric sold more Holders during the Cost Sharing Period, the Shortfall Quantity (and, accordingly, the amount of liquidated damages potentially available to BJB Electric) decreased.[12] This structure makes sense, especially considering that BJB Electric expected to realize increased profit the more Holders it sold. Laufer testified the $0.08 fee had "no profit in it" and was less lucrative than selling the Holders. 8/21 Trial Transcript at 65. Similarly, Pruenster testified BJB Electric and BJB Germany would have made more money by selling the Holders. Trial Transcript at 236 (Aug. 22, 2021). BJB Electric appears to have drawn the reasonable conclusion that it wanted to protect at least $0.08 of the profit it might have expected to make per Holder. This evidence weighs against finding that

---

[12] This case is thus distinguishable from cases where the amounts of liquidated damages available after contract breaches remained constant regardless of the degree to which the parties performed under the contract. *See, e.g.*, *Dollar Tree Stores Inc. v. Toyama Partners LLC*, 875 F. Supp. 2d 1058, 1072 (N.D. Cal. 2012) (reasoning that incremental accrual of damages did not support finding liquidated damages provision unenforceable).

liquidated damages were "designed to exceed substantially the damages suffered" by BJB Electric by being tied to investment costs. *See Garrett*, 9 Cal. 3d at 740 (assessing liquidated damages in borrower-lender context).

At trial, the closest Bridgelux came to making the case BJB Electric did not stand to profit close to what it stood to gain by operation of the liquidated damages provision was during Leavitt's testimony about BJB Electric's profit margins. Leavitt took issue with Pruenster's efficiency adjustments related to the cost of manufacturing Holders and, thus, with Pruenster's lost profit calculations. *See* 8/23 Trial Transcript at 357 ("the labeled and stated year-over-year efficiency gains . . . there's no support that I'm aware of that's been provided for us to appreciate or expect that those would be realized in the future"). Depending on whether Leavitt applied Pruenster's predicted manufacturing efficiency gains, BJB Electric's predicted profits varied dramatically. The upshot of this is that BJB Electric's potential profits were dependent on efficiency gains that BJB Germany would or would not be able to realize (and potentially pass on to BJB Electric) as it manufactured more Holders. If anything, the variability of BJB Electric's potential profits under the Letter Agreement made it reasonable for the parties to agree on a method of determining liquidated damages tied to investment costs that *reduced* potential variability. There is no obvious reason BJB Electric would be barred from considering BJB Germany's investment costs in manufacturing the Holders in trying to predict a reasonable range for its own potential losses in the event of breach. *See, e.g.*, *East West Bank v. Altadena Lincoln Crossing, LLC*, 598 B.R. 633, 643 (C.D. Cal. 2019) (declining to restrict the range of damages that can be considered in assessing reasonableness strictly to out-of-pocket damages).

Finally, Bridgelux argues liquidated damages slightly in excess of $1 million are unreasonably high compared to the $117,000 BJB Electric would have been entitled to under a "time value of money" theory applied to deferred profits. Dkt. 124, ¶ 20. Bridgelux's theory of damages is predicated on Leavitt's assumption that all 15 million units subject to the Minimum Requirement "would be sold and the profit would be realized." 8/23 Trial Transcript at 374. It is far from clear this assumption is justified. At the time of contracting—the point at which the

reasonableness of liquidated damages is assessed—the parties were clearly concerned with protecting BJB Electric in the event that it failed to sell 15 million Holders in total. It was reasonable for the parties to factor in the risk BJB Electric would not obtain orders for 15 million Holders into their calculation of appropriate liquidated damages.[13] For all of the above reasons, Bridgelux did not meet its burden to show that the liquidated damages provision in the Letter Agreement was unreasonable given the circumstances at contracting.

## VIII. Prejudgment Interest

State law determines the appropriate rate of prejudgment interest for federal diversity actions. *Northrop Corp. v. Triad Int'l Mktg*, 842 F.2d 1154, 1155 (9th Cir. 1988). California Civil Code § 3287(a) makes prejudgment interest available where there are "damages certain, or capable of being made certain by calculation." The interest rate for a breach of contract action is 10% per year where the contract does not otherwise specify an applicable rate. Cal. Civ. Code § 3289(b). The Cost Sharing Period expired at the end of October 2020, and November 1, 2020, is an appropriate accrual date for determining the interest to which BJB Electric is entitled. BJB Electric is entitled to $1,022,368.16 in liquidated damages earning interest at a rate of 10% per year between November 1, 2020, and the date of judgment.

## IX. Conclusion

BJB Electric is entitled to a payment from Bridgelux of $0.08 per unit of the Shortfall Quantity of 12,779,602 units, which equals $1,022,368.16, as well as prejudgment interest in accordance with California Code of Civil Procedure §§ 3287(a) and 3289(b). The parties are directed to meet and confer and submit, within 30 days of entry of this Opinion and Order, a proposed final judgment including a calculation of interest flowing to BJB Electric.[14]

---

[13] By the end of the Cost Sharing Period, demand for Holders was dramatically lower than the parties had expected. The fact Bridgelux purported to order approximately 13 million Holders at the end of the Cost Sharing Period did not guarantee all those Holders would actually be delivered and paid for. The evidence at trial did not come remotely close to establishing Bridgelux would have taken delivery of and paid for the millions of Holders remaining under the Minimum Requirement.

[14] Since this calculation depends on the date judgment is entered, the parties are directed to

**IT IS SO ORDERED**.

Dated: December 15, 2023

_____
RICHARD SEEBORG
Chief United States District Judge

---

provide a means of updating the final interest calculation depending on the specific date judgment might be entered.